UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DYSON, INC.,  )
                Plaintiff,  )
                         )
v.  )   C.A. No. 06-654-GMS
                         )
MAYTAG CORPORATION,  )   **REDACTED**
HOOVER, INC. and  )   **VERSION**
HOOVER PARTNERSHIP L.P.  )
           Defendants.

**AFFIDAVIT OF JOSH GOLDBERG IN SUPPORT OF DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, JOSH GOLDBERG, being duly sworn, hereby depose and say:

1.    I am an attorney for Defendants Maytag Corporation, Hoover, Inc. and Hoover Partnership L.P., (collectively "Hoover"), in the above matter. I have personal knowledge of the facts set forth in this affidavit, which is filed in support of Hoover's Brief in Opposition to Dyson's Motion for Preliminary Injunction.

2.    Attached hereto as Exhibit A is a true and correct copy of referenced excerpts of the March 15, 2007 scheduling hearing transcript, pages 6-7 and 24

3.    Attached hereto as Exhibit B is a true and correct copy of Dyson advertising claiming that they never lose suction, ever, no matter how far or how long consumers vacuum, Bates labeled MAY00336, MAY140965, MAY149397, MAY140978, MAY140979, and MAY140999.

4.    Attached hereto as Exhibit C is a true and correct copy of Hoover advertising, photographs of packaging and in-store display instructions that the Fusion and Legacy do not lose suction for up to 10 ounces of dirt vacuumed, along with the disclaimer: "Suction stays constant for up to 10 ounces of dirt, as tested by an independent laboratory using the ASTM International F558 test method and dirt composition comprised of 70% mineral dust, 20%

cellulose dust and 10% fibrous material" Bates labeled DYS30331 and MAY101542-MAY101549.

5.    Attached hereto as Exhibit D is a true and correct copy of the current web page that formally displayed Hoover's Fusion advertising, but that has since been removed from Hoover's                              web                              site. (http://www.hoover.com/db/xq/asp.hvrProductMain/CatID.1/SubID.1/ProdID.267/ModID.1959/qx/FusionCyclonicBagless.htm).

6.    Attached hereto as Exhibit E is a true and correct copy of web pages for Big Lots and Odd Lots – secondary retailers that specialize in selling residual or overstock merchandise at a          discount.          (http://www.biglotscorporate.com/about/index.asp; http://www.rstrading.com/oddlots.html)

7.    Attached hereto as Exhibit F is a true and correct copy of *Dyson Tech. Ltd. v. Maytag Corp.*, No. 05-434 (GMS), slip. op. (D.Del. March 21, 2006).

8.    Attached hereto as Exhibit G is a true and correct copy of *Novozymes A/S v. Genecor Intern., Inc.*, No. Civ.A. 05-160-KAJ, 2005 WL 2716496 (D.Del., October 24, 2005)(J, Jordan).

9.    Attached hereto as Exhibit H is a true and correct copy of *eSpeed, Inc. v. Brokertec USA, LLC*, No. Civ.A. 03-612-KAJ, 2004 WL 62490 at * 1 (D.Del., January 14, 2004).

10.    Attached hereto as Exhibit I is a true and correct copy of referenced excerpts of the March 29, 2007 scheduling hearing transcript, pages 7-11.

11.

**REDACTED**

12.

**REDACTED**

13.     Attached hereto as Exhibit L is a true and correct copy of excerpts of IEC 60312, 4th ed., clause 2.9.

14.

**REDACTED**

15.     Attached hereto as Exhibit N is a true and correct copy of *GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharmaceutical Corp.*, No. 05-4566, 2006 WL 1792856 (3d Cir. June 29, 2006).

16.     Attached hereto as Exhibit O is a true and correct copy of *Millennium Import Co. v. Sidney Frank Importing Co., Inc.*, No. Civ. 03-5145 JRT/FLN, 2004 WL 1447915 at (D. Minn. June 11, 2004)

17.     Attached hereto as Exhibit P is a true and correct copy of excerpts of the April 6, 2006 decision by the National Advertising Division of the Better Business Bureau ("NAD")

18.     Attached hereto as Exhibit Q is a true and correct copy of the May 26, 2006 letter from Hoover to the NAD

Attached hereto as Exhibit R is a true and correct copy of excerpts of deposition exhibit 15 from the deposition of Dyson expert Joel Steckel, entitled "The Effects of Fine-Print Disclosure Type and Involvement on Brand Attitude Formation," Darrel D. Muehling and Russell N. Laczniak , *Journal of Marketing Communications*, Vol. 2, p 78 (1996).

FURTHER AFFIANT SAYETH NAUGHT

Dated: May 4, 2007

Josh Goldberg

3

County of Cook

State of Illinois

Sworn to and subscribed in my presence this 4th day of May, 2007

_Laura J. Smiley_
Notary Public

SEAL

"OFFICIAL SEAL"
LAURA J. SMILEY
NOTARY PUBLIC STATE OF ILLINOIS
My Commission Expires 10/06/2007

## CERTIFICATE OF SERVICE

I, Francis DiGiovanni, hereby certify that on May 4, 2007, I caused a copy of the

foregoing document to be served on the below-listed counsel of record in the manner so

indicated:

**BY HAND AND E-MAIL:**

John W. Shaw
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

**BY E-MAIL AND U.S. MAIL:**

Chad S. Hummel
Kathrin A. Wanner
Manatt Phelps & Phillips, LLP
11355 West Olympic Boulevard
Los Angeles, CA 90064

Christopher A. Cole
Manatt, Phelps & Phillips, LLP
700 12th Street, N.W.
Washington, DC 2005

Steven F. Reich
Jeffrey S. Edelstein
Manatt, Phelps & Phillips, LLP
7 Times Square
New York, NY 10004

/s/ Francis DiGiovanni
Francis DiGiovanni (#3189)

# EXHIBIT A

1

```
1                IN THE UNITES STATES DISTRICT COURT

2                IN AND FOR THE DISTRICT OF DELAWARE

3                         -  -  -

4     DYSON, INC.,                  :       Civil Action
                                    :
5              Plaintiff,           :
                                    :
6        v.                         :
                                    :
7     MAYTAG CORPORATION,           :
                                    :
8              Defendant.           :       No. 06-654-GMS

9                         -  -  -

10                    Wilmington, Delaware
                    Thursday, March 15, 2007
11                       9:30 a.m.
                        Conference

12                        -  -  -

13

14    BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

15    APPEARANCES:

16           JOHN W. SHAW, ESQ., and
             MONTE T. SQUIRE, ESQ.
17           Young Conaway Stargatt & Taylor, LLP
                        -and-
18           CHAD S. HUMMEL, ESQ., and
             KATHRIN WANNER, ESQ.
19           Manatt, Phelps & Phillips, LLP
             (Los Angeles, CA)
20
                            Counsel for Plaintiff
21
             FRANCIS DiGIOVANNI, ESQ.
22           Connolly Bove Lodge & Hutz LLP
                        -and-
23           ANTHONY DiSARRO, ESQ., and
             STEPHEN P. DURCHSLAG, ESQ.
24           Winston & Strawn
             (Chicago, IL)
25
                            Counsel for Defendant
```

6

1  forward. Frankly, there are still, I can tell you,

2  Amazon.com, Dealsurprise.com, Costsavingstoyou.com, with

3  that claim, this morning.

4          So we believe that an injunction is necessary to

5  cause them to cease that conduct.

6          MR. DISARRO: Those are retailer websites. I am

7  sorry.

8          MR. HUMMEL: Right.

9          MR. DISARRO: Hoover's own website does not make

10  any no-loss-of-suction claim. I don't think that an

11  injunction can be directed against third-party retailers as

12  to what claims they make on their websites.

13          In any event, the motion that is teed up is

14  actually, was filed when this case was in New York, filed

15  citing Second Circuit law, and it relies upon a presumption

16  of irreparable injury that does not apply to the Third

17  Circuit.

18          So the motion, we believe, is defective.

19          THE COURT: The standards have changed, you are

20  saying, now that you are in the Third Circuit.

21          MR. DISARRO: I am not quite sure, actually,

22  because according to the Third Circuit in the Novartis case,

23  that is 290 F.3d 578, they don't believe that the Second

24  circuit presumes irreparable injury. But Dyson has taken

25  the position, citing Second Circuit case law in their

7

1  injunction brief, that where the plaintiff and the

2  defendants are competitors, the plaintiff need only show a

3  logical causal connection between the false ad and the

4  sales, and that suffices for irreparable injury.

5          And in the Novartis case, the Third Circuit

6  flatly rejected that and said, no, that is a requirement for

7  standing to assert a Lanham Act claim in the first place.

8  But the traditional requirements of proof of an injury that

9  cannot be redressed following trial is required. And in

10  Novartis, that was evidence of a loss of market share.

11          There has been no proof nor do we think there

12  can be any showing of Dyson's loss of market share.

13          THE COURT: I guess before we get into the

14  specifics — I am not prepared for a discussion as to the

15  differences in the circuits. Circuit courts go off on their

16  own, we know that, until they are corralled by the Supreme

17  Court.

18          I guess my consideration is parochial to some

19  degree, at least in terms of my limited resources and how

20  they can best be applied to your issues, and whether the

21  parties on the one hand can assist the Court, on the other

22  by further conferring, if there is the possibility of a

23  stipulated injunction. I don't know. Maybe that is out of

24  the question. Those words were uttered by your opponent.

25          Is that something that would be considered by

8

1  Maytag?

2          MR. DURCHSLAG: If I might, Your Honor.

3          From our position, we do not feel that there is

4  any false statement in our claims as made. That is our

5  strong contention. And we are prepared, obviously, to

6  present that evidence before the Court.

7          In this particular situation, what we think, a

8  case that was filed under Second Circuit law in September,

9  asking for a preliminary injunction now, when we have ceased

10  making that claim, and we have represented to the other side

11  making the claim, seems to me a bad use of judicial time, to

12  argue these issues on a preliminary basis, when in the

13  ultimate issues in the case we are not making it.

14          But as far as an injunction would go as to us

15  making any such claim which would potentially indicate our

16  claim is indefensible, which is not our case, we feel the

17  claim is very defensible, and that their cause of action

18  would fail.

19          So that we are more than willing to say to Your

20  Honor that this is not the right time for us to be arguing a

21  preliminary injunction filed over eight months ago under a

22  different standard with a stipulated order, we are more than

23  willing to represent to the plaintiff in this case that the

24  matters in this case are moot, that we are not making it on

25  the Internet, and that we are not shipping it after April.

9

1          As far as an injunction goes, Your Honor, we

2  think that is highly uncalled for, and we would fight them

3  on that.

4          THE COURT: I understand that. What is offered

5  is a commercial resolution, a business resolution, which you

6  indicate, counsel, was offered before, and not followed

7  exactly as offered. I am not being articulate. But it

8  didn't come to pass.

9          MR. HUMMEL: Your Honor, if I may make a couple

10  observations and not take too much time.

11          Number one, the injunction as filed is not moot.

12  The claims are still being made. The product is still being

13  shipped. That is number one. I think that was Your Honor's

14  initial concern.

15          As to the passage of time, let me make a

16  comment. What has happened to Dyson here is, tactfully,

17  unfortunate.

18          We filed the case in New York in August. The

19  motion to transfer was granted on October 11th. In the

20  transfer motion, Hoover made the following statement: that

21  defendant respectfully requests that this Court grant its

22  motion and enter an order transferring the present case to

23  this district for consolidation —

24          THE COURT: With the patent case.

25          MR. HUMMEL: Right. That didn't happen.

22

1  expert discovery, Dyson disclosed it had 11 expert
2  witnesses, it is just unconceivable that this case can be
3  ready for trial on December 3, '07, particularly since our
4  client has indicated it wants to be represented by the same
5  lawyers who are defending it in Dyson I because we know the
6  issues and that is what it's comfortable with.
7        So we don't believe that is an appropriate trial
8  date, Your Honor.
9        THE COURT: What would you see as a more
10 accommodating date, that might accommodate your interests as
11 well as the plaintiff's interests?
12       MR. DiSARRO: I would think April or May of '08,
13 which would be approximately a year after the completion of
14 Dyson I, and that would provide for a discovery cutoff
15 sometime around October or November of this year. And even
16 if there were additional extensions, we could accommodate
17 that.
18       The parties had close to 18 expert witnesses in
19 Dyson I, including patent and false advertising. Patents,
20 only four of them. So the advertising themselves had nine
21 and six, 15 expert witnesses. And that is just -- I expect
22 no different in this case.
23       These are competitors who fight hard in these
24 cases and spare no expense.
25       We have deposed nonparty witnesses at testing

23

1  facilities, standards institutes. We have been to the U.K.
2  three or four times to take fact depositions.
3        I would expect that we will have a rigorous and
4  extensive discovery schedule, both fact and expert, in this
5  case as well.
6        MR. HUMMEL: Your Honor, could I respond
7  briefly?
8        THE COURT: Sure.
9        MR. HUMMEL: In the transfer papers filed in New
10 York, this is what our opponents told the Court in New York.
11 Quote, "Dyson and Maytag have agreed and this Court has
12 ordered that all discovery in the Delaware case will be
13 admissible with respect to the claims asserted here."
14       That is now in this case before this Court.
15       "Thus, the parties will be able to litigate
16 Dyson's motion for a temporary injunction in Delaware
17 promptly upon a transfer to that Court."
18       That is what they told the New York Court. That
19 is from their reply brief at Page 9, Footnote 1.
20       We have been sidetracked.
21       THE COURT: Same law firm?
22       MR. HUMMEL: Same law firm, Winston & Strawn.
23       Now we are hearing -- I would like to remove the
24 fiction from this room. They wanted to transfer this case
25 and kill it. I am here to say, that shouldn't happen. We

24

1  have harms that need to be redressed as well. I am
2  prepared -- what has happened has been six months of
3  stalling. That should stop. And we should proceed.
4        Your Honor, competent, large, international law
5  firms could handle a trial in December 2007. Manatt can do
6  it. Winston & Strawn, I submit, can as well.
7        There is no need to delay this case further.
8        THE COURT: Counsel, you are going to need to
9  work up a schedule that is going to get this case ready for
10 trial December 3rd. I am prepared to permit you to remain
11 in this courtroom and to talk about how that is going to happen.  Then I will come
12 out where you have reached loggerheads and we will discuss
13 what needs to be done to ameliorate those conditions.
14       I just looked at my calendar. I cannot
15 accommodate April, nor may, nor February. I can take you
16 December the 3rd. Okay.
17       MR. HUMMEL: Thank you, Your Honor.
18       (Recess taken.)
19       THE COURT: Counsel, what have we come up with?
20       MR. DiSARRO: Your Honor, we have agreed on a
21 schedule accommodating your December 3rd trial date as
22 follows.
23       There is one disagreement.
24       Depositions beginning on June 30th, that is the

25

1  area of potential disagreement. Let's asterisk that.
2        Fact discovery cutoff, August 31st.
3        Opening expert reports, September 15th.
4        Answering expert reports, September 30.
5        Expert deposition cutoff, October 31st.
6        Deadline for filing letters requesting
7  permission to file dispositive motions, September 30.
8        THE COURT: Let's talk about that for just a
9  second, because I am wondering, do counsel feel in earnest,
10 as best you can predict at this point, that there are going
11 to be meritorious, that you are going to have the ability to
12 file truly meritorious case or major issue-dispositive
13 motions? I mean motions that are really going to narrow the
14 field of dispute and/or get rid of the case. Because if
15 not, I am not going to entertain them at all.
16       If it is really going to assist all of us in
17 doing our jobs, I am prepared to dispense with the
18 letter-writing and just set a cutoff for dispositive motions
19 to be filed.
20       MR. DiSARRO: Your Honor, I perceive dispositive
21 motions, potentially meritorious from the defense side, for
22 sure. One would be, particularly to the extent we are
23 seeking injunctive relief, final injunctive relief at trial,
24 certainly, you know, mootness or the fact that the claims
25 are no longer being made. And I foresee summary judgment

# EXHIBIT B

CONFIDENTIAL



**Advertiser: Dyson**
**Product: Dyson**
**Title: Don't Shake It**
**Ad Code: DYSOMS-0022**



**First Date: 09/13/04**
**Source: TBS**
**Length: 30**
**New/Recut: New**



(Fade In)



MAN: When your vacuum cleaner loses suction...



your first instinct is to shake or hit it to unblock the clog.



The problem, however, is more serious.



Bags, filters...



they all clog with dust and then lose suction.



But a Dyson works differently.



It creates 100,000 times the force of gravity...



to spin the dirt out of the air...



so nothing gets clogged, ever.



I just think things should work properly.



(Fade Out)

MAY000336

- Tapes and MPEGs can be ordered by contacting us at 718.482.4211 -

This material may be used for internal review, analysis or research only. No part of this document may be reproduced, published, or publicly displayed in any form.

MAY000336

 

| | |
|---|---|
| **PRODUCT** Dyson Vacuum | **LENGTH** 30 |
| **MARKET** National | **STATION** ENT |
| **PROGRAM** The E! True Hollywood Sto | **DATE** 09/18/2006 |
| **CODE #** 060905780 | **TIME** 01:21 PM |
| **TITLE** Dust Covers Camera Lens | |



(SFX: SUCTION IN)



(SFX)



(SFX)



(SFX)

MALE ANNCR: Other vacuum cleaners
use bags and filters, which clog with
dust so they lose suction.



(SFX: SUCTION OUT)
Dyson is different because it



doesn't rely on bags or filters.

so it never clogs and never

loses suction.

**MAY140965**

VIDEO ALSO AVAILABLE IN ANALOG & DIGITAL FORMATS

Material supplied by VMS may be used for internal review, analysis or research only. Any editing, reproduction, publication, re-broadcasting, public showing or display for profit is forbidden and may violate copyright law.

330 West 42nd Street, New York, NY 10036  T  212 736 2010

You wouldn't buy a car that loses power the first time you drive it.

So why buy a vacuum that clogs the first time you use it?

Other vacuums begin to clog and lose suction as you use them. A Dyson never does.

No clogging. No loss of suction.    dyson

dyson.com

MAY149397

MAY149397



MAY140978

MAY140978

MAY140979

MAY140979



Because        a Dyson            doesn't clog

like                other vacuums,

its suction power        remains constant,

room        after            room,

after        room.

**dyson**

For retailers nearest you,
visit dyson.com

# EXHIBIT C



# FUSION™
## Cyclonic Bagless Upright Vacuum

**The Hoover® Fusion™ Cyclonic Bagless Upright Vacuum Outcleans Dyson by 13%***

**No Loss of Suction****

Cyclonic technology offers powerful cleaning with no loss of suction.**

### Product Features:

**ⓐ No Filters to Replace –**
Permanent washable filters last the life of your vacuum.

**ⓑ Pet Hair Cleaning Tool**
Powerful suction plus a rotating brush easily removes pet hair and dirt from stairs, upholstery and more.

**ⓒ E-Z Empty™ Dirt Cup**
No bags. No mess! Simply remove the cup, hold it over the trash and push the button to dump contents from the bottom.

**ⓓ Adjustable Handle Height**
Telescoping handle adjusts to varying heights for convenient use and storage.

**ⓔ Fingertip On/Off Control**
Turn it off or on with a flip of your finger. No awkward switches or foot pedals to locate or maneuver.

**ⓕ On-Board Cleaning Tools**
Everything you need to reach every corner of the house — including a pet hair tool, two 14" extension wands, crevice tool and dusting brush for delicate surfaces.

**ⓖ Extension wands**
Two extension wands provide more than ten feet of reach with the stretch hose for cleaning ceiling corners and around high windows.

**ⓗ E-Z Access™ Belt Change**
No tools required.

**ⓘ 32' Cleaning Reach**
With a 24' power cord and 8' stretch hose, you can vacuum several rooms without having to reposition the power plug.

**ⓙ 15" Widepath™ Nozzle**
One of the widest cleaning paths available, so you'll finish the job fast.

ⓐ No Filters to Replace   ⓑ Pet Hair Cleaning Tool   ⓒ E-Z Empty™ Dirt Cup   ⓔ Fingertip On/Off Control

\* Outcleans Dyson models DC07, DC14 and DC15 (The Ball™); proven in tests per ASTM International F608, the only recognized industry standard representing real-life conditions in American homes.

\*\* Suction stays constant for up to 10 ounces of dirt, as tested by an independent laboratory using ASTM F558 test method and a dirt composition comprised of 70% mineral dust, 20% cellulose dust and 10% Fibrous material.

DYS 303331

DYS303331







Revised May 25, 2005

**CrystalVision**
Communications

## Hoover Training Video
"Fusion™ Wal-Mart Training"

**[Open with Wal-Mart & Hoover logos and display shot of the Hoover Fusion™ Upright]**

ANNC: Wal-Mart and Hoover have teamed up to make Cyclonic filtration *affordable*...with the all new Fusion™ Cyclonic Bagless upright.  It's well equipped...affordably priced...and available *exclusively* at Wal-Mart!   Take a look at the features available on this dynamic new cyclonic upright from Hoover.

**[Show Cyclonic Innovation – No Loss of Suciton]**

ANNC:  Clearly the top feature on the Hoover Fusion™ upright is the cyclonic filtration system.  Cyclonic technology offers powerful cleaning with *no loss of suction* *  Super powerful cyclonic air movement spins dirt and dust away and helps remove allergens like ragweed and common grass pollens from your home.

*    Superimpose the following qualifier when making the "No loss of Suction" claim –

*Suction stays constant for up to 10 ounces of dirt, as tested by an independent laboratory using ASTM F558 test method and a dirt composition of 70% mineral dust, 20% cellulose dust and 10% fibrous material.*

**[Show EZ™ Empty Dirt Cup]**

ANNC:  The EZ™ Empty Dirt Cup is simple to remove...and empty, by simply releasing the bottom and dumping the contents into the trash.

MAY101542
Highly Confidential

MAY101542

-2-

**[Show Filters]**

ANNC:  Permanent washable filters can also be easily removed, washed, and replaced.  No filters to buy or replace for the life of the cleaner!

**[Show Telescoping Handle & ON/OFF switch]**

ANNC:  The unique telescoping handle adjusts *up* for comfortable operation… and *down* for compact, convenient storage.  There's also a fingertip ON/OFF switch located conveniently on the comfort handle.

**[Show On-Board Tools and Pet Hair Cleaning Tool]**

ANNC:  The Hoover Fusion™ upright comes equipped with a full set of on-board tool attachments, extension wands, and stretch hose.  Just put the cleaner into the upright position, remove the hose end, and attached the desired tool.  A special *Pet Hair Cleaning Tool* uses powerful suction and a rotating brush to effectively clean pet hair, dirt and lint from upholstery, as well as carpeted stairs.  Additional attachments make it easy to tackle a wide range of above floor cleaning jobs around the house, and get into those tight hard-to-clean areas.

**[Show 32' Cleaning Reach]**

ANNC:  Other great features on the Hoover™ Fusion™ upright include a 24-foot power cord with a quick cord release.  Combined with the 8-foot hose and wand combination, you get up to a 32-foot cleaning reach from a single power outlet.

**[Show 15-inch Nozzle]**

ANNC;  A wide 15-inch nozzle saves time and effort, and helps get the job done fast.

MAY101543
Highly Confidential

MAY101543

-3-

**[Show Three-position Handle]**

ANNC:  There's a three-position handle that can be put in the upright position for tool use, trundling and storage...the second position for regular vacuuming and moving easily from one floor surface to another...and a low level position that goes all the way to the floor for vacuuming under coffee tables and chairs.

**[Show Carry Handle]**

ANNC:  The built-in carry handle makes it easy to lift and carry.

**[Show Carpet Height Adjustment]**

ANNC:  A carpet height adjustment lets you set the cleaner for any type of carpeted or hard surface floor.

**[Show EZ™ Access belt change]**

ANNC:  You can also unlatch and remove the nozzle cover for easy access to the belt.

**[Show Display Shot and General Cleaning]**

ANNC:  Clearly Wal-Mart and Hoover™ have made cylonic filtration, along with other great features, both *affordable and effective*...with the exciting Fusion™ Cyclonic Bagless upright...available only at Wal-Mart!

[OPTIONAL END FOR POS/TRAINING]

MAY101544
Highly Confidential

MAY101544

-4-

[Hoover™Fusion™ Wal-Mart Demonstration]

**[Show Sample Display of Demo unit and cartons]**
Let's review the complete steps for demonstrating the Hoover Fusion™ upright on the retail sales floor.

**[Show layout of demo materials]**
ANNC:  In order to properly demonstrate the Hoover Fusion™ Cyclonic Bagless upright at Wal-Mart stores you will need the following items:

**[Show demo materials]**
A completely assembled, clean, and fully operational Hoover™ Fusion™ upright.

A red, 26-inch X 47-inch "First Quality Broadloom Carpet, model number 901, purchased from the Wal-Mart home furnishings department.

A 7-pound container of Tidy Cats, Scoop Multiple Cats kitty litter, purchased from the pet section of Wal-Mart.

An 11 quart Main Stays Bucket, model number 8011, also available at Wal-Mart.

And a packet of Johnson Pure Cotton 100% Cotton Balls, UPC# 038137008263, purchased from the health and beauty section of Wal-Mart.

MAY101545
Highly Confidential

-5-

**[Show set-up procedures checklist]**

First, set up in an area with additional cartons nearby, and room for people to stand a watch.  Lay out the rug... and plug the power cord in to a nearby outlet.

Now go through the following checklist.  First, adjust the telescoping handle up and down.   Also make sure that the dirt cup is properly seated.

Turn the power ON and tilt the unit back to see if the agitator is spinning.

Remove the hose end and be sure that you're getting good suction through the hose, and attach the Pet Hair Cleaning Tool and make sure that the brush roll is spinning.  Then replace the Pet Hair Cleaning Tool and hose end, and go ahead and vacuum the rug.  Since the rug is new, you may vacuum up some fuzz and lint from the fibers.  You can remove the lint from the dirt cup after you've vacuumed the rug.

Next, empty the entire container of Tidy Cats kitty litter into the bucket, and set it on the edge of the demo rug along with the packet of cotton balls.

To test the hose suction with the kitty litter, turn the power ON...remove the hose end...and vacuum a small amount of kitty litter from the bucket.  It should swirl around in the cyclonic dirt cup.  Empty the kitty litter back into the bucket... replace the cup...check that everything is in place, and you're ready to start demonstrating.

MAY101546
Highly Confidential

-6-

**[Demonstration]**

When someone comes by, say hello, and ask them if they've ever seen the new Hoover ™Fusion™ Cyclonic Bagless upright vacuum cleaner available only at Wal-Mart stores.  Tell them that  Wal-Mart and Hoover have made *cyclonic filtration affordable*, and explain that cyclonic technology provides powerful cyclonic air movement that spins the dirt and dust for powerful cleaning, with *no loss of suction!* *

\* Superimpose the following qualifier when making the "No loss of Suction" claim –

*Suction stays constant for up to 10 ounces of dirt, as tested by an independent laboratory using ASTM F558 test method and a dirt composition of 70% mineral dust, 20% cellulose dust and 10% fibrous material.*

Turn the power ON… remove the hose end…and ask the customer to feel the suction at the end of the hose.

Insert the hose end into the bucket and pick-up a small amount of kitty litter. Point to the cyclonic action of the debris as it spins in the E-Z Empty™ Dirt Cup.



Now tell them to watch as you put the hose end into the bucket of kitty litter, and vacuum up enough litter to fill the dirt cup to the top of the graphics on the cup.

Ask them to feel the suction at the end of the hose again.  Even when the dirt cup is full…there is no clogging and no loss of suction!

MAY101547
Highly Confidential

-7-

Next, spread some of the cotton ball onto the rug (making sure to leave only a light covering of the cotton) and attach the Pet Hair Cleaning Tool. Show how easily it picks up the lint and explain that it does a great job on both upholstery and carpeted stairs.

Now unplug the unit, remove the dirt cup and show how easy it is to and empty the contents into the bucket.

Before you replace the dirt cup, remove the filters and explain that they are permanent filters that never need replaced. Both filters are easy to remove, clean, and replace. Be sure to replace both filters and the dirt cup.

Now, show how the innovative telescoping handle can be adjusted to a comfortable operating length.

Finally, ask the customer to try vacuuming with the Hoover® Fusion™. Plug the unit back in and ask the customer to try vacuuming with the Hoover® Fusion™ upright. Letting people touch and operate the cleaner is an important part of demonstrating. This also gets the rug clean and ready for your next demonstration.

MAY101548
Highly Confidential

MAY101548

-8-

Don't allow your demo area or equipment to become cluttered or messy. Make sure the vacuum cleaner, Pet Hair Cleaning Tool and rug are clean, and that everything is well organized and ready for the next demonstration. Remove any cotton or hair that may be wrapped around the roller brush of the vacuum and/or Pet Hair Cleaning Tool.

**[Show Display Shot of Hoover™ Fusion™]**

The Hoover™ Fusion™ Cyclonic Bagless upright is truly a great value, and makes cyclonic filtration very affordable. That's something consumers will really appreciate, and will enjoy seeing you demonstrate on the sales floor. In fact, chances are you will sell ever unit the store has in stock. If this occurs, don't stop demonstrating. After your demonstration, remind the customer that there's no reason to wait for more stock to arrive at the store since the Hoover® Fusion™ is also available for purchase at www.walmart.com. Have fun demonstrating for Wal-Mart, and remember...with the cyclonic technology, there is "no loss of suction!"[*]

[*] Superimpose the following qualifier when making the "No loss of Suction" claim –

*Suction stays constant for up to 10 ounces of dirt, as tested by an independent laboratory using ASTM F558 test method and a dirt composition of 70% mineral dust, 20% cellulose dust and 10% fibrous material.*

**[FD TO BLK]**

MAY101549
Highly Confidential

MAY101549

# EXHIBIT D



 

▷ **Home** ▷ **Products** ▷ **Customer Service** ▷ **Innovations** ▷ **About Us** ▷ **Shop**

| UPRIGHTS | DEEP CLEANERS | HARD FLOOR CLEANERS | CANISTERS | SPECIALTY | CENTRAL VAC | COMMERCIAL | CLEANING SOLUTIONS |

### Uprights:

---
» Elite™ Rewind™ Upright
  Bagless

---
» Fold Away™ Widepath™
       U5172900
       U5175900

---
» Hoover EmPower™
       U5262910
       U5265900
       U5269900

---
» Hoover Z™ Bagless Upright
       U9125900
       U9145900

---
» Mach™ 3 Cyclonic Bagless
  Upright

---
» Mach™ 5 Cyclonic Bagless
  Upright

---
» Savvy™
       U8174900
       U8181900

---
» Self Propelled WindTunnel™
  Bagless
       U6630900
       U6634900

---
» WindTunnel™ 2 Complete
  Bagless

---
» WindTunnel™ 2 Extra
  Reach™ Bagless

---
» WindTunnel™ 2 Surface
  Command™ Bagless

---
» WindTunnel™ Bagless
  Upright
       U5753900
       U5760900

---
◁ PREV.     NEXT ▷

**Please select from one of these products.**

COMPARE

PARTS

FAQ

DID YOU KNOW?

· Copyright Notice  » Contact Us          » Product Safety Recall  » Site Index  » Search  » Service / Parts Locator          » Privacy Policy  » Terms of Service

© 1998-2007 The HOOVER Company. All rights reserved.

Good Housekeeping
Promises
GOOD HOUSEKEEPING

# EXHIBIT E

# BIG LOTS

**Brand Names. Closeout Prices.**

‣ Big Lots.com ⁚

- Home
- About our Company
- News Center
- Real Estate
- Investor Relations
- Community Relations
- Careers
- FAQ
- Contact Us
- Site Map
- Big Lots Wholesale
- Big Lots Gear



# ABOUT OUR C(


Performance

## Helping People Connect with Their Inner Bargain Hunter

Maybe it's the one-of-a-kind shopping experience. Or the unique and ever-changing mix of brand-name merchandise. Or perhaps it's just the thrill of the treasure hunt.

But one thing's for sure - once you get a taste of closeout shopping, you'll never look at traditional retail the same way again.

From everyday consumables and housewares to toys and seasonal goods, Big Lots offers amazing values that other stores just can't match. As the nation's largest broadline closeout retailer, we have the buying power to find and negotiate the best deals in the business.

The result? Unbeatable bargains, with something new to discover every time. Plus stores that are genuinely fun to shop. It's a combination strong enough to break old shopping habits - turning more and more consumers into Big Lots closeout shoppers.

**Big Lots Corporate Offices:**
300 Phillipi Road
Columbus, Ohio 43228-5311
Phone: (614) 278-6800

..............................................................................................................

- ⯈ Distribution (
- ⯈ Grand Open
- ⯈ Big Lots! Wh
- ⯈ Vendor Partr
- ⯈ Vendor Rout

### Careers



A good place to sh(
work.

⯈ Star|



### E-mail Alert Selection

To automatically receive Big Lots, Inc. e-mail alerts, click on the Subscribe button.

Subscribe

View Our Products

Thu, May 03, 2007

**Home**
**Closeout Products**
**Hot Deals**
**Closeout Pallets**
Exports
Logistics
F.A.Q
About us
Contact Info
Email Us
Resources

JOIN OUR MAILING LIST [Enter E-mail] [Go]    REQUEST OUR PRODUCT LIST [Go]

☒ Home ☒ Products ☒ Oddlots

We offer oddlots on a variety of consumer goods. We have oddlots and excess inventory from virtually all major department stores in America closeouts, liquidations, overstock and clearance merchandise. Call today for availability and pricing on the oddlots and pallets of your choice.

**Wholesale Shoe Source**
Over 200,000 Pairs of workboots, sneakers, sandals - Min. order $200

**Wholesale**
Direct To The Public No Minimum Purchase Required

Ads by Google



Athletic & Casual Footwear Oddlots



Babyloads Oddlots



Children's Apparel Oddlots



Cosmetics Oddlots



Diapers & Paper Loads Oddlots



Domestics Oddlots



Electronics Oddlots



Auto Parts & Accessories Oddlots

Blinds & Window Oddlots

Comforters & Domestics Oddlots

Costume Jewelry Oddlots

Dollar Store Merchandise Oddlots

Drug store Merchandise Oddlots

Fashion Accessories Oddlots

 General Mixed Oddlots

 Handbags & Accessories Oddlots

 Home Improvement Oddlots

Knock Down Furniture Oddlots

 Men's Apparel Oddlots

 Office Furniture Oddlots

 Paint Load Oddlots

Softgoods Oddlots

Sports, & Infant Furniture Oddlots

Toys Oddlots

Vacuums & Microwaves Oddlots

Gifts & Tabletops Oddlots

Hardgoods & Hardware Oddlots

 Housewares Oddlots

Lingerie Oddlots

  Mixed Apparel Oddlots

Office Supplies Oddlots

Shoes Oddlots

 Sporting Goods Oddlots

Tools Oddlots

Used Clothing Oddlots

  Women's Apparel Oddlots

**Volleyball Shoes**
Huge collection of shoes at great prices,
free shipping & returns!

**Warehouse Liquidations**
Buy warehouse liquidation equipment direct
from American Surplus, Inc.

Ads by Google

© Copyright 2005 RS Trading Company. All rights reserved.

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DYSON TECHNOLOGY LIMITED and DYSON, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-434 (GMS) |
| | ) | |
| | ) | |
| MAYTAG CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

I.    **INTRODUCTION**

On June 27, 2005, Dyson Technology Limited and Dyson, Inc. (collectively, "Dyson") filed

suit alleging that the defendant, Maytag Corporation ("Maytag"), infringes United States Patent Nos.

4,643,748 (the "'748 patent"), 4,826,515 (the "'515 patent"), 4,853,008 (the "'008 patent"), and

5,848,038 (the "'038 patent") (collectively, the "patents-in-suit"). The patents-in-suit are directed

to improvements in cyclonic vacuum cleaner technology. Dyson specifically alleges that Maytag's

"Hoover Fusion" cyclonic vacuum cleaner infringes at least one claim of each of the patents-in-suit.

Presently before the court is Dyson's motion for a preliminary injunction to prevent Maytag from

engaging in any further infringing activity during the pendency of the case. For the following

reasons, the court will deny Dyson's motion.

II.    **DISCUSSION**

A preliminary injunction is "a drastic and extraordinary remedy that is not to be routinely

granted." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568. A movant is entitled to a

preliminary injunction where it can demonstrate that: (1) it has a reasonable likelihood of success

on the merits; (2) it will suffer irreparable harm if the injunction is not granted; (3) the balance of hardships is in its favor; and (4) the injunction is in the public interest. *See Reebok Intern. Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed. Cir. 1994). No one of these four factors alone is dispositive, and the court should "weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988). Nevertheless, the court cannot issue a preliminary injunction unless the movant establishes both of the first two factors. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (citations omitted).

Success on the merits is established where the movant demonstrates that the patent is infringed and any challenges to the validity and enforceability of the patent "lack substantial merit." *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1366 (Fed. Cir. 2001); *see Reebok,* 32 F.3d at 1555. "Irreparable harm is presumed when a clear showing of patent validity and infringement has been made." *Amazon.com,* 239 F.3d at 1350 (citing *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 708 (Fed. Cir. 1997)). If the presumption of irreparable harm does not attach, the court must "consider, weigh, and balance all of the equitable circumstances," and determine whether monetary damages can sufficiently compensate the patent holder for infringement occurring during the course of the litigation. *Ill. Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990).

Dyson alleges that Maytag's Fusion product infringes claim 14 of the '515 patent, claims 15-17 of the '748 patent, claims 1-3, 7, 11, and 23-25 of the '008 patent, and claims 1-3, 7, 13, and 14 of the '038 patent. Conversely, Maytag argues that Dyson cannot present a strong or clear case for infringement because certain limitations of each of the asserted claims are absent from its Fusion

2

vacuum cleaner. Both Dyson and Maytag have submitted expert affidavits on infringement, which are, not surprisingly, diametrically opposed. After having considered the expert declarations submitted by the parties, the parties' briefs, and the applicable law, the court is not persuaded that, Dyson has made a strong or clear showing of infringement, *i.e.* likelihood of success on the merits.[1,2] This is especially true in light of the fact that the litigation is in its early stages and the court is without the benefit of full blown *Markman* briefing. Dyson, therefore, is not entitled to the presumption of irreparable harm.[3]

Having determined that Dyson is not entitled to the presumption of irreparable harm, the court will examine other factors that might lead to a finding of irreparable harm. Dyson asserts three primary arguments in support of its position on irreparable harm. First, Dyson argues that if an injunction is not issued, Maytag will impede its growth in the United States "mass market" by misleading consumers into believing that the Fusion delivers Dyson technology at a lower price. Dyson also argues that Maytag's activities infringe upon its right to exclude. Lastly, Dyson contends that the limited amount of time remaining on two of the four patents-in-suit strongly supports the

---

[1] The court's conclusion with respect to infringement is limited to this motion.

[2] Because the court has determined that Dyson has not made a strong or clear showing of infringement and, therefore, has not demonstrated a reasonable likelihood of success on the merits, it need not address the parties' arguments with respect to validity of the '038 patent. The court will also not address the parties' contentions because Dyson has withdrawn its allegations of infringement with respect to those claims of the '038 patent of which Maytag has challenged the validity.

[3] The court's finding regarding this presumption is limited to the preliminary injunction context and is further limited to the facts known at this time. The court expresses no opinion as to whether such a presumption might be warranted at a later stage in this litigation.

issuance of a preliminary injunction.[4]  The court is not persuaded by these arguments.

First, Dyson concedes that in less than three years it has gained 29% of the vacuum cleaner market in terms of sales in the United States, and about 10% in the market in terms of number of sales units.  In fact, according to Dyson, "[r]ecently published statistics show that, in the short time its products have been available in our country [*i.e.* the United States], Dyson has become the number one seller of upright vacuum cleaners as measured by value."  (D.I. 13, at 12.)  This success demonstrates that Dyson, even though it would have the court believe otherwise, is firmly entrenched in the United States vacuum cleaner market.  Moreover, Dyson has attained this "extraordinary success" without the use of "mass market" stores, such as Wal-Mart, K-Mart, Sears, Target, Lowes, and Best Buy.  (Id. at 35.)  Dyson contends that Maytag's Fusion product is an attempt to impede its growth, and having to wait until a full trial on the merits will be too late, as Dyson may lose momentum and fail to penetrate the mass market.  Dyson's argument, therefore, is premised on its *potential* loss of market share.  However, the court finds that loss of market share, or the potential to lose market share, is insufficient to support a finding of irreparable harm.  *See Nutrition 21 v. United States*, 930 F.2d 867, 871 (Fed. Cir. 1991) (noting that loss of market share (or speculation that it might occur) is insufficient to state irreparable harm for preliminary injunction).

More important, the court finds that Dyson's claims that Maytag's activities infringe upon its right to exclude is not entitled to great weight in the face of its licensing activities.  The right secured by the patent is the right to exclude.  Engaging in licensing activity is incompatible with the right to exclude.  *See T.J. Smith & Nephew v. Consolidated Med. Equip.*, 821 F.2d 646, 648 (Fed.

---

[4] The '784 patent term expired on February 26, 2006, and the '515 patent term will expire on May 2, 2006.

4

Cir. 1987) (noting that licensing is incompatible with right to exclude). Furthermore, the act of licensing suggests that any injury suffered by the patentee is compensable in money damages, obviating the claim for injunctive relief. *See High Tech Medical Instrumentation, Inc. v. New Image Industries, Inc.,* 49 F.3d 1551, 1557 (Fed. Cir. 1995) (noting that where patentee licenses product, the evidence suggests that any injury suffered by [patentee] [will] be compensable in damages . . ."). Here, Dyson acknowledges that it has licensed three of the patents-in-suit. (D.I. 13, at 24.) Accordingly, any injury suffered by Dyson as a result of Maytag's activities would be compensable in damages assessed at the conclusion of this litigation. *See High Tech. Med. Instrumentation v. New Image Indus.,* 49 F.3d 1551, 1557 (Fed. Cir. 1995) (citation omitted).

Finally, the court concludes that Dyson's argument regarding the limited amount of time remaining on two of the four patents-in-suit is entitled to little, if any, weight, as it seems inconsistent with the notion of irreparable harm. Once Dyson's patents expire, any person or entity will be able to practice the inventions without the fear of being sued for infringement, and in the absence of a license. In other words, after the two patents expire, Dyson will suffer no harm as a result of Maytag's activities. Thus, a finding of irreparable harm based on the fact that a patent term is about to expire is counterintuitive. Indeed, Dyson cites no authority for its position. The court, therefore, rejects Dyson's argument on this point. For all of the aforementioned reasons, the court concludes that Dyson has not demonstrated that it will suffer irreparable harm if the injunction is denied.

III.    **CONCLUSION**

The court finds that Dyson has not made a clear showing of infringement with respect to the patents-in-suit. Moreover, Dyson has failed to demonstrate that irreparable harm will result in the absence of the injunction. Thus, the first two requirements for a preliminary injunction have not been met. As such, the court cannot issue the preliminary injunction, and will deny the plaintiff's motion.

Therefore, IT IS HEREBY ORDERED that:

1.    Dyson's Motion for Preliminary Injunction (D.I. 12) is DENIED.

Dated: March 21 , 2006

UNITED STATES DISTRICT JUDGE

FILED

MAR 21 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

6

# EXHIBIT G



Not Reported in F.Supp.2d                                                                                           Page 1
Not Reported in F.Supp.2d, 2005 WL 2716496 (D.Del.), 78 U.S.P.Q.2d 1858
(Cite as: Not Reported in F.Supp.2d)

**H**
Novozymes A/S v. Genencor Intern., Inc.
D.Del.,2005.

United States District Court,D. Delaware.
NOVOZYMES A/S, Plaintiff,
v.
GENENCOR INTERNATIONAL, INC. and Enzyme
Development Corporation, Defendants.
**No. Civ.A. 05-160-KAJ.**

Oct. 24, 2005.

*MEMORANDUM ORDER*
JORDAN, J.

### I. INTRODUCTION

*1 Plaintiff, Novozymes A/S ("Novozymes"),
brought this patent infringement suit against defend-
ants, Genencor International, Inc. ("Genencor") and
Enzyme Development Corporation ("EDC"). Subject
matter jurisdiction is proper under 28 U.S.C. § 1338.
The patent-in-suit, U.S. Patent No. 6,867,031 (the "
'031 patent"), was issued on March 15, 2005 and is
entitled "Amylase Variants." (Docket Item ["D.I."] 1,
Ex. A.) The named inventors of the '031 patent are
Henrik Bisgård-Frantzen, Allan Svendsen, and
Torben Vedel Borchert; Novozymes is the sole as-
signee. (*Id.*)

On June 22, 2005, Novozymes filed a motion for a
preliminary injunction to halt the sales of Genencor's
allegedly infringing product. (D.I. 16; the "Motion".)
Having reviewed the parties' submissions and heard
the parties at oral argument, I conclude that Genencor
and EDC have raised a substantial question concern-
ing the validity of the '031 patent. Therefore, No-
vozymes has not carried its burden of showing a like-
lihood of success on the merits, and its motion for a
preliminary injunction must be denied.

### II. BACKGROUND [FN1]

> FN1. The following background information
> is drawn from the parties' submissions and
> does not constitute findings of fact.

Novozymes and Genencor sell enzymes used in in-
dustrial processes. (D.I. 17 at 1; D.I. 40 at 3.) The
'031 patent claims variant <<alpha>>-amylases,
which are enzymes that, among other things, are use-
ful in the conversion of starch to fuel ethanol. (*See*
D.I. 17 at 1; D.I. 40 at 3-4.) Due to the requirements
of the relevant industrial processes,
<<alpha>>-amylases capable of maintaining activity
at high temperatures are desirable. (*See* D.I. 17 at 5;
D.I. 40 at 4.) Claims 1 and 3 of the '031 patent, which
are asserted here, relate to variant
<<alpha>>-amylases which are thermostable (i.e.,
able to withstand high temperatures). (D.I. 1 at Ex. A,
col. 4, lines 1-3.) The thermostability is achieved by
deleting two specific amino acid residues from the
<<alpha>>-amylase.[FN2]

> FN2. Claim 1 reads as follows:
> A variant of a parent *Bacillus stearothermo-
> philus* alpha-amylase, wherein the variant
> has an amino acid sequence which has at
> least 95% homology to the parent *Bacillus
> stearothermophilus* alpha-amylase and com-
> prises a deletion of amino acids 179 an [sic]
> 180, using SEQ ID NO:3 for numbering,
> and wherein the variant has alpha-amylase
> activity.
> '031 patent, col. 65, lines 11-17.
> Claim 3 reads as follows:
> A variant alpha-amylase, wherein the variant
> has at least 95% homology to SEQ ID NO:3
> and comprises a deletion of amino acids 179
> and 180, using SEQ ID NO:3 for numbering
> and wherein the variant has alpha-amylase
> activity.
> *Id.* at col. 65, line 21-col. 66, line 12.

In April 2004, Genencor began selling a product that
is now accused of infringing the '031 patent. (D.I. 46
at 1514.) EDC is a distributer of the accused product.
(*Id.*)

In support of its motion for a preliminary injunction,
Novozymes contends that it has shown a likelihood
of success on the merits because the accused product
literally infringes the '031 patent and the '031 patent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                           Page 2
Not Reported in F.Supp.2d, 2005 WL 2716496 (D.Del.), 78 U.S.P.Q.2d 1858
(Cite as: Not Reported in F.Supp.2d)

is valid and enforceable. Novozymes also asserts that irreparable harm to its business will result if Genecor and EDC continue to sell the accused product, and that the balance of hardships and harm to the public interest support the grant of preliminary relief. (D.I.17, D.I.59.) Genencor and EDC argue that the accused product does not infringe the '031 patent, that claims 1 and 3 are invalid and unenforceable, that Novozymes has failed to make a sufficient showing of irreparable harm, and that the balance of hardships and public interest weigh in their favor. (D.I.40.)

### III. STANDARD OF REVIEW

A preliminary injunction is "a drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc.,* 995 F.2d 1566, 1568 (Fed.Cir.1993). As the moving party, Novozymes is entitled to a preliminary injunction only if it shows the following: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's favorable impact on the public interest. *Amazon.com, Inc. v. Barnesand-noble.com, Inc.,* 239 F.3d 1343, 1350 (Fed.Cir.2001) (citing *Reebok Int'l Ltd. v. J. Baker, Inc.,* 32 F.3d 1552, 1555 (Fed.Cir.1994)). "The burden is always on the movant to show entitlement to a preliminary injunction." *Reebok,* 32 F.3d at 1555.

### IV. DISCUSSION

*2 To carry its burden of showing a likelihood of success on the merits, Novozymes must show that, "in light of the presumptions and burdens that will inhere at trial on the merits," Novozymes will likely prove that the defendants infringe the '031 patent, and that the '031 patent will likely withstand the defendants' challenges to validity and enforcement. *Amazon.com,* 239 F.3d at 1350. If the defendants raise "a substantial question concerning either infringement or validity, i.e., assert[ ] an infringement or invalidity defense that the patentee cannot prove lacks substantial merit, the preliminary injunction should not issue." *Id.* at 1350-51 (internal quotations omitted). In particular, since the moving party bears the burden of showing entitlement to a preliminary injunction, "[v]alidity challenges during preliminary

injunction proceedings can be successful ... on evidence that would not suffice to support a judgment of invalidity at trial." *Id.* at 1358. "Vulnerability is the issue at the preliminary injunction stage ... [and][t]he showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself." *Id.* at 1359.

Here, the defendants have successfully raised a substantial question as to invalidity. They argue that the asserted claims of the '031 patent are obvious in light of a prior art reference not disclosed to the patent examiner, the Machius reference (D.I. 44 at 804-805M). During prosecution, the examiner decided there was prima facie obviousness based on the Suzuki reference (D.I. 45 at 980-85), which taught that deleting two amino acid residues from a particular <<alpha>>-amylase would increase thermostability, and the Bisgård-Frantzen reference (D.I. 44 at 666-771), which taught that the *B. stearothermophilus* <<alpha>>-amylase was homologous to the <<alpha>>-amylase studied in Suzuki. The examiner concluded that these two references showed that making the claimed deletion in the *B. stearothermophilus* <<alpha>>-amylase would be expected to increase thermostability, thus making the claims obvious. (D.I. 45 at 950.) Novozymes overcame this obviousness rejection by claiming that the deletion achieved unexpected results. (D.I. 18 at Ex. H, ¶¶ 8-9.)

The examiner, however, never considered the Machius reference, which contains the following additional information. First, the reference discloses the three-dimensional structure of an <<alpha>>-amylase, and, based on a sequence alignment in the context of secondary structure information revealed by the new three-dimensional structure (D.I.44, 805J), the reference states that the three-dimensional structure of the *B. stearothermophilus* <<alpha>>-amylase "can be expected to be very similar" to the <<alpha>>-amylase structure disclosed in the reference (*id.* at 805H). Second, the reference discloses that the Suzuki deletion was located in a loop region and that having two extra residues there "could cause increased mobility of this region and a decreased thermostability of the whole protein." (*Id.*) By show-

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 2716496 (D.Del.), 78 U.S.P.Q.2d 1858
(Cite as: Not Reported in F.Supp.2d)

ing the location of the Suzuki deletion and predicting the structural similarity of the relevant <<alpha>>-amylases, the Machius reference raises a substantial question concerning the nonobviousness of claims 1 and 3.[FN3] While a trial may eventually show that this evidence is not sufficient to prove obviousness by clear and convincing evidence, it suffices to show vulnerability. Novozymes has thus failed to carry the burden of showing that the defendants' validity challenge lacks substantial merit and, as a consequence, has failed to show a reasonable likelihood of success on the merits. *Amazon.com,* 239 F.3d at 1350.

> FN3. After preliminary review, it appears that, contrary to Novozymes's argument, the Machius reference does not teach away from the claimed invention. While the reference concedes that the reasons for the increased thermostability in Suzuki "cannot be completely judged by our study," and that "[n]one of the above mentioned theories is able to explain satisfactorily the enhanced thermostability," (D.I.44, 805H), these statements only reflect an incomplete theoretical understanding of why the deletions cause increased thermostability.

*3 Since that critical factor has not been established, I need not consider the other three factors associated with the granting of preliminary injunctive relief. *See Reebok,* at 1556 ("[T]he district court may deny a preliminary injunction based on the movant's failure to establish either of [the first] two crucial factors without making additional findings respecting the other factors."); *New England Braiding Co. v. A.W. Chesterton Co.,* 970 F.2d 878, 882-84 (Fed.Cir.1992) (affirming the denial of a preliminary injunction based on a failure to show a likelihood of success on the merits, even though no findings were made concerning irreparable harm).

### V. CONCLUSION

Accordingly, it is hereby ORDERED that the Motion for a Preliminary Injunction is DENIED.

D.Del.,2005.

Novozymes A/S v. Genencor Intern., Inc.
Not Reported in F.Supp.2d, 2005 WL 2716496 (D.Del.), 78 U.S.P.Q.2d 1858

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 62490 (D.Del.), 69 U.S.P.Q.2d 1466
(Cite as: Not Reported in F.Supp.2d)

**H**
eSpeed, Inc. v. Brokertec USA, L.L.C.
D.Del.,2004.

United States District Court,D. Delaware.
ESPEED, INC.; Cantor Fitzgerald, L.P.; and CFPH,
L.L.C., Plaintiffs,
v.
BROKERTEC USA, L.L.C.; Brokertec Global,
L.L.C.; Garban, LLC; ICAP PLC; OM AB; and OM
Technology (U.S.), Inc., Defendants.
**No. Civ.A. 03-612-KAJ.**

Jan. 14, 2004.

Jack B. Blumenfeld, Morris, Nichols, Arsht & Tun-
nell, Wilmington, DE, for Plaintiffs.
Richard L. Horwitz, Potter Anderson & Corroon,
LLP, Wilmington, DE, for Defendants.

*MEMORANDUM ORDER*
JORDAN, J.

### I. INTRODUCTION

**\*1** This is a patent infringement case. Jurisdiction is
proper under 28 U.S.C. § 1338. Plaintiffs in this case
are eSpeed, Inc., Cantor Fitzgerald, L.P., and CFPH,
L.L.C. (collectively, "eSpeed"). Defendants are
BrokerTec USA, L.L.C., BrokerTec Global, L.L.C.,
Garban, LLC, ICAP PLC, OM AB and OM Techno-
logy (U.S.), Inc. (collectively, "BrokerTec"). The
patent-in-suit, U.S. Patent No. 6,560,580 B1 (issued
May 6, 2003) (the " '580 patent"), is entitled
"Automated Auction Protocol Processor." (Docket
Item ["D.I."] 1, Exh. A.) The named inventors of the
'580 patent are Stuart A. Fraser, Howard Lutnick, and
Bijoy Paul, with plaintiffs Cantor Fitzgerald, L.P. and
CFPH L.L.C. as assignees. (*Id.*) Plaintiff eSpeed, Inc.
is the exclusive licensee of the '580 patent. (*Id.*, ¶ 11.)

On June 30, 2003, eSpeed filed suit alleging that
BrokerTec is wilfully and intentionally infringing the
'580 patent. (*Id.*, ¶ 12.) On the same day, eSpeed also
filed a motion for a preliminary injunction to prevent
BrokerTec from "making, using, offering for sale,
selling, licensing, or otherwise distributing electronic

trading systems which embody or comprise the in-
ventions claimed in [the '580 patent]." [FN1] (D.I.3.)
On December 12, 2003, the United States, on behalf
of the Department of the Treasury, filed a Statement
of Interest in this proceeding pursuant to 28 U.S.C. §
517. [FN2] (D.I.183.)

> FN1. After fully briefing eSpeed's motion
> for a preliminary injunction, the parties ap-
> peared for a hearing on October 30, 2003,
> (D.I.128), and submitted proposed findings
> of fact and conclusions of law on December
> 4, 2003 (D.I.159, 160, 167, 168).

> FN2. "The Solicitor General, or any officer
> of the Department of Justice, may be sent by
> the Attorney General to any State or district
> in the United States to attend to the interests
> of the United States in a suit pending in a
> court of the United States, or in a court of a
> State, or to attend to any other interest of the
> United States." 28 U.S.C. § 517 (2003).

After reviewing the submissions of the parties and
the government, and the applicable law, I am per-
suaded that the public interest strongly outweighs any
private interest eSpeed may have in obtaining a pre-
liminary injunction. eSpeed has failed to make a per-
suasive showing that irreparable harm will result if
BrokerTec's conduct is not enjoined. Because eSpeed
has not adequately shown that it is entitled to emer-
gency relief, its motion for a preliminary injunction
will be denied.

### II. BACKGROUND

Both eSpeed and BrokerTec operate electronic trad-
ing platforms that facilitate trading among wholesale
purchasers and sellers of United States Treasury se-
curities and other United States government securit-
ies. (D.I. 4 at 9; D.I. 106 at 7.) eSpeed alleges that
BrokerTec's trading platform infringes the technology
disclosed in the '580 patent, specifically, the
"workup" protocol, which eSpeed describes as fol-
lows:
The eSpeed electronic trading platform automatically

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 62490 (D.Del.), 69 U.S.P.Q.2d 1466
(Cite as: Not Reported in F.Supp.2d)

provides the participants who are first to make a bid or offer (or the first to act on a bid or offer) with priority and a time-based right of first refusal with respect to that transaction. Only after an initial trade is done or the defined time interval lapses may others participate in the trade at the defined price. This protocol ... effectively rewards participants for market participation, providing liquidity and driving the market towards the best price by preventing others from exploiting the market that the initial traders have created before they have revealed and been given the opportunity to trade their full volume. After the initial traders have finished trading with one another, the protocol allows another trader to participate in the trade without being able to exclude others from also participating.

*2 (D.I. 4 at 13; D.I. 6, ¶ 7.) Independent claim 22 and dependent claim 23 of the '580 patent address this workup trading protocol, in particular, "its division into two periods, a period when the initial traders control the trade to the exclusion of all other participants and a period that follows in which orders placed by other participants may be executed, without others controlling the trade." FN3 (D.I. 4 at 25; D.I. 6, ¶ 12.)

> FN3. Independent claim 22 reads as follows: A method implemented on a distributed-workstation computer system for trading an item between participants, said method comprising:
> providing a bid/offer system state wherein a first participant enters a bid or offer for the item at a select price and volume;
> receiving from a second participant a trade command to hit or lift the bid or offer;
> entering a trading system state wherein a trade transaction is executed between the first and second participants for a volume of the item at a defined price, and wherein (a) the first and second participants are provided a period to control trading, during which they may transact with each other additional volume of the item at the defined price to the exclusion of other participants desiring to participate in the trade, and (b) upon conclusion of the period, a new trade transaction

is automatically executed at the defined price in response to a trade command entered by another participant without providing the other participant a period to control the trade.

'580 patent, col. 20, Ins. 33-53. Dependent claim 23 claims the method of claim 22, "wherein the trade command entered by the other participant is entered during the period to control trading but not executed until the conclusion of said period." Id., Ins. 54-57.

On May 21, 2001, BrokerTec's electronic trading platform began offering workup privileges to initial participants in a trade. FN4 (D.I. 106 at 14.) BrokerTec states that the workup privileges it "grant[s] its customers ... are of fixed temporal duration," and "[b]y intentional design, [its] customers cannot 'control' a trade, as that latter term is used in the '580 patent...." (D.I. 106 at 16.) eSpeed claims that BrokerTec's trading platform implements the same workup protocol claimed in the '580 patent, and thus literally infringes claims 22 and 23. (D.I. 4 at 26.)

> FN4. BrokerTec argues that eSpeed has "purposefully delayed" for over two years in seeking injunctive relief. (D.I. 106 at 12.) eSpeed, of course, denies this allegation. (D.I. 118 at 17, 18.) The parties will have the opportunity to resolve this issue at trial, as it does not impact my decision that a preliminary injunction is inappropriate given the critical public interest at stake.

In support of its motion for a preliminary injunction, eSpeed asserts that it has a high likelihood of success on the merits of its infringement claim. (D.I. 4 at 20.) eSpeed further argues that, since the '580 patent is both valid and infringed, it is entitled to a presumption of irreparable harm. (Id. at 30.) Finally, eSpeed asserts that both the balance of the hardships and the public interest favor granting a preliminary injunction. (Id. at 34, 36 .) BrokerTec disputes the validity of the '580 patent (D.I. 106 at 23, 26) and claims that eSpeed has not presented competent evidence of infringement (id. at 34). BrokerTec further argues that granting a preliminary injunction would adversely affect the public interest. (Id. at 38.) The government's

position is that "the proposed injunction would effectively eliminate an electronic marketplace used by a significant percentage of traders in the secondary market for Treasury securities," resulting in "a significant, detrimental impact on the public interest." (D.I. 183 at 2.)

### III. STANDARD OF REVIEW

A preliminary injunction is "a drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed.Cir.1993). As the moving party, eSpeed is entitled to a preliminary injunction only if it succeeds in showing (1) a reasonable likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's favorable impact on the public interest. *Amazon.com, Inc. v. Barnesand-noble.com, Inc.*, 239 F.3d 1343, 1350 (Fed.Cir.2001) (citing *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed.Cir.1994)).

When deciding whether a preliminary injunction should be granted or denied, the court should weigh and measure each of the four factors against the other factors and against the magnitude of the relief requested. *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1451 n. 12 (Fed.Cir.1988). Under this rule, no one factor, taken individually, is necessarily dispositive. *Chrysler Motors Corp. v. Auto Body Panel, Inc.*, 908 F.2d 951, 953 (Fed.Cir.1990). If a preliminary injunction is granted by the trial court, the weakness of the showing regarding one factor may be overborne by the strength of others. *Id.* If the injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial. *Id.* "As a basic proposition, [granting or denying a preliminary injunction] lies largely in the sound discretion of the trial judge." *Id.* (citation omitted).

### IV. DISCUSSION

#### A. Public Interest

**\*3** In patent cases, "the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech*, 849 F.2d at 1458. Because the government has taken the extraordinary step of filing a Statement of Interest in this case that exclusively discusses the impact of eSpeed's requested preliminary injunction on the "critical market for Treasury securities," (D.I. 183 at 4), I will first consider whether the proposed injunction adversely affects the public interest.

Apart from asserting that the public interest generally favors protecting a patentee's rights, (D.I. 4 at 36 (citing *Smith Intern., Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed.Cir.1983)), eSpeed argues that the purpose of its motion for a preliminary injunction is not to prevent BrokerTec from using "any version of a workup protocol," but rather to "stop BrokerTec from using the protocol covered by the '580 patent" (D.I. 118 at 19). Thus, eSpeed suggests that BrokerTec and its customers may easily transition back to using an outdated, inferior, and less sophisticated trading platform without causing any disruptions in the secondary market. (D.I. 4 at 35; D.I. 128 at 58:7-10.) That suggestion is belied by the evidence and common sense. eSpeed acknowledges that "virtually all outright trading of Treasury benchmarks in the wholesale secondary market is occurring on one of two electronic marketplaces, eSpeed or BrokerTec." (D.I. 4 at 17; D.I. 5, ¶ 12.) At oral argument, counsel for eSpeed estimated that, with respect to different trading instruments, thirty-five to sixty-five percent of the trading is conducted using BrokerTec's trading platform. (D.I. 128 at 52:1-8.) Though the magnitude of reliance on BrokerTec's trading platform is highly significant by either estimate, eSpeed assiduously ignores the fact that granting injunctive relief would effectively remove BrokerTec from the secondary trading market. BrokerTec's customers, who are accustomed to its current trading platform, are not likely to revert back to an antiquated method of trading. Instead, they are more likely to turn their trading, after some delay, to the only other viable player in the secondary market, namely, eSpeed. Indeed, it is reasonable to believe that that is exactly the result eSpeed hopes to achieve. While eSpeed may ultimately be entitled to the hegemony it seeks with this injunction, the government

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 4
Not Reported in F.Supp.2d, 2004 WL 62490 (D.Del.), 69 U.S.P.Q.2d 1466
(Cite as: Not Reported in F.Supp.2d)

has pointed out three particular reasons why a preliminary injunction that reaches that result will adversely impact the public interest.

First, shutting down the trading system used by a significant part of the market could reduce trading in Treasury securities indefinitely, making them less liquid and decreasing their attractiveness as an investment. (D.I. 183 at 4.) The ultimate result of reduced trading would be an increased cost to the government in borrowing money to finance the Nation's debt. (*Id.*) Second, an "injunction would increase systemic risk to the secondary market for Treasury securities by leaving only one commonly used electronic trading system, the one operated by [eSpeed]." (*Id.* at 5.) Without an alternative trading system, the secondary trading market would be devastated if eSpeed's system went awry. Finally, "an injunction would give the plaintiffs a monopoly over the primary trading system used by the wholesale secondary market for Treasury securities." (*Id.*) In the absence of competition, the transaction fees paid by dealers who trade Treasury securities is likely to increase, with these costs being passed on to the Treasury Department when it issues securities. (*Id.*)

*4 Not surprisingly, BrokerTec's position mirrors the one taken by the government. Brokertec asserts that eSpeed's requested relief "would directly interfere with the [government's] ability to assure itself of a competitive and efficiently operating market for the trading of Treasury securities...." (D.I. 106 at 39.) eSpeed has not set forth any persuasive reason why its private interest in vindicating its patent rights is more important than the critical public interest in maintaining a fluid, competitive market for trading Treasury securities. Therefore, I see no reason to disrupt the secondary market before a full trial on the merits of eSpeed's patent infringement claims.

B. Likelihood of Success on the Merits

The likelihood of success on the merits is established when the moving party demonstrates that the patent-in-suit is both valid and infringed. *Reebok Intern. Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed.Cir.1994). Apart from asserting that its activities do not infringe the '580 patent, BrokerTec argues that the patent is

invalid due to eSpeed's inequitable conduct before the U.S. Patent and Trademark Office.[FN5] (D.I. 106 at 27.) "In resisting a preliminary injunction ... one need not make out a case of actual invalidity. Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial. The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself." *Amazon.com*, 239 F.3d at 1359.

> FN5. BrokerTec also asserts that the '580 patent is invalid because eSpeed impermissibly amended the disclosure of the invention to introduce new matter and because it is obvious in light of the prior art. (D.I. 106 at 23, 26.) eSpeed disputes these claims, (D.I. 118 at 5), and I express no opinion on them at this time.

On February 21, 2002, the three named inventors of the '580 patent submitted declarations to the U.S. Patent and Trademark Office explaining why it had not previously occurred to them that a computer automated trading system, called the "Super System," might be considered prior art. (D.I. 106 at 28, D.I. 118 at 12.) eSpeed's predecessor, Cantor Fitzgerald, began using the Super System in 1993. (D.I. 106 at 28.) The inventors' declarations explained that, even though the Super System was being used in Cantor Fitzgerald's business, it was "an internal computer system." (D.I. 118 at 12, 13.) BrokerTec argues that the Super System "was used to support commercial screen brokerage activities and fed trade information to screens on customers' desks," citing the deposition testimony of one of the inventors of the '580 patent, Stuart Fraser, as support. (D.I. 106 at 28.) eSpeed states that "[t]he fact that information generated by the Super System could be advertised on customers' display screens ... does not mean that the system was not an internal one...." (D.I. 118 at 13.) BrokerTec's position is that the inventors' characterization of the Super System as an internal system was "highly misleading" and led to the Patent Examiner's mistaken belief that the Super System did not constitute prior art. (D.I. 106 at 28.)

If proven, BrokerTec's claim of inequitable conduct

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 62490 (D.Del.), 69 U.S.P.Q.2d 1466
(Cite as: Not Reported in F.Supp.2d)

would invalidate the entire patent. *See Winbond Electronics Corp. v. Int'l Trade Comm'n, 262 F.3d 1363, 1372 (Fed.Cir.2001)* (noting that patent obtained through inequitable conduct may not be enforced). Without expressing an opinion on the invalidity claim, I find that BrokerTec has presented enough facts to raise a substantial question as to the validity of the '580 patent, and I conclude that the question of inequitable conduct, while not resolved, is fairly before the court. *Arthrex Inc. v. dj Orthopedics LLC,* 2002 U.S. Dist. LEXIS 7634 at *10 (D.Del. Apr. 30, 2002). Therefore, I find that eSpeed has not demonstrated a likelihood of success on the merits to a degree that would outweigh the critical public interest in the denial of an injunction. However, even if eSpeed were to make a persuasive showing of likelihood of success, eSpeed's request for injunctive relief would still be denied, given the overwhelming public interest against entering an injunction in this case. *See Cordis Corp. v. Boston Scientific Corp.,* 2003 U.S. Dist. LEXIS 21338 at *10 n. 6 (D.Del. Nov. 21, 2003) (even if movant demonstrated likelihood of success on the merits, in the absence of proof of irreparable harm, the public interest in maintaining competitive medical device market weighed against granting preliminary injunctive relief).

### C. Irreparable Harm

*5 As discussed, BrokerTec has raised a substantial question as to the validity of the '580 patent; thus, eSpeed is not entitled to a presumption of irreparable harm. *See Amazon.com,* 239 F.3d at 1350 (presumption of irreparable harm arises where patentee proves both infringement and validity). eSpeed's only proof of irreparable harm is that, because BrokerTec is a "competitive infringer," eSpeed is likely to lose market share and goodwill, "eroding their hard-won image as a market leader in electronic marketplace technology." (D.I. 4 at 33.) However, "[t]hese threatened injuries, which money alone could not cure," (*id.*), together with any perceived "unfair hardship" eSpeed feels it may suffer if BrokerTec is not enjoined, (*id.* at 35), are not enough to overcome the strong public interest in having both eSpeed's and BrokerTec's trading platform remain fully functional pending a full trial. FN6 *See Nutrition 21 v. United States,* 930 F.2d 867, 871

(Fed.Cir.1991) ("[N]either the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial.")

> FN6. I also note that, at oral argument, eSpeed's counsel was unable to suggest a reasonable amount of money to require as a bond in the event its injunction was granted. (D.I. 128 at 45-49.)

### V. CONCLUSION

For these reasons, it is hereby ORDERED that eSpeed's Motion for a Preliminary Injunction is DENIED.

D.Del.,2004.
eSpeed, Inc. v. Brokertec USA, L.L.C.
Not Reported in F.Supp.2d, 2004 WL 62490 (D.Del.), 69 U.S.P.Q.2d 1466

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT I

1

```
 1                    IN THE UNITES STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                            -  -  -

 4      DYSON, INC.,                    :      Civil Action
                                        :
 5                 Plaintiff,           :
                                        :
 6           v.                         :
                                        :
 7      MAYTAG CORPORATION,             :
                                        :
 8                 Defendant.           :      No. 06-654-GMS

 9                            -  -  -
                         Wilmington, Delaware
10                       Thursday, March 29, 2007
                              3:30 p.m.
11                       Telephone Conference
                              -  -  -
12

13      BEFORE:   HONORABLE GREGORY M. SLEET, U.S.D.C.J.

14      APPEARANCES:

15              JOHN W. SHAW, ESQ., and
                MONTE T. SQUIRE, ESQ.
16              Young Conaway Stargatt & Taylor, LLP
                            -and-
17              CHAD S. HUMMEL, ESQ., and
                KATHRIN WANNER, ESQ.
18              Manatt, Phelps & Phillips, LLP
                (Los Angeles, CA)
19
                                   Counsel for Plaintiff
20
                FRANCIS DiGIOVANNI, ESQ.
21              Connolly Bove Lodge & Hutz LLP
                            -and-
22              ANTHONY DiSARRO, ESQ.,
                RONALD Y. ROTHSTEIN, ESQ., and
23              LISA J. PARKER, ESQ.
                Winston & Strawn
24              (Chicago, IL)

25                                 Counsel for Defendant
```

6

1  point that I will raise in a minute.
2      But in terms of Your Honor's time and the
3  Court's time, what we are envisioning is not a lengthy
4  hearing that requires evidentiary witnesses. The briefing
5  can go in fairly rapidly once the discovery that has been
6  requested is wrapped up. An hour hearing may be sufficient,
7  half-hour from each side or less, depending what Your Honor
8  wants to hear, or more if Your Honor wants to hear more.
9      Dyson is certainly committed to minimizing the
10 burden on Your Honor and the Court in handling this motion.
11     The last point, we spent a lot of time at the
12 scheduling conference discussing the little bit of discovery
13 that Dyson is requesting on this. We committed at the end
14 of the scheduling conference to limit that discovery to one
15 30(b)(6) deposition and to limit it to three hours. We
16 heard from Maytag that it would be extremely burdensome to
17 do that work based on the first Dyson case, which we all
18 know is heading towards trial and the pretrial order and
19 pretrial conference coming up in the next few months.
20     Again, the issue is who should bear that burden
21 of the time and the energy at this point. If we had done
22 the discovery in the fall that had been noticed, had been
23 scheduled, as opposed to what really happened, which was
24 once the case was transferred it got canceled by Maytag,
25 this wouldn't be a question, either.

7

1      So, yes, there may be burden on Maytag. But in
2  terms of fairness and prejudice, Dyson sees that as
3  something that Maytag ought to bear.
4      Thank you, Your Honor.
5      THE COURT: Thank you, Mr. Shaw.
6      Who is going to respond?
7      MR. DiSARRO: Your Honor, Tony DiSarro from
8  Winston & Strawn.
9      THE COURT: Okay.
10     MR. DiSARRO: Your Honor, at the conference on
11 this case, I sort of understood that Your Honor wanted a
12 joint report on whether the settlement or efforts to settle
13 the motion were successful. And instead, Dyson just
14 unilaterally filed really what was a piece of advocacy that
15 charges that we reneged on agreements made in court and
16 didn't negotiate in good faith. We strongly disagree with
17 that.
18     There were no agreements made in court that day
19 at all. And I was present. And the document, the proposal
20 that we received later in the week, the next week, from
21 Dyson, went way beyond anything that has ever been
22 contemplated before. It included restrictions on
23 manufacturing of products, not only the Fusion and the
24 Legacy, but any substantially identical products. That's
25 not an issue in this case. That may be an issue in the

8

1  patent case. But this case is supposedly about false
2  advertising. You can't restrict somebody from manufacturing
3  products.
4      And it included Techtronicx Industries, which is
5  the new indirect parent of Hoover, but Techtronicx also owns
6  other manufacturers and distributors of vacuum cleaners in
7  the U.S., like Royal and Dirt Devil. It can't commit and
8  should not be required to commit to refrain from
9  manufacturing products or making advertising claims that ar
10 not at issue in this case.
11     So that proposal was flatly unacceptable to us.
12 We responded by disclosing what were the facts and offering
13 to file an affidavit in the Court.
14     Let's put aside the issue of mootness for a
15 while, because mootness talks about dismissing a claim. The
16 real issue is irreparable injury. How can there be
17 irreparable injury in light of what is going on?
18     Now, in March 21, 2006, you denied in Dyson I a
19 motion for preliminary injunction on the Fusion vacuum
20 cleaner, finding no irreparable injury. At Page 4 of your
21 decision, you held that Dyson had not lost market share, it
22 had, in fact, increased its market share. At the time of
23 filing the motion it was the number-one seller of upright
24 vacuum cleaners as measured by value.
25     You stated, on Page 4 of your decision, "This

9

1  success demonstrates that Dyson, even though it would have
2  the Court believe otherwise, is firmly entrenched in the
3  United States vacuum cleaner market.
4      "The Court's finds that Dyson's argument is
5  premised on a potential loss of market share. However, the
6  potential loss of market share is insufficient to finding
7  irreparable injury."
8      That was a year ago, when the sales were
9  actively being made of the Fusion. Now it's a year later,
10 and the sales have wound down or are winding down.
11     So it is crystal-clear that there is no
12 irreparable injury here. And we pointed out at the last
13 conference that their briefs were filed in New York under
14 Second Circuit law, arguing for a presumption of irreparable
15 harm. That had been flatly rejected by the Third Circuit.
16 And they agreed that their brief was defective and needed to
17 be retooled. They still haven't done that, because they
18 know that they cannot satisfy the irreparable injury
19 element.
20     So, frankly, the motion at this stage doesn't
21 even surpass the minimum requirements of Rule 11. Frankly
22 it should be denied outright.
23     They argue that they need additional discovery.
24 What discovery could possibly cure the absence of the
25 irreparable injury element to their claim? That is only

10

1  within Dyson's purview to prove. No amount of discovery is
2  going to cure their inability to satisfy irreparable injury,
3  which you already found the lack of in connection with the
4  Fusion a year ago in the patent case.
5        So the argument of how can we be prejudiced by
6  stopping conduct, well, they haven't agreed to stop their
7  advertising claims that we have challenged in Dyson I. We
8  are forced, my clients are forced to endure those claims up
9  until the date of trial. So I don't see any harm when they
10  say that they are still exposed to the potentiality of
11  future false advertising claims or claims that they claim
12  are false advertising claims.
13        The bottom line is, I don't think the motion can
14  frankly be put forward in good faith. Your Honor basically
15  said at the last meeting, conference, that you didn't see
16  the argument of irreparable injury in a way that could be
17  made with a straight face. In light of Your Honor's prior
18  decision, it makes it crystal-clear why they filed this case
19  up in New York: to try to find a different judge and some
20  different law. Therefore, it is their own fault that the
21  case got transferred down here.
22        But, Your Honor, the motion is ready to be
23  briefed right now. There should be no further discovery, no
24  30(b)(6) deposition, because it's not going to change the
25  absence of irreparable injury. And, frankly, we are

11

1  prepared to brief the motion. If they are going to retool
2  it, they ought to retool it now, their brief now. But if
3  they are not, the Court should either just deny the motion
4  or we will file a brief and Your Honor can proceed to deny
5  the motion in that manner.
6        THE COURT: Thank you, Mr. DiSarro.
7        Mr. Shaw, Mr. DiSarro sort of cuts to the heart
8  of the matter, as it were.
9        MR. SHAW: Your Honor, we started down this path
10  at the scheduling conference, and you asked that we not
11  argue the merits. But I will turn to those at this point.
12        THE COURT: Well, I think we should. I think he
13  makes a fair point, I think one to which you need to
14  respond.
15        MR. SHAW: Certainly, Your Honor. Mr. Hummel
16  may need to jump in at certain points. I will begin.
17        First, the motion Mr. DiSarro is referencing was
18  the preliminary injunction motion in the patent case. So
19  there were different issues that were arising at that point
20  in time.
21        In terms of the other point he makes there, it
22  was simply --
23        THE COURT: But, Mr. Shaw -- and I will
24  interrupt from time to time -- at bottom, in both matters,
25  aren't we talking about the presence of irreparable harm?

12

1  Not the threat of irreparable harm. Actually that you are
2  suffering irreparable harm?
3        MR. SHAW: Yes, you are talking about
4  irreparable harm being suffered in each instance. But the
5  bases of irreparable harm and the standards in the one
6  patent case will be coming out of the Federal Circuit. In
7  this part of the case, it will have different standards
8  based on Third Circuit law and the Lanham Act issues.
9        THE COURT: Go ahead.
10        MR. SHAW: The comment about the brief not
11  meeting even Rule 11 at this point, frankly, Your Honor, was
12  offensive. We haven't seen a Rule 11 motion. I think that
13  is thrown in there for color for Your Honor to hear at this
14  point in time.
15        The comment that you had made, Your Honor, at
16  the scheduling conference, on urgency that Mr. DiSarro
17  referenced and irreparable harm, was based on comments that
18  their product sales would be winding down and that the case
19  was moot. That's why Mr. DiSarro didn't want to address
20  mootness right now, because he tried to change the subject
21  and use your earlier comments on mootness to his advantage.
22        The fact of the matter is, the product sales out
23  in the marketplace can still cause irreparable harm.
24  Whether lots of products or smaller numbers are winding
25  down, that point is immaterial.

13

1        Either way, once the brief goes in, the
2  discovery is taken, it will be easy to make that call. You
3  should be able to make that call on a full record. Not on,
4  at this point, a teleconference, with Mr. DiSarro simply
5  asserting irreparable harm isn't there.
6        THE COURT: Okay. Well, then, the other
7  questions that he poses, let's assume for a moment that I
8  accept your position that the effort there was to deflect my
9  attention onto an irrelevant concern. What will the
10  (30)(b)(6) deposition provide this record and how will it
11  aid the Court in its ability to decide the matter, other
12  than the 30(b)(6) is apparently prepared to be briefed,
13  ready to be briefed?
14        MR. SHAW: Anticipating you might ask that
15  question, I was working on some of those issues. I did not
16  get completed on those. Mr. Hummel will jump in.
17        The first one is exactly the urgency question,
18  how much more product is coming into the market and how lon
19  will it be there and where is it going to be. In addition,
20  for the product that is no longer being shipped, how much
21  remains in the marketplace at retailers and how long will
22  that take to be exhausted out of the marketplace.
23        Maytag has been very coy about saying anything
24  on those two points. They only say they stopped
25  manufacturing and as to the one product stopped shipping,

# EXHIBIT J
# REDACTED IN ITS ENTIRETY

# EXHIBIT K
# REDACTED IN ITS ENTIRETY

# EXHIBIT L



**59F/163/FDIS**

### FINAL DRAFT INTERNATIONAL STANDARD
### PROJET FINAL DE NORME INTERNATIONALE

| Project number    Numéro de projet | IEC 60312 Ed 4.0 | |
|---|---|---|
| IEC/TC or SC  CEI/CE ou SC **SC 59F** | | Secretariat / Secrétariat **Sweden** |

| ☒ Submitted for parallel voting in CENELEC    Soumis au vote parallèle au CENELEC | Distributed on / Diffusé le **2007-01-05** | Voting terminates on / Vote clos le **2007-03-09** |
|---|---|---|
| Also of interest to the following committees Intéresse également les comités suivants | Supersedes document Remplace le document 59F/157/CDV and 59F/159/RVC | |

Functions concerned
Fonctions concernées

| ☐ Safety    Sécurité | ☐ EMC    CEM | ☐ Environment    Environnement | ☐ Quality assurance    Assurance de la qualité |
|---|---|---|---|

INTERNATIONAL ELECTROTECHNICAL COMMISSION                    COMMISSION ÉLECTROTECHNIQUE INTERNATIONALE

THIS DOCUMENT IS A DRAFT DISTRIBUTED FOR APPROVAL. IT MAY NOT BE REFERRED TO AS AN INTERNATIONAL STANDARD UNTIL PUBLISHED AS SUCH.

IN ADDITION TO THEIR EVALUATION AS BEING ACCEPTABLE FOR INDUSTRIAL, TECHNOLOGICAL, COMMERCIAL AND USER PURPOSES, FINAL DRAFT INTERNATIONAL STANDARDS MAY ON OCCASION HAVE TO BE CONSIDERED IN THE LIGHT OF THEIR POTENTIAL TO BECOME STANDARDS TO WHICH REFERENCE MAY BE MADE IN NATIONAL REGULATIONS.

CE DOCUMENT EST UN PROJET DIFFUSÉ POUR APPROBATION. IL NE PEUT ÊTRE CITÉ COMME NORME INTERNATIONALE AVANT SA PUBLICATION EN TANT QUE TELLE.

OUTRE LE FAIT D'ÊTRE EXAMINÉS POUR ÉTABLIR S'ILS SONT ACCEPTABLES À DES FINS INDUSTRIELLES, TECHNOLOGIQUES ET COMMERCIALES, AINSI QUE DU POINT DE VUE DES UTILISATEURS, LES PROJETS FINAUX DE NORMES INTERNATIONALES DOIVENT PARFOIS ÊTRE EXAMINÉS EN VUE DE LEUR POSSIBILITÉ DE DEVENIR DES NORMES POUVANT SERVIR DE RÉFÉRENCE DANS LES RÉGLEMENTATIONS NATIONALES.

Title
### IEC 60312 Ed 4.0: Vacuum cleaners for household use - Methods of measuring the performance

Titre
### CEI 60312 Ed 4.0: Aspirateurs de poussière à usage domestique – Méthodes de mesure de l'aptitude à la fonction

**ATTENTION**
**VOTE PARALLÈLE**
**CEI – CENELEC**

L'attention des Comités nationaux de la CEI, membres du CENELEC, est attirée sur le fait que ce projet final de Norme internationale est soumis au vote parallèle. Un bulletin de vote séparé pour le vote CENELEC leur sera envoyé par le Secrétariat Central du CENELEC.

**ATTENTION**
**IEC – CENELEC**
**PARALLEL VOTING**

The attention of IEC National Committees, members of CENELEC, is drawn to the fact that this final Draft International Standard (DIS) is submitted for parallel voting. A separate form for CENELEC voting will be sent to them by the CENELEC Central Secretariat.

Copyright © 2006 International Electrotechnical Commission, IEC. All rights reserved. It is permitted to download this electronic file, to make a copy and to print out the content for the sole purpose of preparing National Committee positions. You may not copy or "mirror" the file or printed version of the document, or any part of it, for any other purpose without permission in writing from IEC.

FORM FDIS (IEC)/FORMULAIRE FDIS (CEI) 2002-08-08

# CONTENTS

FOREWORD..................................................................................................................7

Section 1: General

1.1    Scope.....................................................................................................................9
1.2    Normative references ............................................................................................9
1.3    Definitions .............................................................................................................9
1.4    General conditions for testing .............................................................................11
        1.4.1    Atmospheric conditions ...........................................................................11
        1.4.2    Test equipment and materials .................................................................12
        1.4.3    Voltage and frequency ............................................................................12
        1.4.4    Running-in of vacuum cleaner and attachments .......................................12
        1.4.5    Equipment of the vacuum cleaner ...........................................................12
        1.4.6    Operation of the vacuum cleaner.............................................................13
        1.4.7    Conditioning prior to tests ......................................................................13
        1.4.8    Initial application of dust ........................................................................13
        1.4.9    Mechanical operator ...............................................................................13
        1.4.10  Number of samples.................................................................................14
        1.4.11  Reference cleaner system.......................................................................14

Section 2: Dry vacuum cleaning tests

2.1    Dust removal from hard flat floors .......................................................................14
        2.1.1    Test equipment.......................................................................................14
        2.1.2    Test area and stroke length ....................................................................14
        2.1.3    Distribution of test dust .........................................................................14
        2.1.4    Determination of track width and stroke width...........................................14
        2.1.5    Test method ...........................................................................................15
        2.1.6    Determination of dust removal ability........................................................15
2.2    Dust removal from hard floors with crevices .........................................................16
        2.2.1    Test equipment.......................................................................................16
        2.2.2    Distribution of test dust .........................................................................16
        2.2.3    Determination of dust removal ability........................................................16
2.3    Dust removal from carpets ..................................................................................16
        2.3.1    Test carpet ............................................................................................16
        2.3.2    Test area and stroke length ....................................................................17
        2.3.3    Cleaning cycle .......................................................................................17
        2.3.4    Conditioning of test carpet .....................................................................17
        2.3.5    Distribution of test dust .........................................................................18
        2.3.6    Embedding of dust into carpet ................................................................18
        2.3.7    Preconditioning of dust receptacle..........................................................18
        2.3.8    Determination of dust removal ability........................................................18
2.4    Dust removal along walls ....................................................................................19
        2.4.1    Test equipment and materials .................................................................19
        2.4.2    Distribution of test dust .........................................................................19
        2.4.3    Determination of dust removal ability along walls.......................................19
2.5    Fibre removal from carpets and upholstery............................................................19
        2.5.1    Fibre removal from carpets .....................................................................19

　　　2.5.2　Fibre removal from upholstery.................................................................20
2.6　Thread removal from carpets ...........................................................................21
　　　2.6.1　Test carpet ...........................................................................................21
　　　2.6.2　Distribution of threads..........................................................................21
　　　2.6.3　Determination of thread removal ability ................................................21
2.7　Maximum usable volume of the dust receptacle .................................................22
　　　2.7.1　Conditions for measurement .................................................................22
　　　2.7.2　Introduction of moulding granules.........................................................22
　　　2.7.3　Determination of maximum usable volume of dust receptacle ................22
2.8　Air data ........................................................................................................22
　　　2.8.1　Conditions for measurement .................................................................22
　　　2.8.2　Test equipment .....................................................................................23
　　　2.8.3　Determination of air data......................................................................23
2.9　Performance with loaded dust receptacle ..........................................................23
　　　2.9.1　General ................................................................................................23
　　　2.9.2　Suction with loaded dust receptacle ......................................................23
　　　2.9.3　Throttling to simulate loaded dust receptacle.........................................24
　　　2.9.4　Determination of performance with loaded dust receptacle .....................24
2.10　Dust emission of the vacuum cleaner................................................................25
　　　2.10.1　Test procedure ...................................................................................25
　　　2.10.2　Pre-test .............................................................................................26
　　　2.10.3　Dust test............................................................................................26
　　　2.10.4　Calculating emission ..........................................................................27
　　　2.10.5　Record................................................................................................28

Section 3: Wet vacuum cleaning tests

3.1　Object of the test...........................................................................................28
3.2　Wet cleaning effectiveness on carpet ................................................................29
　　　3.2.1　Test carpet samples .............................................................................29
　　　3.2.2　Soiling of carpet sample.......................................................................29
　　　3.2.3　Cleaning procedure..............................................................................29
　　　3.2.4　Drying of the carpet sample ..................................................................30
　　　3.2.5　Determination of wet cleaning effectiveness ..........................................30
　　　3.2.6　Colorimetric measurements ..................................................................31
　　　3.2.7　Visual assessment................................................................................31

Section 4: Miscellaneous tests

4.1　Motion resistance ..........................................................................................31
　　　4.1.1　Test carpet and test equipment..............................................................31
　　　4.1.2　Determination of motion resistance .......................................................32
4.2　Cleaning under furniture .................................................................................32
　　　4.2.1　Distribution of test dust........................................................................32
　　　4.2.2　Determination of free furniture height ....................................................32
4.3　Radius of operation .......................................................................................32
　　　4.3.1　Conditions for measurement .................................................................33
　　　4.3.2　Determination of radius of operation......................................................33
4.4　Impact resistance ..........................................................................................33
　　　4.4.1　Test equipment.....................................................................................33
　　　4.4.2　Determination of impact resistance .......................................................33
4.5　Deformation of hose and connecting tubes.........................................................33

4.5.1    Test equipment...................................................................................... 33
4.5.2    Determination of permanent deformation...................................................... 33
4.6    Bump test........................................................................................................ 34
4.6.1    Test equipment...................................................................................... 34
4.6.2    Test cycle .............................................................................................. 34
4.6.3    Test procedure ...................................................................................... 34
4.7    Flexibility of the hose ..................................................................................... 35
4.7.1    Preparation of test object ........................................................................ 35
4.7.2    Determination of the flexibility of the hose ................................................ 35
4.8    Repeated bending of the hose ........................................................................ 35
4.8.1    Test equipment...................................................................................... 35
4.8.2    Test method .......................................................................................... 35
4.9    Operation with partly filled dust receptacle ..................................................... 36
4.10    Mass ............................................................................................................. 36
4.11    Specific cleaning time .................................................................................... 36
4.12    Dimensions ................................................................................................... 37
4.13    Noise level..................................................................................................... 37
4.14    Energy consumption ....................................................................................... 37
4.14.1    Energy consumption with vacuuming of carpets...................................... 37
4.14.2    Energy consumption with vacuuming of hard floors with crevices............... 39

Section 5: Test material and equipment

5.1    Material for measurements ............................................................................. 39
5.1.1    Test carpets .......................................................................................... 39
5.1.2    Standard test dust.................................................................................. 41
5.1.3    Fibre material ........................................................................................ 43
5.1.4    Thread material ..................................................................................... 43
5.1.5    Moulding granules.................................................................................. 43
5.1.6    Test cushion .......................................................................................... 43
5.2    Equipment for measurements ......................................................................... 44
5.2.1    Floor test plate....................................................................................... 44
5.2.2    Test plate with crevice ........................................................................... 44
5.2.3    Carpet-beating machine .......................................................................... 44
5.2.4    Carpet hold-downs and guides ................................................................. 44
5.2.5    Dust spreader ........................................................................................ 44
5.2.6    Rollers for embedding............................................................................. 44
5.2.7    Void...................................................................................................... 45
5.2.8    Equipment for air data measurement......................................................... 45
5.2.9    Equipment for dust emission measurement ................................................ 47
5.2.10    Device for motion resistance test ........................................................... 49
5.2.11    Device for impact test ........................................................................... 49
5.2.12    Device for determination of deformation of hoses and connecting
tubes .................................................................................................. 49
5.2.13    Mechanical operator ............................................................................. 49
5.2.14    Weighing machine ................................................................................ 49
5.2.15    Testing surface for wet cleaning tests ..................................................... 50
5.2.16    Spectrophotometer ............................................................................... 50
5.2.17    Test soil mixer ...................................................................................... 50
Annex A (informative)  Information on materials.................................................... 73
Bibliography ........................................................................................................ 76

Table 1 – Values for the upper confidence value of a Poisson distribution for the 95 % confidence level .................................................................................................. 28

Table 2 – Classes for sizes 0,4 – 25 μm .......................................................... 48

Figure 1 – Zig-zag pattern .............................................................................. 51

Figure 2 – Stroke length in measurements of dust removal from hard floors and of thread removal from carpets ........................................................................... 51

Figure 3 – Grain size diagram for test dust ..................................................... 52

Figure 4 – Devices for distribution of mineral dust ......................................... 53

Figure 5 – Test plate with crevice ................................................................... 53

Figure 6 – Carpet-beating machine ................................................................. 54

Figure 7a – Carpet hold-downs and guides ..................................................... 54

Figure 7b – Stroke length in the measurement of dust removal from carpets ......... 55

Figure 7c – Dust spreader and roller for embedding dust into carpets .................. 55

Figure 7d – Mechanical operator for the measurement of dust removal from carpets and of motion resistance ....................................................................................... 56

Figure 8 – Right-angled T ............................................................................... 57

Figure 9 – Arrangement of threads in the thread removal test .......................... 57

Figure 10a – Stencil for distribution of fibres on test carpets ........................... 58

Figure 10b – Frame for test cushion ............................................................... 58

Figure 10c – Stencil for distribution of fibres on upholstery ............................. 59

Figure 11 – Nozzle adaptor for upright cleaners .............................................. 59

Figure 12 – Air data curves ............................................................................ 60

Figure 13a – Alternative A equipment for air data measurements ...................... 60

Figure 13b – Measuring box for alternative A .................................................. 61

Figure 13c – Alternative B equipment for air data measurements ...................... 62

Figure 14a – Testing hood for measurement of dust emission ........................... 63

Figure 14b – Placing of upright cleaners in the testing hood ............................. 63

Figure 14c – Dust dispenser ........................................................................... 64

Figure 15 – Insertion depth ............................................................................ 65

Figure 16 – Drum for impact test .................................................................... 65

Figure 17a – Device for testing deformation of hoses and connecting tubes .......... 66

Figure 17b – Position of test object and cross-section for measurement of deformation ........ 66

Figure 18 – Preparation of hoses for testing flexibility ..................................... 67

Figure 19 – Equipment for repeated bending of hoses ...................................... 67

Figure 20a – Profile of threshold ..................................................................... 68

Figure 20b – Arrangements for bump test ....................................................... 68

Figure 21 – Clamping arrangement for carpet sample ...................................... 69

Figure 22a – Cleaning pattern for appliances with cleaning head used in forward and backward strokes ........................................................................................... 69

Figure 22b – Cleaning pattern for appliances with cleaning head only used in backward strokes .......................................................................................................... 70

Figure 23a – Connecting tube openings ........................................................... 71

Figure 23b – Dust spread uniformly on surface .................................................................... 71
Figure 24 – Test dust for loading dust receptacle ................................................................ 72

60312/FDIS © IEC — 23 —

## 2.8.2 Test equipment

Either of the alternative test equipment described in 5.2.8 may be used. The test report shall state which of the alternative test equipment has been used to obtain the air data.

## 2.8.3 Determination of air data

Air flow, vacuum and input power are determined for a number of throttlings sufficient for plotting curves of vacuum and input power against the air flow (see figure 12).

Prior to the sequence of measurements, the vacuum cleaner shall be operated unthrottled in accordance with 1.4.7 to establish a reference value of the exhaust air temperature for further measuring points.

For each measuring point, the air flow, vacuum and input power are recorded 1 min after the throttling. The cleaner is then again operated unthrottled to attain the reference conditions, which is checked by measuring the exhaust air temperature. This procedure is continued until all the entire curves have been plotted with the measuring point for maximum vacuum being the last one.

For each measuring point, the suction power $P_2$ is obtained as the product of the air flow $q$ and the vacuum $h$. The efficiency $\eta$ is calculated as the ratio of corresponding values of the suction power and input power. Curves of suction power and of efficiency are also plotted against the air flow (see figure 12).

## 2.9 Performance with loaded dust receptacle

## 2.9.1 General

The intention of this procedure is to provide means to measure the performance of a vacuum cleaner having a loaded dust receptacle. For this purpose the vacuum cleaner is submitted to cleaning ability tests with the air flow restricted to simulate the condition of a loaded dust receptacle.

NOTE   This test is not intended to measure the capacity of receptacle or filter.

The reduced air flow, that represents the loaded receptacle condition, shall be determined in accordance with 2.9.1.

With the vacuum cleaner prepared according to 2.9.2 to simulate the reduced air flow, the cleaner may be submitted to cleaning ability tests mentioned in 2.9.3 in order to estimate the alternations in performance of the vacuum cleaner.

For uprights with integral hose, the cleaner shall have a connecting tube attached to the hose.

NOTE   The method described is not suitable for vacuum cleaners where the soil passes through the fan before entering the receptacle.

## 2.9.2 Suction with loaded dust receptacle

## 2.9.2.1 Test equipment

The connecting tube of the vacuum cleaner is modified to include two openings, in accordance with figure 23a.The opening nearest the cleaning head is used to insert a pressure tapping and, thereby, attachment of a vacuum meter. The other opening is used for introduction of the test dust and is fitted with a valve.

NOTE   It should be ensured that the openings or any attachments thereto create no disturbance to the airflow in the connecting tube.

60312/FDIS © IEC                    – 24 –

### 2.9.2.2    Test dust

Test dust, see figure 24, in accordance with 5.1.2.3, shall be used for loading the dust receptacle.

### 2.9.2.3    Test method

The vacuum cleaner is operated with the cleaning head set for hard surface and placed on a wooden surface with controls, if any, set to maximum input power.

With the feed tube closed, the vacuum cleaner is run for at least 10 min. The initial vacuum, $h_i$ is then recorded from the attached vacuum gauge

Prior to the injection of test dust, the starting value of the vacuum, $h$, with the feed tube opened shall be recorded.

The batch of test dust is prepared in accordance with the description in 5.1.2.3. It is uniformly spread on a flat surface, see figure 23b, taking care that the dust is evenly dispersed as shown. It shall be introduced steadily and continuously using the feed tube. During the dust feeding stage, the vacuum level is monitored. The feeding rate is such that 50 g is fed uniformly over 60 s (feed rate of 50 g per min). If the volume of receptacle is less than 1,5 l or the maximum airflow of the vacuum cleaner is less than 15 l per s then the feeding rate is reduced to 25 g per min.

The injection of test dust is terminated when one of the following conditions is first reached:

Condition 1: An indicator on the vacuum cleaner signals that the dust receptacle should be emptied or replaced.

Condition 2: The observed value of the vacuum has dropped to $40^{+0,5}_{-0}$ % of $h_s$.

Condition 3: The amount of injected test dust has reached a total of 50 g per l of the maximum usable volume of the dust receptacle (see 2.7)

NOTE   If the vacuum cleaner has 3.2 l maximum usable volume of dust receptacle, the third condition would occur when 160 g has been introduced. In case of 0.6 l maximum usable volume, the third condition would occur when 40 g has been introduced.

After closing the feed tube, the final value of the vacuum, $h_t$, shall be recorded. This value represents the vacuum attained at the reduced air flow due to loading of the receptacle. The condition for termination of dust injection shall be noted.

### 2.9.3    Throttling to simulate loaded dust receptacle

The vacuum cleaner shall be equipped with a clean dust receptacle and filters in accordance 1.4.5. with the feed tube closed. A suitable throttling method shall then be used to reproduce the vacuum value $h_f$.

NOTE   It is recommended that the throttling being brought about by inserting a suitable device between the motor/fan chamber and the dust receptacle.

### 2.9.4    Determination of performance with loaded dust receptacle

With the vacuum cleaner throttled in accordance with 2.9.2 any of the test procedures described in 2.1 to 2.6 may be carried out to determine the respective cleaning ability with loaded dust receptacle.

60312/FDIS © IEC                           – 25 –

Upon the completion of the test procedure, the adjustment of the throttling device shall be verified.

To the cleaning ability tests with, the throttling device may be completed in connection with air data measurements according to 2.8.

## 2.10   Dust emission of the vacuum cleaner

The purpose of this test is to determine the average dust concentration in the exhaust air of a vacuum cleaner when operating at its maximum air flow and fed with test dust at a specified rate.

Prior to the test, the vacuum cleaner shall have been subjected to air data measurements (see 2.8) in order to establish the maximum air flow of the cleaner.

### 2.10.1   Test procedure

#### 2.10.1.1   Test equipment

The equipment, as described in 5.2.9, comprises a testing hood with a sampling probe tube, a dust dispenser and a dust measuring instrument (particle counter). The air flow at which the particle counter operates shall be known.

The diameter of the sampling probe tube shall be chosen with respect to the air flow in the chimney tube (determined from maximum airflow of the cleaner) and the air flow of the particle counter, in such a way as to maintain an almost isokinetic state at the opening of the probe tube, i.e. air velocity in the chimney tube ≈ air velocity in the probe tube. Alternatively, a probe tube with exchangeable inlets of differing hole diameters may be used.

#### 2.10.1.2   Test dust

Test dust, in accordance with 5.1.2.5, shall be used for this test.

#### 2.10.1.3   Determining the test dust quantity

The quantity of test dust as per 5.1.2.5 to be used for each test is determined once the maximum airflow for the given filter equipment has been calculated.

For the predefined dust concentration $c$ in the intake air, the dust quantity $m$ to be used is calculated as follows as a function of $t_{MEAS}$ and $q$:

$$m = c \times t \times q$$

where

$m$ is in grammes;

$c = 0,550 \ g/m^3$;

$t_{MEAS} = 120 \ s$;

$q$ is in l/s;

therefore

$m = 6,6 \times 10^{-2} \times q$

# EXHIBIT M
# REDACTED IN ITS ENTIRETY

# EXHIBIT N



197 Fed.Appx. 120
197 Fed.Appx. 120, 2006 WL 1792856 (C.A.3 (N.J.)), 2006-2 Trade Cases P 75,351
**(Cite as: 197 Fed.Appx. 120)**

Page 1

H
GlaxoSmithKline Consumer Healthcare, L.P. v.
Merix Pharmaceutical Corp.
C.A.3 (N.J.),2006.
This case was not selected for publication in the Federal Reporter.NOT PRECEDENTIAL Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)
United States Court of Appeals,Third Circuit.
GLAXOSMITHKLINE CONSUMER HEALTH-
CARE, L.P.
v.
MERIX PHARMACEUTICAL CORP., Appellant.
**No. 05-4564.**

Submitted pursuant to Third CircuitL.A.R. 34.1(a)
June 29, 2006.
Filed: June 29, 2006.

**Background:** Drug manufacturer brought action against a competitor for false advertising under the Lanham Act, the New Jersey Consumer Fraud Act. The United States District Court for the District of New Jersey, Dickinson R. Debevoise, J., 2005 WL 2230318, issued preliminary injunction against competitor, and competitor appealed.

**Holding:** The Court of Appeals, Van Antwerpen, Circuit Judge, held that court did not abuse its discretion in issuing the preliminary injunction.

Affirmed.
West Headnotes
**Antitrust and Trade Regulation 29T ⟐383(2)**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(E) Enforcement and Remedies
         29TIII(E)7 Relief
            29Tk380 Injunction
               29Tk383 Preliminary or Temporary Relief, Grounds, Subjects, and Scope
                    29Tk383(2) k. Particular Cases.

Most Cited Cases
District court did not commit clear error in finding that competitor's advertising claims falsely implied a cure by characterizing its cold sore product as a "1 day treatment" and showing before and after photos indicating that product sped healing rather than merely relieved symptoms, that competitor's false advertising about its product would damage and divert sales of drug manufacturer's product, and that manufacturer would suffer irreparable harm absent the injunction; thus, district court did not abuse its discretion in issuing the preliminary injunction against competitor. Lanham Act, § 43(a), 15 U.S.C.A. § 1125(a).

On Appeal from the United States District Court for the District of New Jersey. (D.C. Civil No. 05-cv-00898). District Court Judge: Honorable Dickinson R. Debevoise.

Kenneth A. Plevan, Skadden, Arps, Slate, Meagher & Flom, New York, NY, for Appellee.
James S. Richter, Winston & Strawn, Newark, NJ, for Appellant.

Before: BARRY, VAN ANTWERPEN and JOHN R. GIBSON,[FN*] Circuit Judges.

    FN* Honorable John R. Gibson, United States Court of Appeals for the Eighth Circuit, sitting by designation.

OPINION OF THE COURT
VAN ANTWERPEN, Circuit Judge.
**\*\*1** Appellant Merix Pharmaceutical Corporation ("Merix"), defendant below, brings this interlocutory appeal to challenge the preliminary injunction entered against it following the motion of plaintiff-appellee GlaxoSmithKline Consumer Healthcare, L.P. ("Glaxo"). Glaxo sought the preliminary injunction incident to its lawsuit against Merix for false advertising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-2. The District Court granted the injunction, and for the reasons set forth herein, we will affirm.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

197 Fed.Appx. 120                                                                                   Page 2
197 Fed.Appx. 120, 2006 WL 1792856 (C.A.3 (N.J.)), 2006-2 Trade Cases P 75,351
(Cite as: 197 Fed.Appx. 120)

## I.

Because we write only for the parties, our discussion of the facts is limited to those necessary to adjudication of the case. Glaxo produces and markets a number of over the counter ("OTC") pharmaceuticals, including Abreva. Abreva is an FDA-approved, non-prescription medication that shortens the duration of the healing time for cold sores. It has been publicly available since late 2000, and retails for roughly $15 to $18 a tube. Merix markets its cold sore product, Releev, online and in drug stores for roughly $15 to $20 a tube. Drug stores often stock Releev adjacent to or nearby Abreva.

Meryl Squires formed Merix after discovering that a blend of a common topical antiseptic, benzalkonium chloride and the herb Echinacea relieved the symptoms of the cold sores she frequently suffered. Her friends who tried the compound agreed that it was helpful. She obtained two patents on the substance, and ultimately marketed it as Releev. Merix is a small company, with a total of four employees. Merix started out selling Releev on the internet, and in June 2003, began retailing it in national drug store chains where it competed directly with Abreva. Merix's annual revenues have recently run to several million dollars.

Glaxo brought the instant suit against Merix because it believed the claims Merix made about Releev were false and misleading, and Releev would thereby unfairly compete with Abreva. This is not the first time Glaxo challenged Merix's claims about Releev. In 2003, Glaxo informed the FDA of the claims, which resulted in the agency sending a warning letter to Merix. In July 2004, Glaxo brought an advertising challenge against Merix before the National Advertising Division ("NAD") of the Better Business Bureau. Participation in NAD proceedings is voluntary, and the *122 results are non-binding. Merix participated. The NAD found in favor of Glaxo on all issues presented; Merix appealed to the NAD Review Board. Glaxo abandoned the proceedings there and commenced the present action on February 16, 2005 in the United States District Court for the District of New Jersey.

As set forth by the District Court, Glaxo challenged, and sought a preliminary injunction against, a number of Merix's claims, including, *inter alia*:

"1. Releev has been "clinically proven": (a) to be a "1 Day Cold Sore Treatment" and (b) to "prevent outbreaks"[;]

2. Releev is endorsed by the University of Chicago;

**2 3. Clinical research by Releev's Principal Clinical Investigator has been published;

4. Releev uses the product name Vira Medx;

5. The Releev package bears "before and after" photographs purportedly showing marked improvement after 1 day, after 3 days, and after 5 days."

App. 5. At the inception of the preliminary injunction hearing, counsel for Merix reported that Merix had altered its packaging and promotional material to remove the problematic claims, and pressed that Glaxo's motion for injunctive relief be denied as moot. Its new claims, modified in time for the preliminary injunction hearing, consist of redesigned packaging that asserts:"*1 Day* Cold Sore Treatment Relieves Symptoms in Just a Day!"

Supp.App. 198. The top line is displayed in a more prominent typeface than the second. The packaging also offers "before and after" photos on the back. The prospective purchaser is referred to them by an exhortation on the front of the package to "See actual Before and After Photos on back panel." Three photos show a cold sore at one, three, and five days; it is progressively improved.

The District Court concluded that both sets of claims-those prior to the preliminary injunction proceedings, and those made as a result of their institution-were false. Indeed, it found that "[t]he only claim that Merix can truthfully make for RELEEV is that it provides relief from cold sore *symptoms.*" App. 14 (emphasis added). It concluded that the new set of claims still implied a *cure* by characterizing Releev as a "1 Day ... Treatment" and showing before and after photos indicating Releev speeds healing rather than merely relieving symptoms. Without belaboring the point, Merix has essentially conceded, for purposes of proceedings on the preliminary injunction, that it could not prevail in its defense of its product claims.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

197 Fed.Appx. 120                                                                    Page 3
197 Fed.Appx. 120, 2006 WL 1792856 (C.A.3 (N.J.)), 2006-2 Trade Cases P 75,351
(Cite as: 197 Fed.Appx. 120)

With respect to the preliminary injunction, the District Court concluded that Glaxo had proved its case. The Court found that Glaxo had a high likelihood of success on the merits where it would have to prove that the claims violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[FN1] *123 The District Court also concluded that Glaxo would suffer irreparable harm absent the injunction. In particular, the Court concluded that Releev and Abreeva competed head-to-head because they were the only two cold sore products selling in the $15 to $20 range, and stores placed them on shelves in close proximity to each other. Accordingly, given the unanswered testimony of Glaxo Vice President Jeffrey Brown, Glaxo had lost, and would continue to lose, sales to Releev because of Merix's false advertising. Furthermore, when customers found that Releev did not live up to its promises, its failures might also tar the reputation and goodwill of Abreva, which is the only other cold sore product in the same price range. To the extent the failure to seek interlocutory relief as soon as absolutely practicable weighs against a finding of irreparable harm, the District Court concluded that Glaxo should not have been faulted for initially attempting to resolve its dispute by gentler means. The District Court went on to complete its preliminary injunction analysis, holding that the injury to Merix of granting it did not outweigh the injury to Glaxo of withholding it, and that prevention of false advertising and promotion of lawful competition would serve the public interest.[FN2]

FN1. The elements of a Lanham Act claim for false advertising are:
"1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc."
*Ditri v. Coldwell Banker Residential Affiliates, Inc.,* 954 F.2d 869, 872 (3d Cir.1992)

(quoting *U.S. Healthcare v. Blue Cross of Greater Phila.,* 898 F.2d 914, 922-23 (3d Cir.1990)).

FN2. The parties do not dispute the District Court's findings on these latter two issues, and we do not review them.

## II.

**3 The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have jurisdiction to review grants or denials of preliminary injunctions as interlocutory matters pursuant to 28 U.S.C. § 1292(a)(1).[FN3] Examining the District Court's findings of fact, conclusions of law, and analysis, we discern neither error nor abuse of discretion. We will affirm for essentially the same reasons set forth by the learned Court in its September 13, 2005 opinion and order, and therefore do not recapitulate its analysis here.

FN3. The test for a preliminary injunction requires the district court to consider four now-familiar factors:
"(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest."
*Am. Civil Liberties Union of N.J. v. Black Horse Pike,* 84 F.3d 1471, 1477 n. 2 (3d Cir.1996) (citations and quotations omitted). We review orders granting or denying preliminary injunctions for abuse of discretion, but examine the underlying findings of fact for clear error and afford plenary review to questions of law. *Doe v. National Bd. of Medical Examiners,* 199 F.3d 146, 154 (3d Cir.1999).

We have only the following to add. The parties make much of the evidence adduced by Glaxo to support its claim of irreparable harm. Among other things, Merix argues both that it is speculative, and shows no

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

197 Fed.Appx. 120
197 Fed.Appx. 120, 2006 WL 1792856 (C.A.3 (N.J.)), 2006-2 Trade Cases P 75,351
(Cite as: 197 Fed.Appx. 120)

Page 4

injury that *post hoc* damages could not redress. Assuming, without deciding, that this evidence was less than optimal, we briefly note two points. First, Merix points to no evidence to rebut the testimony of Brown that Merix's false advertising about Releev would damage divert sales of Abreva. The District Court was justified in relying on it, and we discern no clear error in its factual finding in this respect; that is, we are not "left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *see United States v. Westinghouse Elec. Corp.,* 788 F.2d 164, 169 (3d Cir.1986) (no clear error where court relied on unrebutted testimony).

**\*124** Second, any other result would set an unworkably high bar for a district court's fact finding under these circumstances. Given the time-is-of-the-essence nature of preliminary injunction proceedings, courts and parties cannot develop the same depth in the factual record they can at trial. *See U.S. Steel Corp. v. Fraternal Ass'n of Steelhaulers,* 431 F.2d 1046, 1048 (3d Cir.1970). "[T]he grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury." *Id.* In deciding a motion for a preliminary injunction, a district court must *weigh* the appropriate factors, rather than mechanically apply them. *See id.* ("delicate balancing"); *Gerardi v. Pelullo,* 16 F.3d 1363, 1373 (3d Cir.1994).

Here, there is no denying the formidable strength of Glaxo's merits case. Merix concedes as much for purposes of this appeal in its summary of its argument in its brief. Br. of Appellant at 14. The District Court has made adequate-and uncontroverted-findings on the issue of irreparable injury to support its conclusion, and it properly considered and balanced those concerns pertinent to the interlocutory relief requested by Glaxo. Accordingly, the District Court did not abuse its discretion in issuing the preliminary injunction.

**III.**

As just discussed, we will affirm for the reasons set forth herein and in the September 13, 2005 opinion of the District Court.

C.A.3 (N.J.),2006.
GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharmaceutical Corp.
197 Fed.Appx. 120, 2006 WL 1792856 (C.A.3 (N.J.)), 2006-2 Trade Cases P 75,351

END OF DOCUMENT

# EXHIBIT O

Westlaw.

Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 1447915 (D.Minn.), 2004-2 Trade Cases P 74,486, 72 U.S.P.Q.2d 1661
(Cite as: Not Reported in F.Supp.2d)

C

Millennium Import Co. v. Sidney Frank Importing
Co., Inc.
D.Minn.,2004.

United States District Court,D. Minnesota.
MILLENNIUM IMPORT COMPANY, Plaintiff,
v.
SIDNEY FRANK IMPORTING COMPANY, INC.,
Defendant.
No. Civ.03-5145 JRT/FLN.

June 11, 2004.

Peter D. Raymond, Reed Smith, New York, NY; and
Rita Coyle DeMeules, Robins Kaplan Miller &
Ciresi, Minneapolis, MN, for plaintiff.
Thomas A. Smart, Kaye Scholer, New York, N.Y.
and Christopher K. Larus, Fulbright & Jaworski,
Minneapolis, MN, for defendant.

MEMORANDUM OPINION AND ORDER
DENYING PLAINTIFF'S RENEWED MOTION
FOR A PRELIMINARY INJUNCTION
TUNHEIM, J.

**\*1** Millennium Import Company ("Millennium" or
plaintiff), maker of the luxury vodka Belvedere,
brought this lawsuit against Sidney Frank Importing
Company ("Sidney" or defendant), maker of the
luxury vodka, Grey Goose. Millennium accuses
Sidney of false and misleading advertisement
practices relating to a print advertisement ("print ad")
and a "hang tag" advertisement, both of which
reference a 1998 taste test in which Grey Goose
outscored Belvedere. Millennium brings these claims
under the Lanham Act and several Minnesota statutes
including the Deceptive Trade Practices Act, the
Unlawful Trade Practices Act, and the Consumer
Fraud Protection Act. Millennium also brings a claim
for common-law product disparagement or "trade
libel."

On March 19, 2004, the Court heard oral argument
on Millennium's renewed motion for a preliminary
injunction. For the reasons discussed below, the
Court denies the motion for preliminary injunctive
relief. Also on the calendar was Sidney's motion to
dismiss Count IV (brought under the Minnesota
Consumer Protection Statute) and Count V (common
law claim for product disparagement). The parties

rested on their briefing as to that motion, and the
Court ruled on the motion from the bench. The Court
granted the motion to dismiss Count IV, and granted
the motion to dismiss Count V, but granted plaintiff
leave to amend Count V to comply with the pleading
requirement for claims of product disparagement.

BACKGROUND

I. THE VODKAS

Belvedere, introduced in 1996, and Grey Goose,
introduced about a year later, are part of a new and
fast-growing category of "luxury imported vodka."
According to the parties' representations, Belvedere
and Grey Goose hold the vast majority of the market
share for luxury vodkas. Both types of vodka seem to
have done well in the market, though sales of Grey
Goose have outpaced those of Belvedere.

II. THE TASTE TEST

In 1998 the privately run Beverage Testing Institute
of Chicago ("BTI") conducted a taste-test of over 40
vodkas. The BTI is an independent taste testing
organization, which conducts periodic taste tests of
wine, beer, and distilled spirits, including vodka. For
the 1998 vodka taste-test, the BTI tested "luxury"
vodkas, as well as the more run-of-the-mill variety.
The vodkas were rated on a scale of 1 to 100,
according to BTI's regular practices. Points were
awarded based on smoothness, nose, and taste.
Scores from 100-96 are "superlative;" from 95-90 are
"exceptional;" 81-89 are either "recommended" or
"highly recommended;" below 80 are "not
recommended." Grey Goose came out on top, with a
score of 96. Belvedere fared much worse, and scored
74. Although Millennium suggests the test was an
anomaly, neither party complains that the 1998 BTI
taste test at issue did not follow accepted procedure
or was otherwise unreliable.

III. THE AD

Sidney took advantage of Grey Goose's top score,
and began to run advertisements touting the 1998
BTI taste-test results. The at-issue print ad has

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1447915 (D.Minn.), 2004-2 Trade Cases P 74,486, 72 U.S.P.Q.2d 1661
(Cite as: Not Reported in F.Supp.2d)

appeared in multiple issues of numerous different magazines, and reads as follows:

*2 Rated The # 1 Vodka In The World [in large type] "In 1998, the Beverage Testing Institute of Chicago conducted a blind taste test of more than 40 vodkas. They awarded points based on smoothness, nose, and most importantly, taste. Of all the vodkas, Grey Goose Vodka emerged victorious, receiving 96 points out of a possible 100.

"Founded in 1981, the Beverage Testing Institute conducts tests in a specially designed lab that minimizes external factors and maximizes panelists' concentration. The Institute selects judges based on their expertise, and its testing and scoring procedures are widely praised as the best in the industry." [two paragraphs are in a smaller type]

This print ad then lists 31 vodka brands, their countries of origin, and their scores from the 1998 test. In very small print, the ad states that the 31 vodkas are a "sampling" of the 40 vodkas tested. Millennium states that only three "luxury" vodkas are on the list.

Millennium also complains about a "hang tag" or "neck tag." The hang tag is designed to go around the neck of the Grey Goose bottle, and features a bar chart of nine vodka brands in ascending order (from lowest to highest) based on the 1998 BTI ranking. Belvedere is listed first (in the "worst" position) though Smirnoff is also listed with the same score of 74. In tiny print at the bottom of the tag is the following:

NOTE THIS REPRESENTS A SAMPLING OF THE 40 VODKAS TESTED 1998 SOURCE (BTI) BEVERAGE TESTING INSTITUTE INC.

Although Sidney claims that it is no longer placing the hang tag on new product, it is possible that a quantity of Grey Goose vodka still in the chain of distribution carries the hang tag. The record does not reflect how many hang tags remain in the chain of distribution, and counsel for Sidney was unable to provide the Court with more specific information. (Einsidler Decl. ¶ 14, claiming that Sidney has not been applying the neck tag to new bottles of Grey Goose since early June of 2003 and noting, "We anticipate that little, if any, product containing the hang tag will be in the market by year end.").

Millennium suggests that the 1998 taste test was an anomaly, and points out that in subsequent tests conducted by the BTI, Belvedere consistently has earned "Exceptional" ratings. Millennium reports that

Belvedere has attained the following scores in BTI tests: 90 in 1999, 91 in 2001, and 92 in two separate tests in 2002.[FN1]

> FN1. Sidney objects that one of the 2002 tests is unauthenticated and lacks documentary support in this record. For the purposes of this motion, it is enough to note that Belvedere has been ranked as "Exceptional" by the BTI in at least three subsequent taste tests.

### IV. MILLENNIUM'S CHALLENGE

Before filing this complaint, Millennium complained to the "NAD" (National Advertising Division of the Council of Better Business Bureaus). The NAD is a self-regulatory organization of advertisers. Parties can file complaints with the NAD, and NAD endeavors to provide dispute resolution that is more efficient, economical, and confidential than traditional methods of dispute resolution.[FN2] NAD reports having resolved over 3,700 advertising cases. *See* http://www.nadreview.org/AboutNAD. Though decisions of the NAD are not binding, the NAD reports an extremely high compliance rate. *Id.*

> FN2. For a more thorough discussion of NAD's procedures, see the NAD's website at http://www.nadreview.org/AboutNAD.

*3 Sidney presented its position to the NAD, as did Millennium. The NAD found in favor of Millennium, and determined that the Grey Goose ads were misleading. The NAD recommended that Sidney remove Belvedere's 1998 test results from the ad. Sidney disagreed with the NAD's determination.

When an advertiser disagrees with the NAD's findings, the decision can be appealed to the National Advertising Review Board ("NARB") for additional review. Sidney chose to appeal the NAD decision. The NARB adopted the findings of the NAD and determined that the message in the Grey Goose ads was inaccurate and misleading. The NARB panel concluded, "the challenged advertisement can reasonably be perceived by consumers as reflecting BTI's current assessment of Belvedere Vodka." (Gill Decl. at Exhibit E.)

Although Sidney had participated in the NARB process-in fact, Sidney instigated the appeal-Sidney declined to comply with the NARB's decision and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1447915 (D.Minn.), 2004-2 Trade Cases P 74,486, 72 U.S.P.Q.2d 1661
(Cite as: Not Reported in F.Supp.2d)

refused to revise its advertising. Sidney claims that it could not revise its ads in the manner suggested by the NARB, because the BTI explicitly forbids "mixing and matching" test results from different years. Sidney claims that it could not, therefore, have an ad in which it reported Belvedere's scores from the later tests and Grey Goose's score from the 1998 test. Counsel for Sidney indicated at oral argument that it is unclear what the consequence of such "mixing" would be. Sidney does not indicate that it would be a violation of BTI policy to exclude Belvedere entirely from the advertisement.

In addition to the review by the NAD and the NARB, the Bureau of Alcohol, Tobacco and Firearms (now known as the Alcohol and Tobacco Tax and Trade Bureau) has also reviewed the at-issue ads. The BATF has approved BTI's methodology for the 1998 test and has reviewed the challenged ad and determined that it is neither disparaging nor misleading. Millennium suggests that the BATF reviewed the ads in 1998, and therefore the BATF's approval is no longer indicative of the current truth or falsity of the ads. Sidney points out, however, that the NAD/NARB decision was reported to the Bureau, and the Bureau took no action.

## V. THE SURVEYS

After filing this complaint, Millennium commissioned Dr. Alex Simonson to conduct a consumer survey to determine whether, and to what extent, relevant consumers believed that the print ad for Grey Goose vodka makes a current claim about the taste test ranking for Grey Goose in relation to the rankings of other brands of vodka. In brief, vodka consumers, ages 21 and older, who were likely to read the magazines in which the Grey Goose ad runs were asked to read the ad, and then were asked to respond to a series of questions about it. Dr. Simonson interprets the results as proving that about half the respondents believe that the ad communicates something about the listed brands currently, not merely about some past time or period. Simonson also interprets the survey as indicating that a vodka's placement at the bottom of the list would affect the purchasing decisions of about one-third of the respondents. Sidney hired an expert to critique Millennium's consumer survey, which is discussed below.

*4 Sidney also conducted its own consumer survey (the "Lieberman survey") in order to determine what impact, if any, the at-issue advertisement has on purchase interest in Belvedere. The Lieberman survey interviewed 601 consumers in twelve U.S. markets. The survey involved showing consumers one of three ads resembling the at-issue ad, and manipulating the placement of Belvedere on the list. In one ad, Belvedere was near the bottom, in one it was not in the ad at all, and in the third, Belvedere was near the top. Each ad was shown to about 200 respondents, who were adults, 21 and older, who bought vodka in a store or restaurant in the past 12 months, and expected to do so again in the next 12 months, and would be willing tó spend more than $25 on a fifth of vodka or would specify what brand if they ordered in a bar or restaurant.

After screening questions, respondents were shown the ad, and then the ad was taken away. Respondents were then asked a series of questions beginning with "What brand was advertised in the ad?" Respondents were then asked additional questions about how particular brands scored in the test. The survey did not ask any questions about when the taste test occurred, or whether the listing reflected the most recent test results.

Lieberman interprets his results as showing that the Grey Goose ad did not have a harmful effect on Belvedere. Most of the respondents were able to identify Grey Goose as the brand being advertised, but only a very small proportion identified Belvedere, regardless of its placement. Even fewer respondents expressed that they would be less likely to choose Belvedere based on the ad.

## ANALYSIS

### I. PRELIMINARY INJUNCTION

To obtain a preliminary injunction, Millennium must establish that the balance of the following factors is in its favor: (1) the probability that Millennium will succeed on the merits; (2) the threat of irreparable harm to Millennium; (3) the balance between this harm and the injury that granting the injunction will inflict on other parties; and (4) whether the issuance of an injunction is in the public interest. *Calvin Klein Cosmetic Corp. v. Lenox Lab.*, 815 F.2d 500, 503 (8th Cir.1987) (citing *Dataphase Sys. Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981)).

In cases brought pursuant to the Lanham Act, if the relief sought in the preliminary injunction is essentially the same relief sought in a trial on the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 4

Not Reported in F.Supp.2d, 2004 WL 1447915 (D.Minn.), 2004-2 Trade Cases P 74,486, 72 U.S.P.Q.2d 1661
(Cite as: Not Reported in F.Supp.2d)

merits, the movant's burden is heightened. *Calvin Klein Cosmetic Corp.*, 815 F.2d at 503.

### A. Probability of Success on the Merits

The Lanham Act prohibits advertising that is false, and also prohibits statements that tend to deceive or that create a false impression. 15 U.S.C. § 1125(a)(1)(B) (Section 43(a) of the Lanham Act).[FN3] Courts use an analysis "substantially similar to that applicable to federal claims under the Lanham Act to analyze claims based on" the Minnesota statutes under which plaintiff brings causes of action. *Alternative Pioneering Sys., Inc. v. Direct Innovative Products, Inc.*, 822 F.Supp. 1437, 1441 (D.Minn.1993). Therefore, the Court will "analyze only the Lanham Act claim to determine whether [the plaintiff is] likely to succeed on the merits of its false advertising claims." *Id.*

> FN3. Specifically, the Act prohibits the "false or misleading representation of fact, which.-... (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B).

**\*5** To prevail on a false advertising claim under this section, Millennium must prove that (1) defendant made a false statement of fact in a commercial advertisement about its own or another's product; (2) the statement actually deceived or would tend to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant or by a loss of good will associated with its products. *Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc.*, 83 F.Supp.2d 1016, 1022 (D.Minn.2000) (citing *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir.1998)); *see also American Italian Pasta Co. v. New World Past Co.*, No. 03-2065, slip op. at 3-4 (8th Cir. June 7, 2004).

The first element, that the defendant made a false statement of fact, "generally falls into one of two categories: (1) commercial claims that are literally false as a factual matter; and (2) claims that may be

literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *United Indus.*, 140 F.3d at 1180. In cases in the latter category, proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients becomes critical, and the ultimate success of the claim usually turns on the persuasiveness of a consumer survey. *Id.* (citations omitted).

### 1. False by necessary implication

Plaintiff first argues that the ads are "literally false by necessary implication." Plaintiff does not claim that the test was wrong in 1998, or that defendant changed the results. Instead, this "literally false by necessary implication" argument hinges on looking at the overall message of the advertisement, and determining whether "the audience would recognize the claim as readily as if it had been explicitly stated." *Clorox Co. Puerto Rico v. Proctor & Gamble Co.*, 228 F.3d 24, 34 (1st Cir.2000); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir.2002) (noting that a message is false by necessary implication "when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated"); *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 274 (4th Cir.2002) (same).

For example, in *Tambrands v. Warner-Lambert Co.*, 673 F.Supp. 1190 (S.D.N.Y.1987), the district court determined that the claims of a home-pregnancy test maker were "literally false by necessary implication" because the ads claimed results "in as fast as 10 minutes." In fact, only 52% of pregnant women would obtain positive results in 10 minutes, while 48% of pregnant women, and all non-pregnant women required 30 minutes to confirm test. *Id. at 1194.* The Court rejected defendant's argument that the qualifying words-"in as fast as"-sufficiently modified the message to render to advertisement true. *Id. See also Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24 (1st Cir.2000) (reversing dismissal of Lanham Act claim because fact-finder could have determined comparison claim of "Compare with your detergent ... whiter is not possible" was literally false by necessary implication); *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945-48 (3d Cir.1993) (discussing difference between finding claim false by necessary implication, and finding claim true, but likely to deceive; noting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 1447915 (D.Minn.), 2004-2 Trade Cases P 74,486, 72 U.S.P.Q.2d 1661
(Cite as: Not Reported in F.Supp.2d)

that consumer evidence is required only for the latter, and that it is within judicial province to find the former; and concluding that claim that motor oil provided superior engine protection was literally false based on the commercial's necessary implication without reference to consumer confusion); *Playskool, Inc. v. Product Dev. Group, Inc.*, 699 F.Supp. 1056, 1060 (E.D.N.Y.1988) (finding claim that defendant's toys could attach to plaintiff's toys was literally true, but the "clear implication" was that defendant's toys could safely attach to plaintiff's toys, which was untrue and misleading without referring to consumer surveys).

*6 Here, plaintiff's claim is that looking at the overall message of the advertisement, it is clear that Grey Goose is claiming that it is currently ranked the best tasting vodka in the world. Plaintiff also argues that the ad communicates the false message that Belvedere's rating of 74 is the current rating. Plaintiff suggests that even the qualifying words-noting that the tests were conducted in 1998, and the use of the past tense-do not render the ad true. Plaintiff argues that the later tests supersede and contradict the results of the 1998 test.

Defendant responds by arguing that the Grey Goose ad is not "false by necessary implication" because there simply is no implication in the ad. Defendant analogizes to a sporting event, and suggests that advertising a "win" in year one is not false, even if the ad fails to mention that the team "lost" in year two. Defendant also notes the past tense language, and points out that the year of the test is displayed prominently. As a slightly different argument, defendant emphasizes that consumers are accustomed to "taste tests" and understand that taste tests occur with some frequency, and that the results are somewhat subjective. Essentially, defendant argues that consumers know how to read this ad, and consumers are not reading it as putting forth current results of taste tests.

Plaintiff's likelihood of success on the false by necessary implication argument is bolstered somewhat by defendant's alleged violation of the Federal Trade Commission's (FTC) guidelines. Plaintiff argues that according to those guidelines, advertisers should not use outdated third-party endorsements. Some courts have granted FTC guidelines significant weight. *Surdyk*, 83 F.Supp.2d at 1021-22 (citing *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 973 (7th Cir.1999) ("[A]s the administrative agency charged with preventing unfair trade practices, the [FTC's]

assessment of what constitutes deceptive advertising commands deference from the judiciary.")). Both the *Surdyk* and *B. Sanfield* courts, however, also caution against "blur[ring] the distinctions between the FTC and a Lanham Act plaintiff" and note that the Lanham Act plaintiff must "show that the [advertisements] are literally false or misleading to the public," not merely that the advertisements violate FTC guidelines. *Surdyk*, 83 F.Supp.2d at 1022, n. 2 (quoting *Sanfield*, 168 F .3d at 972 n. 3, additional internal quotation omitted).

The print ad is not literally false, and despite the FTC guidelines, the Court is not persuaded by plaintiff's "false by necessary implication" argument. Given the sheer number of claims by adult beverage makers that theirs is "the best" or "the premier," it is unlikely that the plaintiff will be able to show (and plaintiff has not yet shown) that "the audience would recognize the claim"-that Grey Goose is currently rated the best vodka in the world-"as readily as if it had been explicitly stated ." *Novartis*, 290 F.3d at 586.

*7 Plaintiff has not yet persuaded the Court that consumers have no way of knowing that any taste test was ever conducted after 1998, or that it is reasonable to conclude that many consumers would think that the 1998 taste test is the last word on the tastiness of vodkas. The Court notes, however, that at some point, reliance on an outdated test could well render an ad "false by necessary implication" especially where the ad appears to report the most recent taste test results.

### 2. Consumer surveys

Because the Court finds that plaintiff has not presented a strong argument that the printed ad is false by necessary implication, the Court turns to the consumer surveys. Courts review consumer surveys because "[w]here a commercial claim is not literally false but is misleading in context, proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients becomes critical." *United Indus.*, 140 F.3d at 1142. Consumer surveys supply the reviewing court with a measure of public reaction, which "is the measure of a commercial's impact." *Id.* In cases of consumer confusion or deception, " 'the success of the claim usually turns on the persuasiveness of a consumer survey.' " *Id.* (quoting *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 129-30 (3rd

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                            Page 6
Not Reported in F.Supp.2d, 2004 WL 1447915 (D.Minn.), 2004-2 Trade Cases P 74,486, 72 U.S.P.Q.2d 1661
(Cite as: Not Reported in F.Supp.2d)

Cir.1994)).

Plaintiff alternately argues that even if the Grey Goose print ad is "literally true," consumer survey evidence demonstrates that it conveys a deceptive message to consumers.[FN4] To bolster this argument, plaintiff points out that the NAD/NARB determined that the ad was literally true, but that the ad deceived and misled consumers. The NAD/NARB, however, made this determination without the benefit of the consumer surveys. While "full-blown consumer surveys ... are not an absolute prerequisite at the preliminary injunction stage, the movant ... must present evidence of deception" or consumer confusion. *Scotts Co. v. United Indus. Corp.,* 315 F.3d 264, 276 (4th Cir.2002) (internal citations omitted) (emphasis added); *see also United Indus.,* 140 F.3d at 1183.

> FN4. The Court notes that neither survey addressed the hang tag.

After filing this lawsuit, but before filing the instant motion, plaintiff hired Dr. Alex Simonson to conduct a consumer survey. Simonson's team surveyed 254 people in the double-blind study. Simonson interprets the results as proving that almost half (48%) of the consumers responded that the ads communicated a current superiority message about the advertised vodka. Exactly half, again according to Simonson's analysis, indicated that the ad communicated something current about the list of vodka brands in the ad. Plaintiff argues that these results prove that ad is misleading, because the 1998 taste ratings do not support any claim concerning current ratings. Simonson also interprets the results as indicating that the ad is likely to influence the purchasing decisions of about one-third of the respondents.

*8 Defendant argues that the Simonson survey is "fatally flawed" and that the survey does not meet the *Daubert* test for admissibility. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 570 (1993). "The evidentiary value of a survey's results rests upon the underlying objectivity of the survey itself." *Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.,* 960 F.2d 294, 300 (2d Cir.1992) (citation omitted). "The probative value of a consumer survey is a highly fact-specific determination and a court may place such weight on survey evidence as it deems appropriate." *Rhone-Poulenc,* 19 F.3d at 134. Courts measure objectivity by various factors, including "whether [the survey] is properly 'filtered' to screen out those who got no

message from the advertisement, whether the questions are directed to the real issues, and whether the questions are leading or suggestive." *Johnson & Johnson,* 970 F.2d at 300 (citations omitted).

Defendant raises the following specific criticisms: (1) Simonson surveyed the wrong universe; (2) the survey asked leading and ambiguous questions; (3) it did not use controls; and (4) the survey's key questions were hypothetical and did not measure whether consumers actually took away any false messages about Belvedere. The Court addresses each of these criticisms in turn.

#### a. Proper universe

Defendant's first criticism is that although Simonson surveyed individuals likely to buy vodka, he should have interviewed individuals likely to purchase luxury vodka. Defendant cites *Conopco, Inc. v. Cosmair, Inc.,* 49 F.Supp.2d 242, 253 (S.D.N.Y.1999), in which the district court rejected a consumer survey in a trademark dispute regarding a "prestige" perfume bottle. The *Conopco* court cited the three following reasons for finding the universe to be flawed: "(1) it excluded all men and women over the age of forty-five who represent a substantial portion of the total universe of the products' potential consumers; (2) it included past purchasers who were not necessarily future potential purchasers; and (3) it failed to properly discriminate between purchasers of "prestige fragrance" brands as opposed to those who purchase just any fragrance. *Id.* (internal citations to transcript omitted). In addition to the flawed universe, the district court also based the rejection of the survey on the fact that the control bottle used in the survey "did not faintly resemble" the at-issue bottle. *Id* . at 250. Finally, the fairness of the survey was undermined because the survey "was purposefully limited to malls where [the perfume] ha[d] a high recognition rate." *Id.*

Defendant also points to *Weight Watchers Int'l, Inc. v. Stouffer Corp.,* 744 F.Supp. 1259, 1272 (S.D.N.Y.1990), in which the district court accorded only slight weight to the plaintiff's consumer survey because the court determined the survey contained numerous major flaws, and the court noted its "strong misgivings about [the survey's] improper universe and improper miscategorization of responses." *Id.*

*9 Plaintiff answers this critique by arguing that Simonson included all vodka drinkers because that is who is targeted by the ads at issue. Plaintiff also

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 1447915 (D.Minn.), 2004-2 Trade Cases P 74,486, 72 U.S.P.Q.2d 1661
(Cite as: Not Reported in F.Supp.2d)

points out that defendant's expert testified that he did not know what effect, if any, a different universe would have had on the survey results, and plaintiff argues the universe suggested by defendant would have been more beneficial to plaintiff.

The surveys in the cases cited by defendant are distinguishable because those surveys were discredited on multiple grounds. For example, in *Conopco* the universe excluded women over 45, for reasons that were inexplicable to the district court. The survey also omitted all men. There are no such criticisms in the instant case. Further, the difference between purchasers of "regular" fragrance and "prestige" fragrance could well be more extreme than the difference between purchases of "regular" vodka and "luxury" vodka. *See Conopco,* 49 F.Supp.2d at 245 (prices for the "prestige" fragrance up to $180 per ounce and prestige fragrances sold only in department and specialty stores). Another meaningful distinction is that in *Conopco,* the survey was conducted in carefully selected malls-malls which the surveyors believed would lead to favorable results. In this case, there is no indication that plaintiffs selected the malls based on improper criteria.

The *Weight Watchers* case is also distinguishable. The court noted its concern regarding the proper universe; in doing so, the court decided that past purchasers of frozen entrees were not necessarily future purchasers of diet frozen entrees. *Weight Watchers,* 744 F.Supp. at 1272. The court then focused its critique on "sloppy execution" which included allowing responders who did not fit the (improper) universe. *Id.* The court's confidence in the survey was further undermined by the fact that the market study "overstated actual confusion" and miscategorized answers. *Id.* at 1273. Despite these concerns, the court did not reject the survey entirely, but chose to give only slight weight to the survey. *Id.* at 1274. *See also Anheuser-Busch, Inc. v. Balducci Publ'ns,* 28 F.3d 769 (8th Cir.1994) (accepting without comment survey of "beer drinkers" and not distinguishing between drinkers of mass produced beers and microbrews).

The concerns discussed by the *Conopco* and *Weight Watchers* courts are not nearly as pressing in this case. The universe reasonably included past purchasers of vodka who were likely to purchase vodka again. The universe was further limited to those respondents who indicated they were likely to read one of the magazines in which the print ad appears. The Court therefore does not disregard the survey on the basis of a flawed universe.

### b. Leading and ambiguous questions

Defendant suggests that questions 4a and 5a are leading. Question 6a, defendant argues, is both ambiguous and leading.

Question 4a reads: "Based only on the advertisement, would the place of a particular brand on the list affect or not affect your likelihood to purchase that particular brand?" Respondents could answer "Affect / Not affect / Not Sure / No opinion." Question 5a reads: "Based only on the advertisement, how, if at all, would a brand's place near or at the bottom of the list affect your likelihood of purchase for that particular brand?" The respondents' answers were recorded *verbatim.*

**\*10** Questions 4a and 5a were asked only if respondents answered in a certain manner to previous questions. Specifically, 4a was asked only if the respondent answered "Yes" to Question 3: "Did you happen to notice whether there was a list of brands in the advertisement?" Question 5a was asked only if the respondent was asked 4a, and the respondent's answer to 4a was "Affect" (meaning the placement of the brand would affect the purchasing decision). Given that respondents were asked questions 4a and 5a only if they responded in a certain way to "filter" questions, the questions are not unacceptably leading.

The Court agrees with defendant that Question 6a is ambiguous: "Do you believe that the list of brands communicates to you something currently or only something about some past time or period ." The question could easily solicit an answer of "currently" that did not reflect consumer confusion about the ranking. For example, the ad "currently" communicates that in 1998 Grey Goose won a taste test. Not only is this question open to various interpretation, it is also a critical question in the survey. This criticism is tempered, however, by the fact that the next question (6b) is a request to explain "What causes you to say that?" By studying the responses to 6b, the Court can determine how many of the respondents believed that the ad conveyed a current ranking.

### c. No controls

Plaintiff suggests that Simonson's survey was not the type of survey that needs or would benefit from a control group. Defendant's expert conceded that he

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 8
Not Reported in F.Supp.2d, 2004 WL 1447915 (D.Minn.), 2004-2 Trade Cases  P 74,486, 72 U.S.P.Q.2d 1661
(Cite as: Not Reported in F.Supp.2d)

did not know if a control group was necessary in this case. Further, the need for a control group is not evident to the Court. Given that admission, the "no control group" is not a reason to discount the Simonson survey.

### d. Hypothetical questions

The allegedly hypothetical questions were 4a, "Based only on the advertisement, would the place of a particular brand on the list affect or not affect your likelihood to purchase that particular brand?" Respondents could answer "Affect / Not affect / Not Sure / No opinion." Defendant also criticizes # 5a, "Based only on the advertisement, how, if at all, would a brand's place near or at the bottom of the list affect your likelihood of purchase for that particular brand?" The respondents' answers were recorded *verbatim.*

The use of the word "would" as opposed to, for example, the word "is" ("Based only on the advertisement, is the placement likely to affect ...") is insufficient to reject the survey. Defendant also posits that the question should have identified the vodka brands at issue–"Is the placement likely to affect your decision to purchase Belvedere?" Defendant argues that the questions are irrelevant because they are unconnected to the recollection of any particular brand or ranking on the list. The Court finds this criticism specious. Plaintiff is required to show "that the deception is material, in that it is likely to influence the purchasing decision." *Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc.,* 83 F.Supp.2d 1016, 1022 (D.Minn.2000) (citation omitted). A response that placement on the list would be likely to impact a purchasing decision meets this element.[FN5]

> FN5. Nothing in the Lanham Act prevents Grey Goose from designing ads that influence consumers to buy Grey Goose, rather than Belvedere. Nonetheless, that seems to be what defendant's survey addresses. What is forbidden by the Lanham Act, and what plaintiff's survey is designed to address, is whether that influence results from misleading or deceiving consumers. The fact that a consumer is less likely to buy Belvedere after reading the ad is fine (in fact, that is the goal of advertising). What makes the ad objectionable (arguably, what makes the ad violate the Lanham Act) is that it influences consumers to buy Grey Goose

(instead of any other vodka including Belvedere) by misleading or deceiving consumers. Plaintiff suggests defendant's own survey establishes materiality, because defendant's survey shows that placement at the top of this list influences consumers to purchase Grey Goose. A decision to buy Grey Goose is a decision not to buy another vodka, and therefore establishes the "materiality" element.

### 3. Conclusion

\*11 The Court does not accept defendant's invitation to reject plaintiff's consumer survey. However, the Court does not agree with plaintiff's conclusion that the survey proves that half the consumers are misled and perceive that the ad conveys a message that the taste test results are the most current. The Court reaches this result by studying the answers to 6a and 6b. Plaintiff's expert suggests that the responses to those questions prove that about half of the respondents were misled. The Court carefully reviewed the responses to 6a and 6b, and finds that only 27 of 256 responses to 6b clearly evidence that the respondent believed the rankings were current (about 11%).[FN6] After reviewing 6a and 6b together, it is clear that an answer of "current" to 6a is not evidence that the particular consumer believed the list conveyed the current / most recent rankings because some of the individuals who answered "current" to 6a explicitly identified the year of the testing in 6b.

> FN6. Included in this grouping were responses the Court believed fairly evidences that the respondent was misled. For example, the Court included the following answers: "because the taste test was apparently current" (respondent ("R") 109), "I'd like to think these things are kept up to date" (R 212), and "These studies are recent. Grey Goose is the highest rated." (R 232).

Under the Court's analysis, plaintiff has not demonstrated, at least on the current record as it is fairly analyzed, that a "substantial" number of consumers are misled by the print ad. The Court therefore concludes that plaintiff has yet to demonstrate a likelihood of success in its Lanham Act claim premised on the print ad.

### B. Irreparable harm

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 2004 WL 1447915 (D.Minn.), 2004-2 Trade Cases P 74,486, 72 U.S.P.Q.2d 1661
(Cite as: Not Reported in F.Supp.2d)

"[T]he failure to demonstrate the threat of irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction." _United Indus., 140 F.3d at 1183_. In certain Lanham Act cases, however, irreparable harm is presumed. Specifically, courts have presumed irreparable harm when a comparative advertising claim actually names the competitor's product, and is false or deceptive. _Ott A.G. v. Target Corp., 153 F.Supp.2d 1055, 1072 (D.Minn.2001)_ (citing _Porous Media Corp. v. Pall Corp., 110 F.3d 1329, 1336 (8ᵗʰ Cir.1997))._ The Court can assume irreparable harm in this instance, because plaintiff has not established that the print ad misleads a substantial number of consumers.

The Court therefore must consider whether plaintiff has established that it faces irreparable harm if the Court does not enjoin the print ad. Given Belvedere's impressive market performance, plaintiff has a difficult argument to make regarding irreparable harm. Nonetheless, plaintiff argues that even with remedial advertising, it will be impossible to reach all the consumers who have seen the Grey Goose ad, therefore the misperception about the anomalous score will remain. Further, plaintiff argues that the ad diminishes plaintiff's marketing position, and no amount of monetary consideration can fully compensate the company for what has been lost.

Defendant urges that plaintiff's delay in bringing this lawsuit undermines any argument that plaintiff faces irreparable harm. It is well-established that a movant's delay in seeking relief or objecting to the actions the movant seeks to enjoin "belies any claim of irreparable injury pending trial." _Hubbard Feeds v. Animal Feed Supplement, 182 F.3d 598, 603 (8ᵗʰ Cir.1999)._ In this case, however, the Court does not credit defendant's delay argument. As an initial matter, the 1998 survey results were current for a time, so any delay has to be something less than the five years defendant cites. Further, plaintiff pursued alternate, and arguably less drastic, ways to resolve the parties' dispute. The Court will not fault a party for attempting to resolve a dispute more amicably (especially where both parties participated in the alternative dispute resolution, and the opposing party simply refused to comply with the result).

**\*12** Although plaintiff did not unreasonably delay in bringing this motion, the Court is not convinced that monetary damages, coupled perhaps with remedial advertising, would not suffice if plaintiff eventually prevails. The irreparable harm factor therefore does not favor the grant of preliminary injunctive relief.

### C. Balance of harms

"The 'balance of harms,' requires the court to consider 'the balance between the harm [to the movant] and the injury that the injunction's issuance would inflict on other interested parties, and the public interest.' " _Doctor John's, Inc. v. City of Sioux City, Iowa, 2004 WL 360985 \*16 (N.D.Ia. Feb. 26, 2004)_ (quoting _Pottgen v. Missouri State High Sch. Activities Ass'n, 40 F.3d 926, 929 (8ᵗʰ Cir.1994))._ In this case, the balance of harms is roughly the same, therefore this factor does not favor either granting or denying the injunction. Both parties face the potential loss of business goodwill, and the loss of sales.

### D. Public interest

"The public interest favors enjoining false statements." _Sanborn Mfg. Co. v. Campbell-Hausfeld/Scott Fetzer Co., 997 F.2d 484, 490 (8ᵗʰ Cir.1993)._ Defendant argues granting the injunction would not benefit the public, because the ad is not misleading. Denial of the injunction, defendant continues, is in the public interest, because the public has an interest in the "free flow of commercial speech." _Bates v. State Bar of Arizona, 433 U.S. 350, 364 (1977)._ Plaintiff argues the opposite-that consumers are being misled, therefore defendant's false statements should be enjoined.

Plaintiff has not shown that the ad is misleading to a substantial number of consumers. In addition, even assuming some consumers are confused, the public interest in avoiding that misperception is not as strong as it is, for example, where the misstatement implicates consumer health or safety. _See, e.g., Playskool, 699 F.Supp. at 1060_ (public interest favored entering injunction where false advertising created potential safety risk to young children); _Tambrands, 673 F.Supp. 1190_ (public interest in accurate results of over-the-counter pregnancy tests). This factor therefore weighs in favor of denying preliminary injunctive relief.

### II. HANG TAG

Although the parties do not focus on the hang tag, the Court finds that plaintiff is more likely to prevail on the merits as to the hang tag, because the hang tag does not have the same emphasis on the "past" nature of the taste test. In fact, the year of the taste test, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the source, is printed in tiny font at the bottom of the hang tag and is virtually indiscernible. *See Weight Watchers v.. Stouffer Corp.,* 744 F.Supp. at 1276 (disclaimer appearing in miniscule print on the very bottom of ad insufficient to reduce or eliminate consumer confusion); *Anheuser-Busch, Inc.,* 28 F.3d 769 (disclaimer in tiny print not sufficient to cure consumer confusion).

Defendant represents that the hang tag is nearly out of use, and therefore an injunction would be inappropriate and unnecessary. The Court, however, is concerned that defendant was unable to tell the Court how many of the hang tags remain in the chain of distribution. Before the Court determines whether an injunction would be appropriate, and before the Court further discusses the *Dataphase* factors in relation to the hang tag, the Court will order defendant to provide the Court with the number of hang tags that remain in the chain of distribution, and where the remaining hang tags are found. If more than an insignificant number of hang tags remain, the Court will revisit the issue.[FN7]

> FN7. Nothing in this Order prevents defendant from removing the remaining hang tags. If that is the course of action defendant pursues, defendant shall so inform this Court, and opposing counsel, within 30 days of the date of this Order.

**\*13** Therefore, although the Court denies plaintiff's renewed motion for a preliminary injunction, it does so without prejudice. If hang tags remain in the chain of distribution in more than insignificant numbers, plaintiff may renew its motion, but the motion may be renewed only as to the necessity of granting preliminary injunctive relief as to the hang tags.

## ORDER

Based on the foregoing, all the records, files, and proceedings herein, IT IS HEREBY ORDERED that plaintiff's renewed motion for a preliminary injunction [Docket No. 27] is DENIED without prejudice.

IT IS FURTHER ORDERED that within 30 days of the date of this Order, defendant shall provide the Court and opposing counsel with an affidavit indicating the number of hang-tags remaining in the chain of distribution and the location of such tags.

D.Minn.,2004.
Millennium Import Co. v. Sidney Frank Importing Co., Inc.
Not Reported in F.Supp.2d, 2004 WL 1447915 (D.Minn.), 2004-2 Trade Cases P 74,486, 72 U.S.P.Q.2d 1661

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT P





**NATIONAL ADVERTISING DIVISION®**
70 West 36th Street, New York, NY 10018

NARC PARTNERS

**BY MESSENGER**

Direct Line: (212) 705-0119

April 6, 2006

Jeffrey S. Edelstein, Esq.
Manatt, Phelps & Phillips, LLP
7 Times Square
New York, NY 10036

**Re: Advertising for WindTunnel and Fusion Upright Vacuum Cleaners**

Dear Mr. Edelstein:

I am writing to advise you that NAD has concluded the investigation based on your challenge. The final case decision is enclosed. NAD's announcement to the press will follow by regular mail or by fax. Please note that NAD's findings may not be used for promotional purposes or to indicate impropriety by any party.

As stated in *NAD/NARB Procedures* at § 3.1(B), if Dyson, Inc. takes issue with NAD's decision, you have a ten-day period (ending April 20, 2006) within which you may request that a panel of the National Advertising Review Board review the decision. The granting of a panel review is at the discretion of the Chairman of the NARB. Your request for a panel review should be addressed to the Chairman, NARB, 70 West 36th Street, 13th Floor, New York, New York, 10018, and copies must be sent to all the parties. The entire appeal process is described in the *Procedures* at §§ 3.1 through 3.8. Please review it carefully.

We greatly appreciate your contribution to the self-regulation program and, in particular, to the resolution of this inquiry. If you have any questions, please do not hesitate to call.

Sincerely,

Jennifer Fried
NAD Attorney

cc:    Stephen P. Durchslag, Esq.

Enclosure

phone: 866.334.6272  •  fax: 212.705-0130  •  www.nadreview.org

The National Advertising Division of the Council of Better Business Bureaus (CBBB). Policy is established by the National Advertising Review Council (NARC).

*Case #4467 (04/05/06)*
**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**

| | |
|---|---|
| *Advertising Agency:* | *Undisclosed* |
| *Challenger:* | *Dyson, Inc.* |
| *Product Type:* | *Household Products* |
| *Issues:* | *Comparative Performance Claims* |
| *Disposition:* | *Modified* |

Advertising claims by The Hoover Company for its WindTunnel and Fusion Upright vacuum cleaners were challenged by Dyson, Inc., the manufacturer of Dyson vacuums. The claims at issue appeared in a wide variety of media, including television commercials, print ads, radio spots, websites, brochures, and product packaging.

The challenged television commercial featured the following dialogue.

Person holding a Dyson vacuum cleaner: *"My vacuum is purple. They say it doesn't loose suction."*

Second person with a Dyson vacuum cleaner: *"My vacuum makes me look good."*

Third person with a Dyson vacuum cleaner: *"My vacuum was in a fashion magazine."*

Person standing next to a Hoover vacuum: *"My vacuum's a WindTunnel and it cleans better than Dyson."*

Voice-over: *"The self-propelled WindTunnel by Hoover cleans carpet 56% better than Dyson. It's proven by the only recognized test representing real-life conditions in American homes. After all, do you want people to look at your vacuum or your clean home?"; "Clean to the highest power."*

The following are representative of the other claims that served as the basis of the instant challenge:

*"Dyson thinks things should work properly. We couldn't agree more. That's why our self-propelled WindTunnel picks up 56% more dirt than Dyson."*

*"[WindTunnel] Picks up more dirt than any other brand."*

*"The Hoover Self-Propelled WindTunnel Vacuum has been proven to extract more embedded dirt from horizontal floor surfaces than any other upright."*

*"The Hoover® Self-Propelled WindTunnel picks up 56% more dirt than Dyson."*

*"The self-propelled WindTunnel by Hoover cleans carpet 56% better than Dyson."*

*"WindTunnel Technology ... They [dual air ducts] not only lift the dirt but trap it so it won't fall back into your carpet." [Accompanied by close up of cyclone logo]*

*"[WINDTUNNEL] PICKS UP MORE DIRT THAN ANY OTHER UPRIGHT"*

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
**Page: 2**

"*[WINDTUNNEL]HEPA FILTER WITH ALLERGEN FILTRATION. Long-lasting 3-year HEPA Filter with allergen filtration traps 100% of dust mites, ragweed and common pollen."]*

"*[WindTunnel] TWIN CHAMBER BAGLESS SYSTEM HELPS MAINTAIN MAXIMUM PERFORMANCE"*

"*Patented WindTunnel Technology picks up more dirt than any other brand, including Dyson. Some vacuums pick up dirt, only to scatter it back down into your carpet."*

"*These results are based on ASTM International Test F608, the only recognized industry standard test representing real-life conditions found in American homes."*

"*[WindTunnel] 'No-Touch' Filter Cleaning System"*

"*[Fusion] Incredible cleaning power – every time you use it"*

*[WindTunnel] "PICKS UP MORE DIRT THAN ANY OTHER UPRIGHT ... Period!"*

*[WindTunnel] "PICKS UP OVER 70% MORE DIRT!" caption over chart comparing "All Hoover Self Propelled Uprights", "Oreck Model XL21-600 Upright", and "Dyson Model DC-07 Upright".*

*[WindTunnel and Fusion] "HEPA FILTER WITH ALLERGEN FILTRATION. Long lasting 3-year HEPA filter with allergen filtration traps 100% of dust mites, ragweed and common pollen."*

*[WindTunnel] "TWIN CHAMBER BAGLESS SYSTEM HELPS MAINTAIN MAXIMUM PERFORMANCE"*

*[Fusion] "Cyclonic technology offers powerful cleaning with no loss of suction."*

*[Fusion] "NO LOSS OF SUCTION"*

"*The Hoover® Fusion Cyclonic Bagless Upright Vacuum Outcleans Dyson by 13%"*

*[Fusion] "E-Z Empty Dirt Cup. No bags. No mess! Simply remove the cup, hold it over the trash and push the button to dump contents from the bottom."*

**Challenger's Position**

*I. Background*

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 6

advertiser's superiority claims were true, the advertiser would not have license to falsely claim that the challenger's vacuums do not clean properly, or that the only reason consumers purchase these vacuums is for their looks and style. The challenger further added, again citing NAD precedent[6] that the presence of humor in an advertisement does not relieve an advertiser from the obligation to support all reasonable interpretations of its claims.

### III. Hoover's Implied Claim that The Dyson Vacuum Looses Suction

The challenger also took issue with what it characterized as the implied claim that the challenger's Dyson vacuum loses suction. The challenger noted the commercial at issue in this proceeding in which an actor sarcastically says, "My vacuum is purple. They say it doesn't lose suction." The challenger argued that the sarcasm in her voice indicates that she means the opposite of what she is saying—that the challenger's vacuum does in fact lose suction. Indeed, the challenger noted, the above-described consumer perception survey indicated that 23% of respondents took away such a disparaging message from this line alone.

Here again, the challenger pointed to the above-described testing (conducted by ITS) to show that its own vacuum cleaners maintain constant suction power throughout the test—while the suction power of all tested competitors rapidly declined. The challenger also noted that according to the only recognized industry standard designed to measure suction power under dust-loaded conditions, its Dyson machines are the only vacuum cleaners that do not lose suction as the vacuum fills with dust. Accordingly, the challenger argued that the claim that Dyson vacuums lose suction is false and misleading.

### IV. The Advertiser's Cleaning Claims

#### (a) The Advertiser's Claim that the WindTunnel Cleans Better than Other Vacuums

The challenger objected to the advertiser's claim that the WindTunnel cleans better than other vacuum cleaners. Specifically, the challenger took issue with the advertiser's claim in Sears brochures that the WindTunnel "[o]utcleans all competitive bagless cleaners," in addition to the advertiser's tagline (in print advertisements, on television commercials, and on WindTunnel hangtags) that WindTunnel vacuums "[c]lean to the highest power." The challenger characterizes this claim as a broad cleaning superiority claim.

The challenger explained that cleaning involves a combination of pick-up and suction power with respect to all surfaces that consumers may reasonably use a vacuum cleaner. Among these surfaces, the challenger noted, were carpeted and hard floors, crevices, curtains, upholstery, stairs, and automobile interiors. The challenger noted, however, that the advertiser relies primarily on the results of testing conducted pursuant to ASTM F608 (*Standard Test Method for Evaluation of Carpet Embedded Dirt Removal Effectiveness of Household/Commercial Vacuum Cleaners*), which only measures pick-up on four types of carpeting. In addition, the challenger noted, the ASTM test does not measure suction power. For these reasons, the challenger argued

---

[6] *Sanderson Farms/Sanderson Farms Chicken*, NAD Case # 4289 (March, 2005)

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 9

(b) *The Advertiser's Claim that the WindTunnel Cleans 56% Better Than the Dyson Vacuum*

Dyson challenged the accuracy of a claim made in print advertising and on the advertiser's website and online brochure that the WindTunnel "cleans carpet 56% better" than the challenger's vacuum. Likewise, the challenger took issue with the television commercial claims that the WindTunnel "cleans carpet 56% better" than the challenger's vacuum and more generally that it "cleans better" than the challenger's machine. The challenger also noted the hangtag claims that "Patented WindTunnel Technology™ picks up over 56% more dirt than Dyson DC-14" and "Picks up over 56% more dirt."

The challenger maintained that the WindTunnel does not in fact perform better, let alone 56% better, than the Dyson DC07 or DC14 vacuums. Here again, the challenger noted that its Dyson vacuum performed better than the WindTunnel when tested according to the IEC standard, and when the results of the ASTM and IEC testing are averaged across all surfaces.

The challenger further objected to the advertiser's statement that "These results are based on ASTM International F608, the only recognized industry standard representing real-life conditions in American homes."[7] As argued above, the challenger contended that in fact the ASTM test is *not* the only industry-accepted standard, and that the IEC test is in fact broader and more comprehensive. Moreover, the challenger contended that the advertiser's reference to ASTM fails to inform consumers about the limitations of the test—namely, that it is limited to removing fine test dirt from certain types of carpet only. The challenger added that consumers are generally not familiar with ASTM testing standards, and that 77% of respondents in the above-discussed consumer perception survey took away an overall superiority message, rather than a narrow claim that the WindTunnel tested better in removing one type of dirt from certain types of carpet. Nor does the advertisement inform consumers that the test was performed on a brand new, empty vacuum cleaner with a new drive belt and new bristles. Here again, the challenger noted that the WindTunnel loses both suction power and pick-up efficiency in a dust-loaded vacuum.

(c) *Claim that the Fusion Out-cleans the Dyson Vacuum by 13%*

Dyson also challenged advertiser's claim that its Fusion vacuum "outcleans Dyson by 13%." This claim is accompanied by the disclaimer: "Outcleans Dyson models DC07, DC14, and DC15 (The Ball™); proven in tests per ASTM International F608, the only recognized industry standard representing real-life conditions in American homes."

The challenger reiterated its argument that ASTM is not the only recognized industry standard, and that this test does not account for a wide variety of floor surfaces. Moreover, as discussed in reference to the WindTunnel vacuum, the challenger argued that the Fusion's performance rapidly declines as dust enters the vacuum cleaner and the drive belt and bristle bar wear down as

---

[7] This disclaimer on the television commercial is "It's proven by the only recognized test representing real-life conditions in American homes."

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 13

The advertiser argued that its independently supervised tests, conducted pursuant to ASTM F608, prove that its Hoover Self Propelled WindTunnel cleans carpet better than Dyson vacuum cleaners by at least 56%.

> a.  *The advertiser's testing demonstrates that Hoover WindTunnel vacuums out-clean Dyson vacuum cleaners*

The advertiser contended that the primary reason consumers purchase upright vacuum cleaners is to clean their carpeting and rugs, and that carpeting and rugs account for roughly two-thirds of the total floor covering market in the United States. Accordingly, the advertiser argued, the ability of a vacuum to clean carpets is the most meaningful measure of how well the machine works.

The advertiser's independently supervised testing, which used the ASTM F608, tested each of the upright Hoover WindTunnel vacuum cleaners against the Dyson DC07 model and the Dyson DC14. The advertiser's test results show each of its vacuums outperforming the Dyson models by at least 49.5%, and as much as 70.5%. The advertiser also tested Dyson's newest model, the DC15. According to The advertiser, the DC15 performed a near parity with the DC07, and therefore is also outperformed by the upright Hoover WindTunnel vacuums.

> b.  *Consumers Union Agrees That Hoover WindTunnel Vacuum Cleaners Outclean Dyson Vacuum Cleaners*

The advertiser noted that Consumers Union reported generally similar results to those demonstrated by the advertiser's independently supervised ASTM F608 tests. Consumers Union rated two Hoover WindTunnel models as "excellent" for carpet cleaning, while it rated the Dyson DC07 and DC14 as merely "good"—the lowest rating given to any of the 33 vacuum cleaners tested. The advertiser contended that these results confirm the superior cleaning ability of the Self Propelled WindTunnel.

> c.  *ASTM F608 is the appropriate standard*

ASTM F608 is a testing standard that evaluates the effectiveness of household and commercial vacuums for the removal of carpet-embedded dirt. According to the advertiser, it is the only method recognized in the United States for testing the cleaning efficacy of an upright vacuum cleaner. The advertiser also maintained that ASTM F608 is the American National Standard, as recognized by ANSI, which means that this standard takes precedence over the IEC 60312 procedure for evaluating carpet cleaning in the United States. The advertiser reasoned that since upright vacuum cleaners (such as the Hoover and Dyson models involved in this challenge) are primarily purchased by consumers to clean carpets and rugs, and since carpeting accounts for

THE HOOVER COMPANY
WindTunnel and Fusion Upright Vacuum Cleaners
Page: 14

roughly two-thirds of the total floor-covering market in the United States,[9] the ASTM F608 is the most consumer relevant measure for testing upright vacuums.

The advertiser then compared the ASTM F608 to the IEC 60312—the standard used by the challenger. According to the advertiser, there are several differences between the two testing procedures which support the advertiser's argument that the ASTM F608 is the more accurate and more relevant test method.

First, explained the advertiser, ASTMF608 procedure correlates to actual field results in American homes,[10] whereas IEC 60312 was not based upon field studies. ASTM F608 requires that the carpets and padding used in the testing conform to ASTM F655, which requires the use of multiple carpets representing the major styles found in American homes. Conversely, the IEC 60312 only uses Wilton wool carpet, which according to the advertiser, has been criticized by members of the IEC and the European Carpet Association ("ECA") because it is not representative of current carpets. According to the advertiser, ASTM F608 has an established statistical precision statement which details expected repeatability and reproducibility errors unlike the IEC test which has a "lack of reproducibility between laboratories and materials."[11] The advertiser explained that ASTM vacuum cleaner test methods require a minimum of three units per each tested model, each of which must meet the repeatability requirements. Furthermore, unless a 90% confidence interval for the units is less than 5% of the sample mean, additional units must be tested. The advertiser points out that the IEC method only requires testing of a single unit of any given model to determine a representative value for the entire population. Finally, argued the advertiser, ASTM F608 has specific rules for determining when a test carpet must be replaced. The advertiser argued that because the IEC test leaves carpet replacement up to the individual laboratory it creates the possibility for massive reproducibility errors between laboratories.

The advertiser also rejected the challenger's assertion that Dyson's testing, which combines the averages of both ASTM and IEC based tests, is more consumer relevant than the "well established standard" used by the advertiser.

Finally, the advertiser submitted consumer research conducted by *Good Housekeeping* magazine, which was conducted between June and October of 2005 at the request of the ASTM F11.93.05 Task Group to "determine what attributes of a vacuum cleaner were the most important influences in making a purchase decision." The research consisted of three separate surveys which the advertiser argued "confirmed that cleaning ability on carpets was the most important attribute to consumers and that the cleaning ability on bare (hard) floors was either 6 or 7 out of the 8 attributes."

---

[9] Carpet and Area Rugs account for 66.8% of the floor covering sales by volume. *Floor Covering Weekly*, July 18/25, 2005.
[10] The advertiser explained that ASTM F608 was based upon 27 field studies in which numerous vacuum cleaners were tested side-by-side in 25 houses per study, for a total of 675 homes. Additional field studies have been conducted since then to insure that the field conditions have not changed the correlation that was established between the laboratory and the field.
[11] Advertiser's Final Response, Page 7, ¶2.

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 33

Once again, the question for NAD is whether the challenger's evidence is "more reliable" than the advertiser's ASTM F608 testing. As a preliminary matter, NAD was troubled by the challenger's deviation from the standards set forth by both ASTM and IEC. First, as noted by the advertiser, the challenger only conducted ASTM F608-based tests on two of the four carpets specified by ASTM F655. NAD noted that ASTM specified four carpet types for a reason: because they were deemed representative of the array of carpeting seen in actual American homes. Failure to test its vacuum cleaner on half the required carpet types rendered the test of highly limited value.

Nor was NAD persuaded that the challenger's IEC testing is "more reliable" than the advertiser's ASTM testing. As discussed above, NAD noted that the ASTM standard—unlike IEC 60312—is based upon and represents real-life conditions found in American homes. NAD also determined that the advertiser's attempt to piece together portions of results from different test methodologies was not a meaningful exercise.

NAD was further troubled by the excessive variability in the challenger's testing. As noted by the advertiser, the challenger's testing took place over a five-year period and utilized different carpets for different vacuum cleaners, as well as different technicians. Accordingly, NAD found that the challenger's testing was of limited value in terms of head-to-head comparisons.

Accordingly, NAD was not persuaded that the challenger's evidence was "more reliable" than the advertiser's ASTM F608 testing. NAD therefore determined that the advertiser's ASTM testing provided a reasonable basis for its WindTunnel and Fusion cleaning superiority claims—provided that the advertiser modifies its superiority claims, as discussed above, to clearly and conspicuously disclose that its cleaning superiority claims are limited to cleaning carpeting.

*V.    The Claim that Fusion Offers "NO LOSS OF SUCTION"*

The challenger contended that the advertiser's claim that its Fusion cleaner offers "NO LOSS OF SUCTION" is false because the design of the Hoover vacuum which permits dirt and dust to clog the pores of the filter. Dyson maintained that suction is reduced with repeated use. In support of its argument, Dyson submitted data indicating that there is a decline in suction as the bin fills with dust.[38] The advertiser, on the other hand, maintained that the claim is truthful because it is properly qualified through the use of the following disclosure: "Suction stays constant after picking up 10 ounces of dirt, as tested by an independent laboratory using ASTM F558 test method and a dirt composition composed of 70% mineral dust and 10% fibrous material." The challenger objected to the appropriateness of the disclosure arguing that the results of a narrow ASTM test do not support the advertiser's broad claims and, moreover, does not measure a vacuum's performance over time.

The claim "No loss of suction" is a broad claim that reasonably communicates to consumers a performance attribute that occurs over time and with repeated use of their vacuum cleaners.

---

[38] Suction was examined by measuring air flow and Air Watts.

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
**Page: 34**

Accordingly, NAD was concerned as to whether the disclosure was adequate to qualify the claim.[39] It is not unusual for a performance claim to be qualified with language indicating that the claim is based on laboratory testing or that the touted measure of performance occurs only under some limited set of conditions. While such qualifying language may, in some circumstances, be perfectly appropriate, NAD must assess the correlation between the test conditions and the real world experience of consumers to ensure that the performance claim is meaningful and not misleading to consumers.[40]

The support for the claim "No Loss of suction" consisted of a laboratory test, based on ASTM F558, which purportedly demonstrated that the suction power of the Fusion model remained constant in certain laboratory conditions. NAD was not persuaded that there was sufficient correlation between the laboratory testing and consumer experience in the real world to support a "No Loss of Suction Claim." NAD noted that limitations of the test to support claims for consumer use are addressed in the test itself. Section 4.1 of the Test, under the heading "Significance and Use," provides as follows:

> The test results allow the comparison of the maximum potential air power available for cleaning tasks when tested under the conditions of this method. The test results do not indicate the actual air power present during the cleaning process due to the effects of the various tools in use and surfaces being cleaned.[41]

NAD also noted that although the test was based on an industry test standard, ASTM F558, the test method conducted by the advertiser, the standard does not provide for measuring the suction of a cleaner in a dust-loaded condition. NAD appreciates that the advertiser sought to measure suction in a cleaner that was not in a new condition but was not persuaded that the protocol utilized by the advertiser, which involved dust loading the machine with 10 ounces of dirt composed of 70% mineral dust and 10% fibrous material, was representative of real world experience of consumers or a representative measure of how vacuum cleaners perform over time. NAD therefore determined that the claim "No Loss of Suction" was not adequately substantiated and recommended that the claim be discontinued.

*VI.    The Remaining Claims*

---

[39] The qualifying language appeared as follows: "Suction stays constant after picking up 10 ounces of dirt, as tested by an independent laboratory using ASTM F558 test method and a dirt composition composed of 70% mineral dust and 10% fibrous material." On the product packaging, the qualifying language appeared in a disclosure on a separate panel.
[40] The Valvoline Company (Zerex G-05 Extended Life Antifreeze) , Report #4375, *NAD Case Reports* (September 2005); Dow Chemical Company (Styrofoam Brand Insulation), Case # 4383, *NAD Case Reports* (August 2005); EuroPro Corporation (Shark Bagless Stick Vacuum Cleaner, Case # 4216, *NAD Case Reports* (August 2004); Bausch & Lomb Incorporated (Renu), Case #4385, *NAD Case Reports* (August 2005).
[41] ASTM F558-03. In contrast, NAD observed that the test methodology for ASTM 608, which evaluates the dirt removal effectiveness of vacuum cleaners, specifically provides for a correlation with real world use by consumers:

> This test method provides an indication of the capability of the vacuum cleaner to remove embedded dirt from carpeting. This test method is based upon results of home cleaning tests so that, in most cases, a reasonable correlation exists between home and laboratory results. (Section 4.1).

# EXHIBIT Q

# WINSTON & STRAWN LLP

| | | |
|---|---|---|
| 43 RUE DU RHONE<br>1204 GENEVA, SWITZERLAND<br><br>BUCKLERSBURY HOUSE<br>3 QUEEN VICTORIA STREET<br>LONDON, EC4N 8NH<br><br>333 SOUTH GRAND AVENUE<br>LOS ANGELES, CALIFORNIA 90071-1543 | 35 WEST WACKER DRIVE<br>CHICAGO, ILLINOIS 60601-9703<br><br>(312) 558-5600<br><br>FACSIMILE (312) 558-5700<br><br>www.winston.com | 200 PARK AVENUE<br>NEW YORK, NEW YORK 10166-4193<br><br>21 AVENUE VICTOR HUGO<br>75116 PARIS, FRANCE<br><br>101 CALIFORNIA STREET<br>SAN FRANCISCO, CALIFORNIA 94111-5894<br><br>1700 K STREET, N.W.<br>WASHINGTON, D.C. 20006-3817 |

STEPHEN P. DURCHSLAG
(312) 558-5288
sdurchslag@winston.com

May 26, 2006

**VIA FEDERAL EXPRESS**

Jennifer Fried, Esq.
National Advertising Division
Council of Better Business Bureaus, Inc.
70 West 36th Street
New York, NY 10018

Re:    **Advertising for Hoover WindTunnel and Fusion Upright Vacuum Cleaners**

Dear Jennifer:

This letter is Maytag Corporation's ("Maytag") response to Dyson, Inc.'s ("Dyson") May 11 and May 16, 2006 letters regarding Maytag's compliance with the recommendations set forth in NAD Case Report #4467 regarding advertising for Maytag's Hoover WindTunnel and Fusion upright vacuum cleaners.

Initially, Maytag notes that Dyson's first letter, dated May 11, 2006, was sent only three weeks after the final NAD decision was published on April 17, 2006. As Maytag indicated in its advertiser's statement, Maytag has agreed to clarify its cleaning superiority claims (where necessary) to communicate that the such claims apply only to cleaning of carpeted surfaces, as well as to address NAD's concerns regarding other claims at issue in the challenge in future advertising. Three weeks hardly constitutes "a reasonable amount of time" to bring advertising into compliance with NAD's recommendations. Dyson knows full well that even Web pages take more than "a matter of hours" to revise. Thus, Dyson's compliance challenge is undeniably premature.

Notwithstanding, Maytag is in the process of revising each of the Web pages in Exhibit 1 to Dyson's initial letter to clarify that the cleaning superiority claim applies to carpet cleaning. The cleaning superiority claim has been removed from the Self Propelled WindTunnel microsite. *See* Exhibit A. The cleaning claim on the Hoover.com home page is currently being revised and Maytag expects that this revision will be completed within approximately one week.

WINSTON & STRAWN LLP
Jennifer Fried
May 26, 2006
Page 2

Exhibit 2 to Dyson's initial letter is a print out of Maytag's brochure for the Hoover WindTunnel Self Propelled Bagless upright vacuum. This brochure is available in PDF format on the Hoover Website. This brochure will have to be completely redone to incorporate NAD's request that the cleaning claim be clarified, and thus will take more than the three weeks Dyson believes is reasonable to make such changes. Maytag is currently in the process of revising this brochure to clarify the cleaning superiority claim is with respect to carpet cleaning. In the meantime, the link to the brochure has been removed from the Website.

With regard to the Web page attached as Exhibit B, which was included in Exhibit 1 to Dyson's challenge, the copy clearly states "Want to be assured you *carpet* is truly clean? With its advanced technology and power, the Self-Propelled WindTunnel Bagless picks up more dirt than any other upright on the market." (Emphasis added.) Thus, this claim is already limited to carpet cleaning performance and is consistent with NAD's recommendations.

In addition, Maytag has modified the claims relating to allergen filtration in accordance with NAD's recommendations. The challenged Web pages now state "Allergen filter traps 100% dust mites and their eggs and 99.98% of ragweed and common grass pollens." *See* Exhibit C.

Finally, as noted in Dyson's second letter, Maytag has clarified the "no loss of suction" claim with the following clear and conspicuous disclosure, which appears directly after the "no loss of suction" claim in the same size font: "\*Vacuum Cleaner Suction Tests Do No Represent Carpet Cleaning Ability\*\*" This is linked the original disclosure, "Suction stays constant after picking up 10 ounces of dirt, as tested by an independent laboratory using ASTM F558 test method and a dirt composition composed of 70% mineral dust and 10% fibrous material." The added disclosure clarifies that the claim does not relate to the cleaning effectiveness of the vacuum cleaner, and thus should address NAD's concerns regarding the applicability of the substantiation to real world use conditions.

NAD has consistently found that consumers understand claims relating to vacuum cleaner suction power as cleaning claims, and has consistently required that vacuum cleaner suction power claims be substantiated by cleaning efficacy. *See* Euro-Pro Corporation, NAD Case Report #4217 (08/06/04) and Euro-Pro Corporation, NAD Case Report #4216 (08/06/04). In the Fantom Twister Vacuum Cleaners case, NAD Case Report #4217, NAD determined "that consumers could reasonably interpret the claim that the Fantom Twister has '1 ½ times more suction power' to mean that it has 1½ times more suction power than competing vacuums, *and that it cleans better than other vacuums in real use* – a message NAD determined was not supported by the evidence in the record." (Emphasis added.) This statement was repeated almost verbatim in the Shark Bagless Stick Vacuum Cleaner case, NAD Case Report #4216.

Maytag's disclosure that the "no loss of suction" claim is not related to carpet cleaning ability, together with the very clear description that this claim is based on a discreet laboratory test, clearly communicates to consumers that the claim is not a performance claim, but

WINSTON & STRAWN LLP
Jennifer Fried
May 26, 2006
Page 3

rather a recognized industry test dealing with vacuum cleaner suction capabilities. Accordingly, Maytag believes that the added disclosure adequately addresses NAD's concerns regarding the possible interpretation of this claim by further clarifying that the reference is to a laboratory test regarding suction capabilities, as opposed to cleaning performance capabilities under home use conditions. It should be noted that Dyson's no loss of suction claim, which is based on similar laboratory testing, contains no such disclosure. In addition, Maytag notes that NAD did not take issue with the validity of the test results cited by Maytag as the basis for the "no loss of suction" claim, or, as Dyson mistakenly alleges, find that the claim was inherently false.

Clearly, Maytag has acted in a reasonable manner to comply with NAD's recommendations. Accordingly, we trust this concludes this matter. However, if you have further questions, please call.

Respectfully submitted,

Stephen P. Durchslag, Esq.

cc:    A. Burgess Lowe, Esq. (Maytag Corporation)

# EXHIBIT R

JOURNAL OF MARKETING COMMUNICATIONS 2 67–82 (1996)

# The effects of fine-print disclosure type and involvement on brand attitude formation

DARREL D. MUEHLING*[1] AND RUSSELL N. LACZNIAK[2]

[1]Washington State University, Pullman, WA 99164–4730 and [2]Iowa State University, Ames, IA 50011, USA

This study explores the information processing tendencies of individuals exposed to advertisements containing fine-print disclosure footnotes. Results indicate that individuals have a lower recall of disclosure footnotes than to the message points contained in the body of the advertisement, though involvement with the advertisement tends to improve recall of disclosure points. In addition, the study tests a model of attitude formation, finding that the type of disclosure (restrictive versus informative) and advertisement involvement interact to affect the means by which brand attitudes are formed. Theoretical and practical implications for the findings are discussed.

KEYWORDS: Advertising disclosures; advertising disclaimers; fine print; attitude formation; advertising processing; advertising involvement

## INTRODUCTION

Many consumers are probably aware of a relatively common advertising practice whereby advertisers place 'fine print' messages near the bottom of the printed advertising page or television commercial screen. Though quite prevalent in the American market-place, these messages (referred to as 'disclaimers', 'disclosures', 'supers', 'footnotes' or, simply, 'fine print') have received less research attention in the past decade than one might think. For example, basic questions such as 'Do individuals pay attention to the information contained in fine-print messages?' or 'What effect does the content of fine-print messages have on consumer responses?' have not been fully explored. While the present study makes no claim of being the definitive and final statement with regards to research on the topic, it does provide some preliminary answers to questions of both theoretical and practical concern. The objective of this study is to explore three separate, yet related questions:

(1) Relative to other claims made in an advertisement, to what extent do individuals recall footnoted claims presented in fine print?

(2) Does involvement with the advertisement affect individuals' recall of their fine-print messages?

*To whom correspondence should be addressed.

1352-7266 © 1996 Chapman & Hall



EXHIBIT

STECKEL00069

significant relationship to brand attitudes in either the high- or low-involvement conditions (as expected). In other words, when exposed to advertisements containing restrictive disclosures, consumers' brand attitudes were not a function of their beliefs, irrespective of involvement levels. On the other hand (and consistent with expectations), beliefs were significantly related to brand attitudes for subjects viewing advertisements containing informative disclosure statements (in high-involvement conditions). In other words, the brand attitudes of highly involved consumers exposed to advertisements containing informative disclosures were a function of advertisement-induced beliefs. In low-involvement conditions, informational disclosures were apparently less influential; the belief-brand attitude relationship was less pronounced and not significant at $p < 0.05$.

## DISCUSSION

This study was designed to provide additional insight into the effects of fine-print disclosure footnotes on information processing. Results tend to support the notion that individuals are less likely to recall fine-print statements placed near the bottom of print advertisements than claims made in the body of these advertisements. In addition, it appears that uninvolved individuals are less likely to elaborate cognitively on these fine-print disclosures than are their more-involved counterparts. These findings coupled with the notion that consumers generally make few 'connections' with many advertising messages (Krugman, 1965) provide corroborative evidence concerning the assumption that consumers often may not attend to and subsequently use information provided in fine-print advertising.

Beyond matters of recall, this study advances and provides some support for notions concerning the differential effects of disclosure type. Whereas the general perception of fine print is that it is 'restrictive' in nature (Foxman et al., 1988; Best, 1989; Kolbe and Muehling, 1992), content analyses (cf. Kolbe and Muehling, 1992) have shown that many advertisements contain fine-print statements that are designed to augment or clarify claims without delimiting the statement made in the body of the advertisement. Therefore, we felt it may be instructive to examine whether different disclosure types (specifically, informative and restrictive) would have differential effects on the means by which brand attitudes are formed. In addition, given past research that has emphasized the need to consider involvement effects in brand attitude models, we examined the effects of disclosure type on attitude formation under both high and low advertisement involvement conditions.

In this vein, the findings provide some preliminary support for the notion that, even though recall of fine-print disclosures may not be high (and, in fact, may be relatively low), consumers, nonetheless, respond differently to these two types of disclosures. Restrictive disclosures, which essentially weaken arguments made in the advertisement body, may also create some consumer doubt concerning the efficacy of the advertised brand. We found that, under high-involvement conditions, overall belief strength was reduced when individuals were subjected to advertisements containing restrictive (as opposed to informative) footnoted statements. Moreover, the perceived inconsistency between what was presented in the body of the advertisement and what was presented in the restrictive disclosure may have served to weaken the relationship between advertisement-induced brand beliefs and brand attitudes. However, when informative disclosures were used, they likely reinforced attribute information in the body of the advertisement, making for a stronger belief-brand attitude relationship. This finding was observed even though fine-print message recall levels in the high-involvement conditions were relatively low.

STECKEL00080