## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

DYSON, INC.,

    Plaintiff,

   v.

MAYTAG CORPORATION, et al.

    Defendant.

Civil Action No. 06-654 (GMS)

**REDACTED – PUBLIC VERSION**

### DECLARATION OF KATHRIN A. WANNER

   Kathrin A. Wanner, being duly sworn, deposes and says:

1.  I am an attorney with Manatt, Phelps & Phillips, LLP, counsel to Plaintiff Dyson, Inc. ("Dyson") in the above-captioned action. I execute this Declaration in support of Dyson's Motion for a Preliminary Injunction which is filed concurrently herewith.

2.  A true and correct copy of Defendant's Supplemental Objections and Responses to Plaintiff's Special Interrogatories Regarding Plaintiff's Motion for Preliminary Injunction is attached hereto as Exhibit A.

3.  A true and correct copy of relevant portions of the IEC section 60312 (4th ed.) is attached hereto as Exhibit B.

4.  A true and correct copy of Defendants' Objections and Responses to Plaintiff's Special Interrogatories Nos. 8 & 9 is attached hereto as Exhibit C.

   I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

   Executed this 11th day of May, 2007 at Los Angeles, California

           Kathrin A. Wanner, Esq.
           MANATT, PHELPS & PHILLIPS, LLP

41116349.1

## <u>CERTIFICATE OF SERVICE</u>

I, Chad S.C. Stover, hereby certify that May 18, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Francis DiGiovanni, Esquire
> James D. Heisman, Esquire
> CONNOLLY BOVE LODGE & HUTZ LLP
> The Nemours Building – 8th Floor
> 1007 N. Orange Street
> Wilmington, Delaware 19801

I further certify that on May 18, 2007, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel of record and on the following in the manner indicated:

> **BY E-MAIL**
>
> Anthony DiSarro, Esquire
> WINSTON & STRAWN LLP
> 200 Park Avenue
> New York, NY  10166

> YOUNG CONAWAY STARGATT & TAYLOR, LLP

> /s/ *Chad S.C. Stover*
> C. Barr Flinn  (No. 4092)
> John W. Shaw (No. 3362)
> Adam W. Poff (No. 3990)
> Monté T. Squire (No. 4764)
> Chad S.C. Stover (No. 4919)
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware  19801
> (302) 571-6600
> cstover@ycst.com

> *Attorneys for Dyson, Inc.*

**Exhibit A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DYSON, INC., | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 06-654-GMS |
| v. | ) | |
| | ) | |
| | ) | |
| MAYTAG CORPORATION, | ) | |
| HOOVER COMPANY 1, LP, and | ) | |
| HOOVER, INC. | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES REGARDING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendants Maytag Corporation, Hoover Company 1, LP and Hoover, Inc. ("Hoover")[1], by and through its counsel, hereby submit the following supplemental objections and responses to the Special Interrogatories regarding Plaintiff's Motion for Preliminary Injunction ("Special Interrogatories") served by Plaintiff ("Dyson").

### I.    GENERAL OBJECTIONS

1.    To the extent these Special Interrogatories may be construed as calling for the production of information that is subject to a claim of privilege, including, without limitation, the attorney-client privilege or the work product doctrine, Hoover asserts that privilege and objects on that basis. To the extent any information protected by the attorney-client privilege or the work product doctrine or by any other applicable privilege is produced inadvertently, Hoover has not authorized such production, and no waiver of any privilege shall be inferred from such inadvertent production.

---

[1] Dyson originally sued the Maytag Corporation, but, as a result of a January 31, 2007 transaction, the parties have stipulated to add Hoover, Inc. and Hoover Partnership L.P. as defendants to this action. Although Dyson directed the current interrogatories solely against the Maytag Corporation, these objections and responses are filed on behalf of all three defendants, referred to collectively as "Hoover.".

2.     Hoover objects to Dyson's Special Interrogatories to the extent they impose upon Hoover obligations which exceed those imposed by the Federal Rules of Civil Procedure and the Local Rules.

3.     To the extent these Special Interrogatories call for the production of information of a non-public, confidential, or proprietary nature, including trade secrets and/or commercial, financial or other information that has not been disseminated publicly, or any other matter protected by any commercial information or similar privilege, Hoover hereby asserts the confidentiality of such information. Hoover's answers to these Special Interrogatories are hereby designated as Highly Confidential under the terms of the parties' agreed upon Protective Order and any letter or oral agreements among the parties regarding the confidentiality of documents and other information.

4.     Hoover objects to these Special Interrogatories to the extent they seek information not reasonably calculated to lead to the discovery of admissible evidence; which is unreasonably cumulative or duplicative, or obtainable from some other source that is more convenient, less burdensome or less expensive; or which Dyson has ample opportunity to obtain from other sources.

5.     Hoover objects to these Special Interrogatories to the extent they seek overly broad information over which Hoover exercises no control or has no knowledge.

6.     Hoover objects to these Special Interrogatories to the extent they encompass topics and seek information beyond the scope of the Court order which permitted Dyson to serve these interrogatories. *See* Telephone Conference Tr. at 18-19 (Mar. 29, 2007).

7.     Hoover objects to these Special Interrogatories to the extent Dyson intends to equate from Hoover's responses any legal conclusions or determination of liability related to this lawsuit.

8.    Hoover's responses are based on information currently in its possession.

Investigation continues, and Hoover reserves the right to supplement its responses to these Special

Interrogatories.

## II.    RESPONSES AND OBJECTIONS TO SPECIAL INTERROGATORIES

1.    **Identify the corporate entity that is presently responsible for any manufacture, distribution, and/or marketing (including advertising, packaging, or promotional activities) of the Hoover Fusion vacuum cleaner. (For purposes of this interrogatory, "identify" means state the precise corporate name, the state by which it is incorporated, and its principal place of business. "Presently" means as of the date of the response to this interrogatory.)**

Hoover, Inc., a Delaware corporation, presently is responsible for the manufacture,

distribution and/or marketing (including advertising, packaging, or promotional activities) of the

Hoover Fusion vacuum cleaner.  Hoover, Inc's principal place of business is located at 7005

Cochran Road, Glenwillow, Ohio 44139

2.    **Identify the corporate entity that is presently responsible for any manufacture, distribution and/or marketing (including advertising, packaging, and promotional activities) of the Maytag Legacy vacuum cleaner. (For purposes of this interrogatory, "identify" means state the precise corporate name, the state by which it is incorporated, and its principal place of business. "Presently" means as of the date of the response to this interrogatory.)**

Hoover, Inc., a Delaware corporation, presently is responsible for the manufacture,

distribution and/or marketing (including advertising, packaging, or promotional activities) of the

Maytag Legacy vacuum cleaner.  Hoover, Inc's principal place of business is located at 7005

Cochran Road, Glenwillow, Ohio 44139

3.    **State the total volume of sales of the Hoover Fusion vacuum cleaner in the United States between September 7, 2006 and the present. (For purposes of this interrogatory, "volume of sales" means the number of units and total revenues from such sales, and "present" means as of the date of the response to this interrogatory.)**

# REDACTED

3

REDACTED

4.    State the total volume of sales of the Maytag Legacy vacuum cleaner in the United States between September 7, 2006 and the present.    (For purposes of this interrogatory, "volume of sales" means the number of units and total revenues from such sales, and "present" means as of the date of the response to this interrogatory.)

REDACTED

REDACTED

5

REDACTED

8.    Identify any and all steps taken by Maytag, including any of its affiliated entities and successors, between September 7, 2006 and the present, to substantiate or otherwise validate advertising or marketing claims made about either the Hoover Fusion or Maytag Legacy products to the effect that the products have "No Loss of Suction." (For purposes of this interrogatory, "identify" means state the date such steps were taken, describe the "steps," state the names and corporate affiliations of all persons who took and or who were responsible for taking such "steps," and state the results of such "steps.")

Hoover strongly objects to this Special Interrogatory as it encompasses topics and seek

information beyond the scope of the Court order which permitted Dyson to serve these

interrogatories. *See* Telephone Conference Tr. at 18-19 (Mar. 29, 2007). Consequently, Hoover

will not respond to Special Interrogatory 8 at this time.

---

[2] In prior responses to these Special Interrogatories, Hoover stated that it had about 8,400 Legacy units. Hoover has since learned through a physical count of its inventory that the number is far less – around 2,000. The discrepancy in the number of remaining units is wholly attributable to the fact that, within the past month, Hoover's entire logistics, order entry, invoicing and financial systems migrated from the Maytag Corporation systems to the systems of the Hoover, Inc., whose new, indirect parent is TTI Floorcare North America ("TTI").

9.    Identify any and all communications with either the National Advertising Division of the Better Business Bureau or the Federal Trade Commission regarding advertising claims made about the Hoover Fusion or the Maytag Legacy between August 2006 and the present. (For purposes of this interrogatory, "identify" means state the date, persons involved in, and substance of each such communication. "Present" means as of the date of the response to this interrogatory.)

Hoover strongly objects to this Special Interrogatory as it encompasses topics and seek information beyond the scope of the Court order which permitted Dyson to serve these interrogatories. *See* Telephone Conference Tr. at 18-19 (Mar. 29, 2007). Consequently, Hoover will not respond to Special Interrogatory 9 at this time.

Respectfully submitted,

**MAYTAG CORPORATION**

By:  */s/ James D. Heisman*
Francis DiGiovanni
James D. Heisman
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 N. Orange Street
Wilmington, DE 19899
Phone (302) 658-9141
Fax (302) 658-5614

Kimball R. Anderson
Stephen P. Durchslag
Anthony DiSarro
Lisa J. Parker
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601
Phone (312) 558-5600
Fax (312) 558-5700

7

## CERTIFICATE OF SERVICE

I, James D. Heisman, hereby certify that on May 10, 2007, I caused a copy of the foregoing document to be served by hand delivery and e-mail on the below-listed counsel of record:

> John W. Shaw
> Young Conaway Stargatt & Taylor LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware 19801

I further certify that on May 10, 2007, I caused a copy of the foregoing document to be served by e-mail and U.S. mail on the following counsel of record:

> Chad S. Hummel
> Kathrin A. Wanner
> Manatt Phelps & Phillips, LLP
> 11355 West Olympic Boulevard
> Los Angeles, CA 90064

> Christopher A. Cole
> Manatt, Phelps & Phillips, LLP
> 700 12th Street, N.W.
> Washington, DC 2005

> Steven F. Reich
> Jeffrey S. Edelstein
> Manatt, Phelps & Phillips, LLP
> 7 Times Square
> New York, NY 10004

> _/s/ James D. Heisman_
> James D. Heisman (# 2746)

8

**Exhibit B**

# INTERNATIONAL STANDARD

# NORME INTERNATIONALE

## IEC
## CEI

## 60312

Fourth edition
Quatrième édition
2007-04

**Vacuum cleaners for household use –**
**Methods of measuring the performance**

**Aspirateurs de poussière à usage domestique –**
**Méthodes de mesure de l'aptitude à la fonction**



Reference number
Numéro de référence
IEC/CEI 60312:2007

60312 © IEC:2007                    – 23 –

### 2.8.2    Test equipment

Either of the alternative test equipment described in 5.2.8 may be used. The test report shall state which of the alternative test equipment has been used to obtain the air data.

### 2.8.3    Determination of air data

Air flow, vacuum and input power are determined for a number of throttlings sufficient for plotting curves of vacuum and input power against the air flow (see figure 12).

Prior to the sequence of measurements, the vacuum cleaner shall be operated unthrottled in accordance with 1.4.7 to establish a reference value of the exhaust air temperature for further measuring points.

For each measuring point, the air flow, vacuum and input power are recorded 1 min after the throttling. The cleaner is then again operated unthrottled to attain the reference conditions, which is checked by measuring the exhaust air temperature. This procedure is continued until all the entire curves have been plotted with the measuring point for maximum vacuum being the last one.

For each measuring point, the suction power $P_2$ is obtained as the product of the air flow $q$ and the vacuum $h$. The efficiency $\eta$ is calculated as the ratio of corresponding values of the suction power and input power. Curves of suction power and of efficiency are also plotted against the air flow (see figure 12).

### 2.9    Performance with loaded dust receptacle

### 2.9.1    General

The intention of this procedure is to provide means to measure the performance of a vacuum cleaner having a loaded dust receptacle. For this purpose the vacuum cleaner is submitted to cleaning ability tests with the air flow restricted to simulate the condition of a loaded dust receptacle.

NOTE   This test is not intended to measure the capacity of receptacle or filter.

The reduced air flow, that represents the loaded receptacle condition, shall be determined in accordance with 2.9.1.

With the vacuum cleaner prepared according to 2.9.3 to simulate the reduced air flow, the cleaner may be submitted to cleaning ability tests mentioned in 2.9.4 in order to estimate the alternations in performance of the vacuum cleaner.

For uprights with integral hose, the cleaner shall have a connecting tube attached to the hose.

NOTE   The method described is not suitable for vacuum cleaners where the soil passes through the fan before entering the receptacle.

### 2.9.2    Suction with loaded dust receptacle

### 2.9.2.1    Test equipment

The connecting tube of the vacuum cleaner is modified to include two openings, in accordance with figure 23a.The opening nearest the cleaning head is used to insert a pressure tapping and, thereby, attachment of a vacuum meter. The other opening is used for introduction of the test dust and is fitted with a valve.

NOTE   It should be ensured that the openings or any attachments thereto create no disturbance to the airflow in the connecting tube.

### 2.9.2.2    Test dust

Test dust,see figure 24, in accordance with 5.1.2.3, shall be used for loading the dust receptacle.

### 2.9.2.3    Test method

The vacuum cleaner is operated with the cleaning head set for hard surface and placed on a wooden surface with controls, if any, set to maximum input power.

With the feed tube closed, the vacuum cleaner is run for at least 10 min. The initial vacuum, $h_i$ is then recorded from the attached vacuum gauge

Prior to the injection of test dust, the starting value of the vacuum, $h$, with the feed tube opened shall be recorded.

The batch of test dust is prepared in accordance with the description in 5.1.2.3. It is uniformly spread on a flat surface, see figure 23b, taking care that the dust is evenly dispersed as shown. It shall be introduced steadily and continuously using the feed tube. During the dust feeding stage, the vacuum level is monitored. The feeding rate is such that 50 g is fed uniformly over 60 s (feed rate of 50 g per min). If the volume of receptacle is less than 1,5 l or the maximum airflow of the vacuum cleaner is less than 15 l per s then the feeding rate is reduced to 25 g per min.

The injection of test dust is terminated when one of the following conditions is first reached:

Condition 1: An indicator on the vacuum cleaner signals that the dust receptacle should be emptied or replaced.

Condition 2: The observed value of the vacuum has dropped to $40^{+0,5}_{-0}$ % of $h_s$.

Condition 3: The amount of injected test dust has reached a total of 50 g per l of the maximum usable volume of the dust receptacle (see 2.7)

NOTE   If the vacuum cleaner has 3.2 l maximum usable volume of dust receptacle, the third condition would occur when 160 g has been introduced. In case of 0.8 l maximum usable volume, the third condition would occur when 40 g has been introduced.

After closing the feed tube, the final value of the vacuum, $h_f$, shall be recorded. This value represents the vacuum attained at the reduced air flow due to loading of the receptacle. The condition for termination of dust injection shall be noted.

### 2.9.3    Throttling to simulate loaded dust receptacle

The vacuum cleaner shall be equipped with a clean dust receptacle and filters in accordance 1.4.5. with the feed tube closed. A suitable throttling method shall then be used to reproduce the vacuum value $h_f$.

NOTE   It is recommended that the throttling being brought about by inserting a suitable device between the motor/fan chamber and the dust receptacle.

### 2.9.4    Determination of performance with loaded dust receptacle

With the vacuum cleaner throttled in accordance with 2.9.2 any of the test procedures described in 2.1 to 2.6 may be carried out to determine the respective cleaning ability with loaded dust receptacle.

| wear layer: | 100 % polyamide |
| base: | polypropylene – fleece |
| backing: | non-coated textile |
| pile height: | (5 ± 0,5) mm |
| thickness: | (8 ± 0,5) mm in total |
| colour: | light beige |
| size: | 300 mm × 200 mm with the longer side in parallel with direction of the pile |

### 5.1.2    Standard test dust

#### 5.1.2.1    Mineral dust

The mineral dust shall consist of dolomite sand with the following grain size distribution (see also figure 3):

| Particle size range | Parts by weight |
|---|---|
| mm | % |
| < 0,020 | 20 |
| 0,020 < 0,040 | 10 |
| 0,040 < 0,075 | 10 |
| 0,075 < 0,125 | 10 |
| 0,125 < 0,25 | 20 |
| 0,25 < 0,5 | 16 |
| 0,5 < 1,0 | 11 |
| 1,0 < 2,0 | 3 |

#### 5.1.2.2    Carpet test dust

Measurement of dust removal ability from carpets is carried out with the following test dust:

Test dust: Sieved from CEM 1 according to ISO 679        Grain size: 0,09 mm / 0,20 mm

#### 5.1.2.3    Simulated household dust

Test dust for establishment of the filled dust receptacle condition shall be a homogeneous mixture of:

> 70 % by weight mineral dust, in accordance with 5.1.2.4

> 20 % by weight cellulose dust (Arbocel)

> 10 % by weight second cut cotton linters

The cotton linters shall be cut with an upper length of 4 mm in a linters screening mill. Before cutting, the linters shall have been pressed into a bale and stored at a temperature of (20 + 2) °C and a relative humidity of (40 + 5) % The residual moisture of the cut linters shall not exceed 2,5 %.

The test dust may be obtained ready-mixed or be prepared by adding to a mixing vessel the separate components alternating in the order: mineral dust, cellulose dust, cotton linters. The mixing vessel shall be part of tumble mixer which can be operated at 28 r/min with a tilting angle of 150°/r.

### 5.1.2.4    Dust loading mineral dust

The mineral dust for simulation of household dust shall consist of dolomite sand with the following grain distribution.

| Particle size range | Parts by weight |
|---|---|
| mm | % |
| < 0,005 | 9 |
| 0,005 < 0,010 | 5 |
| 0,010 < 0,020 | 8 |
| 0,020 < 0,040 | 11 |
| 0,040 < 0,075 | 10 |
| 0,075 < 0,125 | 7 |
| 0,125 < 0,250 | 20 |
| 0,250 < 0,500 | 24 |
| 0,500 < 1,000 | 6 |
| 1,0000 < 2,000 | 0 |

### 5.1.2.5    Emission test dust

The test dust for measurement of dust emission shall have the following particle size distribution.

| Particle size range | Parts by weight |
|---|---|
| µm | % |
| < 5 | 39 ± 2 |
| 5 < 10 | 18 ± 3 |
| 10 < 20 | 16 ± 3 |
| 20 < 40 | 18 ± 3 |
| 40 < 80 | 9 ± 3 |

### 5.1.2.6    Test soil

Soil for test of wet cleaning effectiveness on carpet shall be a homogeneous mixture of:

| | |
|---|---|
| 1 part by weight: | grease-free grey pigment |
| 3 parts by weight: | sieved carpet dirt, collected from household vacuum cleaners |
| 25 parts by weight: | carpet test dust, in accordance with 5.1.2.2 |

For each series of tests, the test soil shall be from the same production batch and mixed at one time.

The test soil is prepared in two steps, using a soil mixer in accordance with 5.2.17. First, the grease-free grey pigment and sieved carpet dirt are mixed at 20 r/min for 15 min. Then the carpet test dust is added and mixed at 60 r/min for 30 min.

NOTE 1   The test soil should be handled carefully in order to prevent components from separating.

NOTE 2   It is recommended to mix a minimum batch of 500 g.

**Exhibit C**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **DYSON, INC.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No. 06-654-GMS** |
| | ) | |
| | ) | |
| **MAYTAG CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANTS' OBJECTIONS AND RESPONSES
## TO PLAINTIFF'S SPECIAL INTERROGATORIES NOS. 8 and 9

Defendants, by and through its counsel, hereby submits the following objections and responses to Plaintiff's Special Interrogatories Nos. 8 and 9.

### I.    GENERAL OBJECTIONS

1.    To the extent these Special Interrogatories may be construed as calling for the production of information that is subject to a claim of privilege, including, without limitation, the attorney-client privilege or the work product doctrine, Defendants assert that privilege and objects on that basis.  To the extent any information protected by the attorney-client privilege or the work product doctrine or by any other applicable privilege is produced inadvertently, Defendants have not authorized such production, and no waiver of any privilege shall be inferred from such inadvertent production.

2.    Defendants object to Dyson's Special Interrogatories to the extent they impose upon Defendants obligations which exceed those imposed by the Federal Rules of Civil Procedure and the Local Rules.

3.    To the extent these Special Interrogatories call for the production of information of a non-public, confidential, or proprietary nature, including trade secrets and/or commercial, financial or other information that has not been disseminated publicly, or any other

CHI:1906299.1

matter protected by any commercial information or similar privilege, Defendants hereby assert the confidentiality of such information. Defendants' answers to these Special Interrogatories are hereby designated as Highly Confidential under the terms of the parties' agreed upon Protective Order and any letter or oral agreements among the parties regarding the confidentiality of documents and other information.

4.      Defendants object to these Special Interrogatories to the extent they seek information not reasonably calculated to lead to the discovery of admissible evidence; which is unreasonably cumulative or duplicative, or obtainable from some other source that is more convenient, less burdensome or less expensive; or which Dyson has ample opportunity to obtain from other sources.

5.      Defendants object to these Special Interrogatories to the extent they seek overly broad information over which Defendants exercise no control or has no knowledge.

6.      Defendants object to these Special Interrogatories to the extent they encompass topics and seek information beyond the scope of the Court order which permitted Dyson to serve these interrogatories. *See* Telephone Conference Tr. at 18-19 (Mar. 29, 2007).

7.      Defendants object to these Special Interrogatories to the extent Dyson intends to equate from Defendants' responses any legal conclusions or determination of liability related to this lawsuit.

8.      Defendants' responses are based on information currently in Defendants' possession. Investigation continues, and Defendants reserve the right to supplement their responses to these Special Interrogatories.

## II.    RESPONSES AND OBJECTIONS TO SPECIAL INTERROGATORIES

8.      Identify any and all steps taken by Maytag, including any of its affiliated entities and successors, between September 7, 2006 and the present, to substantiate or otherwise validate advertising or marketing claims made about either the Hoover Fusion or Maytag Legacy products to the effect that the products have "No Loss of Suction." (For

2

purposes of this interrogatory, "identify" means state the date such steps were taken, describe the "steps," state the names and corporate affiliations of all persons who took and or who were responsible for taking such "steps," and state the results of such "steps.")

Maytag has not taken any "steps" between September 7, 2006 and the present to substantiate or otherwise validate advertising or marketing claims made about either the Hoover Fusion or Maytag Legacy products to the effect that the products have "No Loss of Suction."

REDACTED

9.    Identify any and all communications with either the National Advertising Division of the Better Business Bureau or the Federal Trade Commission regarding advertising claims made about the Hoover Fusion or the Maytag Legacy between August 2006 and the present. (For purposes of this interrogatory, "identify" means state the date, persons involved in, and substance of each such communication. "Present" means as of the date of the response to this interrogatory.)

The following communications with either the National Advertising Division of the Better Business Bureau or the Federal Trade Commission regarding advertising claims made about the Hoover Fusion or the Maytag Legacy took place between August 2006 and the present.

REDACTED

REDACTED

Respectfully submitted,


By: /s/ Francis DiGiovanni
    Counsel for Defendants

    Kimball R. Anderson
    Stephen P. Durchslag
    Anthony DiSarro
    Lisa J. Parker
    Winston & Strawn LLP
    35 W. Wacker Drive
    Chicago, IL 60601
    Phone (312) 558-5600
    Fax (312) 558-5700

4

Francis DiGiovanni (#3189)
James D. Heisman (#2746)
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 N. Orange Street
Wilmington, DE  19899
Phone (302) 658-9141
Fax (302) 658-5614

#536868

5

## CERTIFICATE OF SERVICE

I, Francis DiGiovanni, hereby certify that on May 2, 2007, I caused a copy of the foregoing document to be served on the below-listed counsel of record in the manner so indicated:

### BY HAND AND E-MAIL:

John W. Shaw
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

### BY E-MAIL AND U.S. MAIL:

Chad S. Hummel
Kathrin A. Wanner
Manatt Phelps & Phillips, LLP
11355 West Olympic Boulevard
Los Angeles, CA 90064

Christopher A. Cole
Manatt, Phelps & Phillips, LLP
700 12th Street, N.W.
Washington, DC 2005

Steven F. Reich
Jeffrey S. Edelstein
Manatt, Phelps & Phillips, LLP
7 Times Square
New York, NY 10004

/s/ Francis DiGiovanni
Francis DiGiovanni (#3189)